UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

\*    \*    \*

KEVIN JOHNSON,                    :
      Plaintiff,              :
    - vs -                        : NO: 1:21-cv-00201-JMS-MG
JOHN PERDUE, et al.,              :
      Defendants.             :

\*    \*    \*

TELEPHONIC DEPOSITION OF KEVIN JOHNSON

APPEARING REMOTELY FROM

BURKESVILLE, VIRGINIA

MONDAY, FEBRUARY 7, 2022

9:00 a.m.

REPORTED BY:

LISA M. COOPER, COURT REPORTER

APPEARING REMOTELY FROM DEPTFORD, NEW JERSEY

\*    \*    \*

U.S. LEGAL SUPPORT
Northeast Processing Center
1818 Market Street, Suite 1400
Philadelphia, Pennsylvania  19103
(877)  479-2484

Exhibit A

1    REMOTE APPEARANCES:

2
            KEVIN JOHNSON (#1007485)
3    NOTTOWAY CORRECTIONAL CENTER
     Inmate Mail/Parcels
4    2892 Schutt Road
     PO Box 488
5    Burkeville, Virginia  23922
     -- Representing himself Pro Se
6

7    KATZ KORIN CUNNINGHAM, P.C.
     BY:  ERIKA L. STEUERWALD, ESQUIRE
8    The Emelie Building
     334 N. Senate Avenue
9    Indianapolis, Indiana  46204
     esteuerwald@kkclegal.com
10   -- Representing the Defendants, Ciemone
     Easter-Rose, PhD, HSPP, Dawn Ingalls, DA,
11   Gregg Noll, DDS, Patricia Northcutt, BHS,
     Martin Perdue, LSW, and Wexford of Indiana,
12   LLC

13
     OFFICE OF THE INDIANA STATE ATTORNEY GENERAL
14   BY W. ANDREW KIRTLEY, ESQUIRE
     200 W. Washington Street, Suite 219
15   Indianapolis, Indiana  46204
     andrew.kirtley@atg.in.gov
16   -- Representing the Defendants, Robert Carter
     and Dushan Zatecky
17                  *    *    *

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2

 3    WITNESS                               PAGE

 4

 5    KEVIN JOHNSON

 6

 7          By:  Ms. Steuerwald          28, 104

 8          By:  Mr. Kirtley                87

 9

10                   *     *     *

11

12

13

14                E X H I B I T S

15

16    NUMBER          DESCRIPTION      PAGE MARKED

17    None marked

18

19

20                   *     *     *

21

22

23

24

25
```

Exhibit A

 1  REPORTED REMOTELY FROM GLOUCESTER COUNTY, NEW JERSEY

 2          THE COURT REPORTER:  The attorneys

 3      participating in this deposition acknowledge

 4      that I am not physically present in the

 5      deposition room and that I will be reporting

 6      this deposition remotely.  They further

 7      acknowledge that, in lieu of an oath

 8      administered in person, the witness will

 9      verbally declare his/her testimony in this

10      matter is under penalty of perjury.

11          The parties and their counsel consent to

12      this arrangement and waive any objections to

13      this manner of reporting.  Please indicate

14      your agreement by stating your name and your

15      agreement on the record.

16          MR. KIRTLEY:  Andrew Kirtley, we agree.

17          MS. STEUERWALD: Erika Steuerwald, for

18      the medical defendants.  We agree.

19                    *    *    *

20              (It is hereby stipulated by and

21      among counsel for the respective parties

22      that sealing, certification, and filing are

23      waived, and that all objections, except as to

24      the form of the question, are reserved until

25      the time of trial.)

Exhibit A

1                    *    *    *

2              KEVIN JOHNSON,

3     after having been first duly sworn, was

4     examined and testified as follows:

5                    *    *    *

6          THE WITNESS:  Before we proceed, I would

7     like to state a concern that was made and

8     reserve a formal objection and a motion for

9     protective order under Federal Rule of Civil

10    Procedure 26D1E.  I'm being compelled to

11    participate in this deposition with counsel

12    present and I expressed to him my objection

13    to that.

14         And the basis of which he said his

15    presence is to be a witness for me.  I talked

16    to him Friday about this.  I have an

17    objection to his presence.  And I do -- the

18    Court does have the right -- or the parties

19    do have a right to address concerns with who

20    will be present during a deposition, if

21    there are objections to any particular

22    person.

23         I think the parties, counsel, and the

24    reporter should be present.  Conflict of

25    interest and other concerns that I have with

Exhibit A

1    his presence.  So if you all cannot arrange

2    to have him removed, I would move to put this

3    proceeding off and allow me to file a motion

4    for a protective order under the Federal Rule

5    of Civil Proceeding 26D1E to have this

6    deposition conducted just between the parties

7    and the transcriber present.

8        MS. STEUERWALD:  Mr. Johnson, it's

9    common practice for inmates to have

10   correctional staff in the room with them in a

11   deposition.

12       THE WITNESS:  In my experience actually

13   it is not.  If they are conducted like legal

14   calls.  As I explained, he's not here for

15   security purposes.

16       MS. STEUERWALD:  We are not your

17   attorney.  We represent -- I represent the

18   medical defendants and Mr. Kirtley represents

19   the State.

20       THE WITNESS:  I understand that

21   completely.  And I represent myself pro se.

22   And, again, my concerns are on my behalf.

23   Not on behalf anyone else.  And I'm not

24   asking you all to assert my concern.  That's

25   why it would be up to the Court to determine

1    who can be present and who not.  Because as I

2    said, I have an objection to his presence.

3          And it's not necessary on behalf of

4    matters in which they could allow, which they

5    would do with a legal call, this deposition

6    be conducted as a confidential call between

7    the parties and with the court reporter

8    present.  He's not here for security reasons.

9    He's not a security staff member.

10         MR. KIRTLEY:  Mr. Johnson, this is

11   Andrew Kirtley.  So as you remember, this

12   involves your Indiana litigation.  So we have

13   -- Erika's from Indiana.  I'm from Indiana.

14   We have nothing to do with your Virginia

15   correctional facility, nor could we tell them

16   to do anything, or anything like that.

17         So I know in my experience in Indiana,

18   and in a few other places as well, this --

19   this has never come up.  I've never had an

20   objection on this.  But even if you had one I

21   don't know that --certainly we could not, but

22   I don't know what the court could really

23   order either in this case.  So I -- are you

24   saying you do not want to proceed with him in

25   the room?

Exhibit A

1        THE WITNESS:  That's my concern.  I'm

2   absolutely willing to move forward with the

3   deposition.  I'm perfectly willing to

4   participate and cooperate.  My objection is

5   with him being present, yes.  It's not for

6   security reasons.  It's not essential.  It's

7   not necessary.  And the rationale he gave me

8   for being here is not any essential purpose.

9        I have a conflict of interest with

10   specific individuals here with respect to

11   potential litigation and matters related to

12   pending litigation.  So my concern is based

13   on matters related to me.  It's not related

14   to you all.  It's not related to you all

15   being located in Indiana.

16        The fact that you are located in Indiana

17   doesn't, you know, detract from my concerns.

18   So, I mean, if you could address it with the

19   personnel here.  As I explained, I talked to

20   him about it Friday and his statement was he

21   was a witness for me.  I don't want him here

22   as a witness.  He's not my witness.  We have

23   a conflict of interest.  So we have no shared

24   concern.  So again --

25        MS. STEUERWALD:  Mr. Johnson, this is

Kevin Johnson
February 07, 2022

1    Erika Steuerwald for the medical defendants.

2    Like Mr. Kirtley said, this is about your

3    lawsuit from Indiana while you were housed at

4    the Pendleton Correctional Facility.  You

5    have sued my clients for issues regarding

6    dental care and mental health care.

7        And this deposition is part of the

8    process when you sue -- as you know, you have

9    sued quite a few people in your time, and so

10   you understand that this is part of the

11   discovery process.  Are you -- and Mr.

12   Kirtley said correctly, we cannot tell the

13   Virginia prison what to do.  We are here in

14   Indiana.  It's -- if that person is in the

15   room with you, if the counselor is in the

16   room will you not proceed in this deposition?

17       THE WITNESS:  I will ask to file

18   a motion under Federal Rule of Civil

19   Procedure 26D1E for protective order.  Which

20   I would have a right to not proceed and to

21   follow that motion regarding who can be

22   present during the deposition.  I'm not

23   refusing to participate or cooperate in the

24   deposition.  My concern is with the presence

25   of a person during this deposition that I

Exhibit A

1    object to.

2         MS. STEUERWALD:  Andrew, how would you

3    like to proceed?

4         MR. KIRTLEY:  I'd be fine with asking

5    some questions and getting a brief

6    transcript.  And then I could potentially

7    file a motion to dismiss with that as failure

8    to cooperate in discovery.  Or we could call

9    the Magistrate.  However you want to handle

10   it is fine with me.

11        MS. STEUERWALD:  Mr. Johnson --

12        THE WITNESS:  That is a right of a party

13   to file a motion for a protective order under

14   Federal Rule of Civil Procedure 26D1E, to

15   determine who may be present during the

16   deposition.

17        MS. STEUERWALD:  Mr. Johnson, if we --

18   if we move forward and go on the record here

19   will you answer our questions?

20        THE WITNESS:  So you're denying me a

21   right to file this motion for protective

22   order, is that what you're saying?  Against

23   this discovery.  And I only just found out

24   Friday that he's going to be present.  If I

25   would have known this ahead of time I would

1  have filed this before all of this was

2  arranged.  So I'm not refusing to participate

3  in this deposition.

4      My concern is with his presence.  And it

5  would totally invalidate my concern about his

6  presence if you proceed with the deposition

7  above my objection when I have a right, under

8  the Federal Rules and on this particular

9  ground, to file for a motion of protective

10  order before any deposition commences.

11      Particularly when I was not notified

12  that he was going to be present within a

13  reasonable time where I could have filed

14  that motion before all of this was arranged.

15      MS. STEUERWALD:  Okay.  Mr. Johnson, Mr.

16  Kirtley and I are going to call the

17  Magistrate Judge, Mario Garcia, because we

18  are viewing this as failure to cooperate in

19  the deposition.  As you know, we have a right

20  to take your deposition under discovery.  And

21  the Court can order -- and the Court can

22  compel you to take this deposition.

23      THE WITNESS:  I'm not refusing to take

24  the deposition.  My only concern is with the

25  presence of this individual.

Exhibit A

1          MS. STEUERWALD:  Okay.

2          MR. KIRTLEY:  So, Mr. Johnson, if Erika

3     and I start asking you questions, are you

4     going to answer them?  I guess that's what

5     this boils down to.

6          THE WITNESS:  Are you all willing to

7     consult with the officials at this

8     institution to see if you can conduct this

9     deposition without this individual present?

10         MR. KIRTLEY:  We couldn't tell him to do

11    anything.  He doesn't have to do anything.

12    Nor could we tell him to do anything.  We're

13    not going to -- that's not our place to do

14    that.  So that's my question, are you going

15    to answer questions if we start asking them

16    to you?

17         THE WITNESS:  I'm going to file a motion

18    for protective order.  And a motion for

19    protective order precludes the necessity to

20    participate until the court will decide

21    whether or not this person should be present

22    during the deposition.

23         MR. KIRTLEY:  Erika, let's just go ahead

24    and call the Magistrate.

25         MS. STEUERWALD:  Sure.  And should we

Exhibit A

1  leave a record, Andrew, that we're calling

2  the Magistrate?  Or do you want to do that

3  after?

4        MR. KIRTLEY:  We can just do that after,

5  I think.

6        MS. STEUERWALD:  Okay.  All right.

7  Lisa, if you'll stay on the line.

8              *    *    *

9        (Whereupon, a short break was taken.)

10             *    *    *

11       JUDGE GARCIA:  This is Magistrate Judge

12 Mario Garcia.  We are here for a discovery

13 conference in the matter of Kevin Johnson

14 versus Robert E. Carter and others.  I've got

15 Mr. Johnson on the line.  Mr. Johnson?

16       THE WITNESS:  Yes, sir.

17       JUDGE GARCIA:  Good morning, sir.  And

18 with you -- let's see.  You are in Virginia,

19 is that right?

20       THE WITNESS:  Yes, I am.

21       JUDGE GARCIA:  At a correctional

22 facility?

23       THE WITNESS:  Yes, sir.

24       JUDGE GARCIA:  And you are sitting for a

25 deposition today, is that right?

Exhibit A

1      THE WITNESS:  Yes, we are.

2      JUDGE GARCIA:  All right.  And for the

3   defendants, I believe we have Counsel -- is

4   it Steuerwald?

5      MS. STEUERWALD:  Yes.  Erika Steuerwald

6   for the medical defendants, Wexford of

7   Indiana and others.

8      JUDGE GARCIA:  All right.  Good morning,

9   Ms. Steuerwald.  And then do we have a deputy

10  attorney general on the line?

11     MR. KIRTLEY:  Andrew Kirtley for the two

12  State defendants.

13     JUDGE GARCIA:  Okay.  Mr. Kirtley for

14  the State defendants.  Got it.  Okay.  All

15  right.  So as I understand it, defendants

16  from Wexford reached out because there was a

17  discovery dispute occurring.  In simple

18  terms, Ms. Steuerwald, what can we do today?

19  What's the issue?

20     MS. STEUERWALD:  Judge, we have -- it's

21  been very difficult to schedule this

22  deposition.  Mr. Johnson is housed in a

23  Virginia correctional facility, so he's no

24  longer in Indiana.  And we have only been

25  able to schedule this deposition via phone,

Exhibit A [14]

1    and video conferencing is not available at

2    the facility.

3        Mr. Johnson has someone in the room with

4    him from the Virginia correctional facility.

5    I believe he is a mental health staff member.

6    And Mr. Johnson will not move forward with

7    the deposition while this correctional staff

8    member is in the room.  And, Andrew, please

9    feel free to add anything.

10        MR. KIRTLEY:  That's my understanding as

11    well.

12        JUDGE GARCIA:  All right.  Mr. Johnson,

13    why don't you tell me about what's going on

14    from your perspective this morning.

15        THE WITNESS:  All right.  My concern,

16    and I expressed to counsel a concern to file

17    to a motion for protective order under Rule

18    26D1E under Federal Rules of Civic Procedure

19    regarding who can be present during a

20    deposition.  The person who is present is not

21    a mental health staff member.  They have no

22    medical nor mental health license as a

23    counselor.  He's a basic correctional staff

24    member.  He's not security.

25        I spoke with him Friday asking him about

Exhibit A

1    the deposition, how it will be conducted, and

2    he said he will be present.  And I asked him

3    for what purpose.  He said as my witness.

4    And I explained to him that I didn't need him

5    as a witness.  And it's very clear this

6    institution, throughout the Department of

7    Corrections, legal calls may be conducted

8    without staff being present.  So he's not

9    present for security issues.

10           The issues that I anticipate being

11   addressed this morning will run a wide range

12   of medical, mental health and dental issues,

13   which are all privileged issues.  And unless

14   we're in open court, dealing with this as a

15   trial matter, or a matter with some motion, I

16   think we will be covering ground that is

17   privileged.

18           And of course privileged issues may be

19   objected to and not answered in a deposition.

20   Of course if I have objections or something

21   on other grounds that's relevant to what have

22   you, I can state my objection, but I'm still

23   required to move forward with answers through

24   a deposition.

25           In this case these are specific

1    privileges dealing with confidentiality of

2    medical, dental and mental health issues that

3    I do not wish to divulge in the presence of a

4    nonmedical, nonmental health, non dental

5    staff person.  That's my concern.

6          And I would like to be given an

7    opportunity to, if he cannot be simply asked

8    to allow me to have this deposition conducted

9    in a private setting, which is not a problem,

10   because it's done all the time in legal

11   calls, that I be allowed to file a motion for

12   protective order under Rule 26 that deals

13   specifically with who may be present during a

14   deposition and state the basis for my

15   concern.

16          I'm fully willing to participate in the

17   deposition.  I'm not refusing to answer

18   questions.  But my concern is one related to

19   privilege.

20          JUDGE GARCIA:  Sure.  Well, it's --

21   let's -- if I can, what's the name of the

22   counselor who's present?

23          THE WITNESS:  His name is MacDonald.  He

24   is sitting right here.  He can hear you.

25          JUDGE GARCIA:  Okay.  Hi, Counselor

1    MacDonald.  How are you?

2         MR. MACDONALD:  Yes, sir.  How are you

3    doing?  Counselor MacDonald.

4         JUDGE GARCIA:  Hi.  Good, Counselor

5    MacDonald.  How are you?

6         MR. MACDONALD:  I'm doing okay.  How

7    about yourself?

8         JUDGE GARCIA:  I'm okay.  Hey, it sounds

9    like we've got a small discovery dispute

10   that's arisen.  Is there a practical solution

11   by asking you to sit outside of the room

12   while Mr. Johnson gives his deposition today?

13        MR. MACDONALD:  That's where I was going

14   to go next.  Do you know how long -- how long

15   it's supposed to last?

16        JUDGE GARCIA:  You know, I don't.  Let

17   me hear from the attorneys for the -- the

18   defendants.  Ms. Steuerwald, how long do you

19   expect to go today?

20        MS. STEUERWALD:  Anywhere from two to

21   three hours.  It just depends on how

22   plaintiff answers our questions.  We can be

23   quick or it can be longer.

24        JUDGE GARCIA:  Sure.  Two to three

25   hours, Mr. MacDonald.

Exhibit A

1    MR. MACDONALD:  Okay.  I think we can

2    try to be flexible.  Because we really do

3    want to try to take care of -- take care of

4    this today, right?

5        JUDGE GARCIA:  Yeah.  It would save

6    everybody a lot of time and efficiency going

7    forward without the Court having to get

8    involved in the future if we can make that

9    accommodation today.  That would be much

10   appreciated.

11       MR. MACDONALD:  Okay.  Okay.  Let me --

12   let me -- let me have a conversation with the

13   -- with Mr. Johnson and then I'll give you an

14   answer on that, okay?

15       JUDGE GARCIA:  Okay.  We'll stand by for

16   a few minutes.  Just -- you take your time.

17   We're here.

18       MR. MACDONALD:  Okay.  Thank you, sir.

19                *    *    *

20       (Pause in the proceedings.)

21                *    *    *

22       MR. MACDONALD:  I'm back.  I had a

23   conversation with Mr. Johnson.  And he was --

24   sir, I'm going to let him speak to you and

25   explain what -- what we had just discussed

Exhibit A

1    right now.  I'm going to hand the phone to

2    him.

3         JUDGE GARCIA:  That's fine.

4         THE WITNESS:  His proposal is that he

5    will step outside of the office.  But he can

6    still very clearly hear me outside the

7    office, though, just like we can hear other

8    staff outside the office door talking inside

9    here.  So it's still a very clear line of

10   being able to hear what's being communicated.

11        Like I said, under normal circumstances

12   with a legal call, they have areas where you

13   can conduct legal calls in complete privacy

14   where staff cannot hear anything that's being

15   discussed.  And that's my concern.

16        JUDGE GARCIA:  I understand, Mr.

17   Johnson.  And I'm trying to strike a balance

18   between your reasonable expectation of

19   privacy and the need to move the case

20   forward.  You know, when legal calls

21   ordinarily occur, those are with, you know,

22   your counsel.  And those are expected, and,

23   in fact, the law provides that those are

24   privileged communications that can't be

25   monitored.

Exhibit A

1    In this case you're providing open and

2    public testimony through a deposition.  And,

3    of course, the prison already has access and

4    knows about your medical history.  So I think

5    it's a fair accommodation that Mr. MacDonald

6    is going to at least step outside of the room

7    to make it semi-private for you to provide

8    the testimony that you're providing.  And I

9    think that -- you know, that's the

10   instruction the court would give.

11        THE WITNESS:  Okay.  And I would note my

12   objection.  I would still like to file

13   a motion of protective order.  But the

14   privilege of attorney client privileges is no

15   stronger, no, not stronger, than the

16   privilege of medical, mental health and

17   dental confidentiality.

18        JUDGE GARCIA:  But, Mr. Johnson, you're

19   providing open and public testimony through a

20   deposition.  It's not -- you're not speaking

21   with your own counsel in an attorney client

22   privileged communication.

23        THE WITNESS:  I agree.  But the question

24   is after the deposition what would remain

25   part of the record.  And whether we're going

Kevin Johnson
February 07, 2022

1  afar afield of things that are open in public

2  record and would be allowed to remain there,

3  because I would be able to object to certain

4  things to remain in the record or be in

5  public and am asking that maybe they be --

6  they be kept confidential or, you know, a

7  protective order issued for certain portions

8  of the deposition.

9      JUDGE GARCIA:  So, of course, if the

10  defendants were to move for summary judgment,

11  or to file and attach portions of your

12  transcript to any motion, if you believe that

13  that material is contrary to the need for

14  public disclosure, then you could move to

15  seal it, or strike it, if it's not relevant

16  to the proceedings at hand.

17      THE WITNESS:  I agree a hundred percent.

18  And that would be the concern now, why would

19  this man be exposed to potentially

20  confidential information?  That's not

21  necessary.

22      JUDGE GARCIA:  Well, like I said, I

23  think we're striking a reasonable balance

24  here where he's going to provide you with a

25  semi-public -- I'm sorry, semi-private space

Exhibit A

1   to conduct a deposition.  The facility is

2   already aware that, in fact, you give up some

3   limitation on the privileges that you have

4   inside of the facility.

5        And so you know, my instruction will

6   be to go ahead and move forward with the

7   deposition this morning.

8        THE WITNESS:  Okay.  And I will state my

9   objection for the record and I will also ask

10  to be allowed, even after your decision, your

11  oral decision, to file a motion for

12  protective order.

13       JUDGE GARCIA:  Hold on just one second

14  here.  Let me just look at the rule.  One

15  second.

16                    *    *    *

17       (Pause in the proceedings.)

18                    *    *    *

19       JUDGE GARCIA:  All right.  So are you

20  making an oral motion?  Or are you asking to

21  follow up with one?

22       THE WITNESS:  I'm going to file one in

23  light of what you said and in light of their

24  response to my concerns.  I want to file

25  a formal motion for the record for appealing

Exhibit A

1  purposes if that becomes necessary.

2      JUDGE GARCIA:  Sure.  And that's fine.

3  And I would certainly grant you that leave to

4  do so.  And, furthermore, why don't I do

5  this.  Why don't I instruct the defendants to

6  not disclose the contents of your deposition

7  until you've had a chance to at least file

8  for that protective order.

9      MR. KIRTLEY:  Your Honor, the State

10  would have no objection to that, provided all

11  of that was filed before the file a motion

12  deadline.

13      JUDGE GARCIA:  Sure.  Of course.

14      THE WITNESS:  That kind of contradicts

15  the concern with a nonmedical person being

16  present now.  If it's potentially a future

17  concern with the privilege, why does the

18  privilege not exist in relation to this

19  individual in dealing with this deposition?

20      JUDGE GARCIA:  Because I don't find that

21  there is -- go ahead, Ms. Steuerwald.

22      MA. STEUERWALD:  Judge, if I may, it is

23  policy and practice for a correctional staff

24  member to be present for via virtual or phone

25  depositions.  And especially with maximum

1    security prisoners, there's always a

2    correctional staff member in the room, due to

3    security concerns.  And from my

4    understanding, Mr. Johnson has been and may

5    still be classified as maximum security.

6        JUDGE GARCIA:  Well, I'm not concerned

7    about any security issues, because those

8    haven't been raised by the facility.  It

9    sounds like Counsel MacDonald is willing to

10   make a modification to the procedures this

11   morning and stand outside of the room.  That

12   creates a semi-private space that Mr. Johnson

13   would be allowed to provide his testimony.

14       What I would anticipate doing is giving

15   the parties 30 days, Mr. Johnson, to file for

16   any protective order and ask that the

17   defendants withhold from disclosing any of

18   the information in your deposition for at

19   least 30 days, to give you time to file

20   a motion for protective order.  And would

21   instruct the parties to move forward with the

22   deposition.

23       If you don't want to move forward with

24   the deposition, then of course that could

25   result in discovery sanctions against you.

Exhibit A

1    Do you understand?

2         THE WITNESS:  I do.  And I made it clear

3    I'm not refusing to participate in discovery.

4    Let me just say this and I'll be done with

5    it.  I think it's kind of a contradiction

6    that the protective order would be against

7    this person who has no medical qualifications

8    sitting in on this deposition.  It's just

9    going to be a spontaneous discussion of

10   medical, dental, mental health issues.

11        JUDGE GARCIA:  You've already provided

12   that -- that facility already has access to

13   your mental and medical health and history

14   information.

15        THE WITNESS:  That's one of the issues

16   in this case now is mental health, medical

17   and dental records being exposed to

18   nonmedical mental health and dental

19   personnel.  Which is both a constitutional

20   issue, an issue under the HIPAA Privacy Act,

21   and an issue under State law dealing with

22   private and confidential medical, mental

23   health and dental issues.

24        JUDGE GARCIA:  Well, that's -- that's

25   the ruling of the Court.  So, you know, when

1    you brought the lawsuit alleging these

2    claims, and potential damages, the defendants

3    are entitled to explore those with you.  And

4    so you put those out into the public space.

5    I believe Counsel MacDonald is offering you a

6    reasonable accommodation.  And so I'm going

7    to instruct the deposition to go forward.  Is

8    there anything else I can help you with this

9    morning, Mr. Johnson?

10        THE WITNESS:  No.  That would be it.

11        JUDGE GARCIA:  Okay.  Anything else, Ms.

12   Steuerwald?

13        MS. STEUERWALD:  Thank you, Judge.  We

14   appreciate your time and for hopping on so

15   quickly.

16        JUDGE GARCIA:  Sure.  Anything further,

17   State?

18        MR. KIRTLEY:  No, your honor.  Thank

19   you.

20        JUDGE GARCIA:  Okay.  All right, folks.

21   Thank you very much.  And let us know if

22   anything else arises.

23        MS. STEUERWALD:  Thank you.

24                *    *    *

25                EXAMINATION

Exhibit A

1                      *    *    *

2    BY MS. STEUERWALD:

3    Q.        Mr. Johnson, are we ready to move forward?

4    A.        He's still here.  All right.  He left the

5    room.

6    Q.        Okay.  Are you ready to proceed?

7    A.        Yes.  Will there be a problem with me stating

8    privileged objections if you ask questions that I feel

9    are confidential?  Would it be my right in the

10   deposition?

11              MS. STEUERWALD:  Mr. Kirtley -- Andrew,

12              would you like to weigh in on that?

13              MR. KIRTLEY:  I didn't catch all of it.

14              I -- I would just say under Rule 6, I think

15              anything we're going to ask you is going to

16              be discoverable information.  I can't imagine

17              there's going to be anything beyond that.

18              THE WITNESS:  There are also privileges

19              as far as objections that may be raised and

20              the deponent is going to have to respond when

21              questions are asked that invade the space of

22              privileged issues.

23   BY MS. STEUERWALD:

24   Q.        Mr. Johnson, if you're not -- if you don't

25   answer a question, we may have to get the Judge on the

1  line again.  You have -- like the Judge mentioned, you

2  have asserted your mental health and medical issues in

3  this lawsuit, which are public domain.  Everything in

4  your Complaint is in the public domain and a public

5  record.  And so we can move forward and we can take it

6  question by question.  But I will -- I will ask you to

7  answer the questions.  You can note your objection for

8  the record, but we're going to ask you to move forward.

9  A.        All right.  And I will raise complaints

10 concerning discussing private matters for people

11 without privilege in a nonpublic situation.  It's not

12 -- a deposition is not a public domain.  All right.

13 Q.        My name is Erika Steuerwald.  I'm an attorney

14 representing the medical defendants in a Federal

15 lawsuit that you filed against them.  Can you please

16 state and spell your name for the record?

17 A.        Do you mean my incarcerated name, or my legal

18 name?

19 Q.        Could you please provide both?

20 A.        My first name is Orlando, O-R-L-A-N-D-O, Lee,

21 L-E-E, Brene, B-R-E-N-E.  I'm being held under the name

22 Kevin Johnson.  K-E-V-I-N.  J-O-H-N-S-O-N.

23 Q.        Can you confirm your date of birth?

24 A.        My date of birth is October 3rd, 1971.

25 Q.        What is your Indiana DOC number?

Exhibit A

1    A.        It was 264847.  That was the number that was

2    imputed to me.

3    Q.        You understand that you filed a lawsuit in

4    Federal court?

5    A.        I filed several lawsuits in Federal court.

6    Q.        And that you specifically sued Martin Perdue,

7    Dr. Easter-Rose, Patricia Northcutt, Wexford of

8    Indiana, Dr. Noll and Dawn Ingalls?

9    A.        Yes, I did.

10   Q.        And these are the medical defendants that I

11   represent.  Mr. Kirtley represents the State

12   defendants.  So he will -- after me, he will ask you

13   questions.

14   A.        All right.

15   Q.        Have you ever been deposed before?

16   A.        No, I have not.

17   Q.        Have you ever filed a lawsuit before?

18   A.        Yes, I have.

19   Q.        Have you filed a lawsuit in Federal court?

20   A.        Yes, I have.

21   Q.        How many?

22   A.        I do not know.  I do not have the records of

23   those.

24   Q.        And you've never been deposed before?

25   A.        No, I have not.

Exhibit A

1    Q.        All right.  Before we get started I'm going

2    to go over some ground rules.  Our court reporter is on

3    the line and she's typing down every word that we say

4    here today.  In order for her to do that, please try to

5    speak slowly and clearly so she understands what's

6    being said.  And that way the transcript, when we're

7    done, will read clearly.

8    A.        I should notify you, as you probably can

9    tell, I am sick right now.  My voice is going, if not

10   almost gone.  I'm extremely hoarse.  I have a chronic

11   cough.  So I don't know that everything I say will be

12   clear and legible, because my voice is -- is

13   compromised right now.  But I will speak as clearly as

14   I can.  And I would, for the record, like to receive a

15   copy of the transcript of this deposition.

16   Q.        Thank you, Mr. Johnson.

17              MS. STEUERWALD:  Lisa, if you cannot

18              hear Mr. Johnson or cannot understand him,

19              will you jump in and ask him to repeat his

20              answers?

21              THE COURT REPORTER:  Yes, I will.

22              THE WITNESS:  But you do understand that

23              I'm requesting to review the deposition

24              transcript?

25   BY MS. STEUERWALD:

1  Q.        Yes.  And we will go over that at the end
2  when we advise you of the deposition.
3  A.        All right.
4  Q.        If I ask you a question and your answer is
5  yes or no, please try to say yes or no, as opposed to
6  yeah or a shake of your head.  Does that make sense?
7  A.        All right.
8  Q.        If you don't understand one of my questions,
9  you can ask me to repeat it or rephrase it.  But if you
10  do answer my question, we'll assume that you understood
11  what the question was.  Sound okay?
12  A.        Okay.
13  Q.        And, Lisa, the court reporter, is typing
14  everything we say.  I will do my best to let you finish
15  when you answer one of my questions.  And I just ask
16  that you do the same and let me finish my question
17  before you begin answering, so that we're not talking
18  over each other.  Does that sound fair?
19  A.        All right.
20  Q.        And you understand that you were just
21  administered an oath by the court reporter to answer
22  truthfully here today?
23  A.        All right.
24  Q.        And that will be the same oath that you would
25  take if this were to proceed to trial and you testified

1  in front of a Judge and a jury.

2  A.        I do intend to answer honestly, whether the

3  oath was administered or not.

4  Q.        I'm going to ask you some background

5  questions now.  And if it seems repetitive I apologize,

6  but I have to ask in every case.  How old are you?

7  A.        I'm 50 years old.

8  Q.        Where are you from?

9  A.        Richmond, Virginia.

10 Q.        Before being incarcerated, what did you do

11 for a living?

12 A.        I had various employments.  I was a

13 carpenter's assistant and I had worked in fast food.

14 Q.        What is your highest level of education?

15 A.        I have a GED.

16 Q.        Do you have any special skills or training?

17 A.        Not that I know of.

18 Q.        Have you ever been involved in any prior

19 civil lawsuits?

20 A.        Yes, I have.

21 Q.        Are they State or Federal suits?

22 A.        Both.

23 Q.        How many?

24 A.        I don't have the records of that.

25 Q.        What has been the outcomes of these cases?

Exhibit A

1    A.         Various.  As I said, there were a number of

2    them.  Various outcomes.

3    Q.         What has been the outcome?

4    A.         Some have been dismissed voluntarily.  Some

5    have been dismissed on dispositive motion.  Some of

6    them have been damages that have been recovered.

7    There's been a range of outcomes.  I don't have the

8    records.  Some were disposed of, a lot of those

9    records, when I returned to Virginia, as I explained to

10   the Court, in response to your questions did I have

11   access to my property or not.  I don't have access to

12   all of those records anymore.

13   Q.         Have you taken any medication so far today?

14   A.         Yes.  I take blood pressure for hypertension.

15   I take medication for cholesterol.  Yeah.

16   Q.         Will any of those medications impact your

17   ability to testify truthfully today?

18   A.         I wouldn't think so.  I should hope not.

19   Q.         Did you review any documents in preparation

20   for this deposition?

21   A.         No, I did not.

22   Q.         Do you have any documents in the room with

23   you?

24   A.         I have a file of this case.  I have a book

25   with the Federal Rules of Civil Procedure.  That's it.

1   I have a note pad and an ink pen.

2   Q.      Thank you.  Do you have a history of prior

3   drug use?

4   A.      No, I do not.

5   Q.      What about alcohol?

6   A.      No, I do not.

7   Q.      Did you ever receive substance abuse or

8   mental health treatment?

9   A.      Yes, I did.

10  Q.      For what?

11  A.      As a juvenile, a number of things.  But I

12  never actually used those substances or alcohol.

13  Q.      What kind of treatment was that?

14  A.      Just part of inpatient commitments through

15  various group homes, those sorts of things.

16  Q.      When did you enter the group home system?

17  A.      There were a number of commitments throughout

18  my adolescence.

19  Q.      About how old were you when that started?

20  A.      I'm not sure.  Probably around 15.

21  Q.      When did you first get incarcerated?

22  A.      1990.

23  Q.      For what?

24  A.      Being mistakenly identified as a person named

25  Kevin Johnson, who the police were looking for.

Exhibit A

Kevin Johnson
February 07, 2022

1   Q.        And what -- what did Kevin Johnson allegedly

2   do?

3   A.        I'm not sure.  There are a large number of

4   charges.  Kevin Johnson is a common name.  There are a

5   large number of charges in the City in which I was

6   incarcerated, their computer, under Kevin Johnson.  I'm

7   not even sure -- or I'm not -- I can't confirm which,

8   if all of them, may have been imputed against me

9   supposedly, being misidentified -- well, not supposedly

10  -- but being misidentified as said Kevin Johnson.  So

11  I'm not sure.

12  Q.        How long have you been incarcerated?

13  A.        Since 1990.

14  Q.        How many facilities have you been at?

15  A.        A large number.

16  Q.        What have been the most recent facilities

17  you've been at?

18  A.        At present I'm at Nottoway Correctional

19  Center in Virginia.  I was at -- prior to this, I was

20  at Southern Ohio Correctional facility in Lucasville,

21  Ohio.  Prior to that I was at Reception -- Ohio

22  Reception Center in Ohio.  Prior to that I was at

23  Wabash Valley Correctional Facility in Indiana.  Prior

24  to that I was at Pendleton Correctional Facility in

25  Indiana.  Prior to that I was at The Reception Center

Exhibit A

1    in Indiana.  Do you want me to continue?

2    Q.       Were those all the facilities that you've

3    been at in Indiana?

4    A.       Yes, they are.

5    Q.       When did you come to an Indiana correctional

6    facility for the first time?

7    A.       In November 2018.

8    Q.       Before you were incarcerated were you

9    diagnosed with any medical condition?

10   A.       Before my incarceration?  I don't understand

11   your question, when you say any medical condition.

12   Q.       Yeah.  So before you came into the prison

13   system did you have any medical condition?

14   A.       You mean like chronic medical condition?

15   Q.       Yes.

16   A.       No, I did not.

17   Q.       Were you prescribed any medication before you

18   were incarcerated?

19   A.       For chronic medical conditions, no, I was

20   not.

21   Q.       Okay.  And your suit today is regarding

22   Pendleton Correctional Facility, correct?

23   A.       Yes, it is.

24   Q.       Okay.  Let's talk about Pendleton now.  How

25   long were you housed at Pendleton?

Exhibit A

Kevin Johnson
February 07, 2022

1    A.       I was housed at Pendleton from November -- I

2    think around November 16th, 2018, somewhere around

3    there, until September of 2020.

4    Q.       And do all of your allegations in this

5    lawsuit relate to your care and treatment at Pendleton

6    Correctional Facility?

7    A.       There were some continuity of what began at

8    Pendleton.  So it may extend beyond conditions at

9    Pendleton.

10   Q.       While you were at Pendleton were you treated

11   for medical conditions?

12   A.       Yes, I was.

13   Q.       What medical conditions?

14   A.       Chronic hypertension.  Cholesterol.  As far

15   as chronic, yeah.

16   Q.       What about mental health?

17   A.       I was denied mental health care, as you are

18   aware, is one of the claims in my lawsuit.

19   Q.       What about dental care?

20   A.       Yes, I received dental care while I was at

21   Pendleton.

22   Q.       Were you prescribed any medications at

23   Pendleton?

24   A.       Yes, I was.

25   Q.       Were you prescribed any medication for mental

1    health?

2    A.          I was not given mental health care.  I was

3    refused.

4    Q.          Were you prescribed any medication for your

5    dental care?

6    A.          No, I was not.  Except Novocain.  No,

7    actually -- yeah, except Novocain when I received

8    dental care.  But for pain, no, I was not.

9    Q.          What did you do to occupy your time while you

10   were at Pendleton?

11   A.          Read, write.

12   Q.          Were you housed in a particular unit?

13   A.          I was housed in several units.

14   Q.          What were they?

15   A.          I was housed in the segregation unit.  And I

16   was housed in general population.

17   Q.          Why were you housed in the segregation unit?

18   A.          It's stated in my lawsuit.  Allegedly because

19   of my -- half of my detainer which didn't exist.  And

20   some claim of activity affiliation which I never had.

21   That claim's being addressed in the sister lawsuit to

22   this.

23   Q.          Were you in any group, clubs, or education

24   program?

25   A.          You mean provided by the facility?

Exhibit A

1  Q.        Yes.

2  A.        No, I was not.

3  Q.        Did you have access to rec and commissary?

4  A.        Commissary, yes.  Rec, not on a regular

5  basis, no.  Which is addressed, again, in the claims in

6  my original lawsuit.  I think that would be claim 9,

7  which addresses the fact that recreation was frequently

8  canceled because of the frequent claim that there were

9  insufficient staff or they didn't have available staff

10 to conduct what was supposedly regular scheduled

11 recreation opportunities.  And this would happen on

12 days and weeks on end in the segregation unit.

13 Q.        What did you typically buy out of commissary?

14 A.        A range of foods, which a lot of times I

15 would trade for vegetables and other foods that weren't

16 available on commissary that I needed for health

17 reasons.  And weren't regularly provided by the trades.

18 Q.        Could you repeat that last answer?

19 A.        I said I would buy food items that were not

20 -- that I would trade a lot of times for other foods

21 that weren't available on commissary or the regular

22 trade that were more healthy and that I would need for

23 health purposes.  I would also buy hygienic items.

24 Writing supplies.  Those sorts of things.

25 Q.        Did you buy any medication off of commissary?

Exhibit A

Kevin Johnson
February 07, 2022

1  A.        I wasn't aware that there were medications

2  available on commissary.

3  Q.        Things like Tylenol, ibuprofen?

4  A.        Oh, no.  I have -- my stomach is not very

5  accommodating to certain pain medications like that.

6  No, I never bought those.

7  Q.        When did you typically go to sleep?

8  A.        That's a range of hours.  I spend a lot of

9  time reading and writing.  My sleeping hours vary.  I

10  usually don't sleep more than about five hours a day.

11  And I sleep at different times.  During the day

12  sometimes.  During the night sometimes.  It depends.

13  Q.        What time did you get up?

14  A.        As said, I sleep different hours.  So I

15  didn't have a set time that I woke up or went to sleep.

16  Q.        Do you have -- did you have any passes or

17  permits while you were at Pendleton?

18  A.        I'm not clear what you mean by passes or

19  permits.

20  Q.        Like a bottom bunk pass, a wheelchair pass.

21  A bathroom pass.

22  A.        No.  Not that I'm aware of.

23  Q.        Did you have any jobs?

24  A.        No.

25  Q.        How did you request medical care while you

Exhibit A

Kevin Johnson
February 07, 2022

1    were at Pendleton?

2    A.        By submitting a request for medical care

3    forms.  Notifying medical staff when they made medical

4    rounds.  And when I was in population and addressed the

5    medical staff.  I may have gone to pick up medication

6    and those such things.  But typically by filing a

7    request for medical care forms.

8    Q.        And were those health care request forms

9    easily accessible to you?

10   A.        Oftentimes no, they weren't.  Because the

11   staff, particularly in the segregation unit, the staff

12   would often claim that they ran out of forms.  Didn't

13   have them.  They needed to stock up.  So a lot of times

14   forms, a range of forms, grievance forms, medical

15   forms, other forms that were used on a more regular

16   basis by people who are confined there, were not

17   available.

18   Q.        Are you currently diagnosed with any medical

19   condition?

20   A.        Yes, I am.

21   Q.        What are those?

22   A.        Once again, chronic hypertension.

23   Q.        Are you receiving any dental care at your

24   current facility?

25   A.        I am awaiting dental care.  I requested

Exhibit A

Kevin Johnson
February 07, 2022

1  dental care.

2  Q.        What kind of dental care?

3  A.        I wanted to follow up on the filling that I

4  received from Dr. Noll that is the subject of

5  litigation in this case.  Maybe some other -- I don't

6  know.  But I have what I think may be a cracked tooth.

7  I don't know.  But I need to see dental to see if I

8  have any other dental problems.  But I'm having

9  problems with the filling that Dr. Noll put in.

10  Q.        Okay.  We'll get into that in a minute.  Are

11  you currently prescribed any medication?

12  A.        Yes, I am.

13  Q.        What are those?

14  A.        Medication for hypertension.  Again,

15  cholesterol.

16  Q.        And you mentioned earlier that you were

17  enrolled at Chronic Care at Pendleton, is that correct?

18  A.        Yes, I was.

19  Q.        How often did you have a Chronic Care visit?

20  A.        I think it was like once every six months.

21  Q.        What about mental health?  How often were

22  your mental health visits?

23  A.        Once again, I was refused mental health care,

24  because I would not sign a consent form to allow mental

25  health to discuss my mental health issues with

1  nonmental health staff.  Once again, I was refused

2  mental health care.  And you have the documentation of

3  it, because you sent me copies of it on your list of

4  disclosures.  So you're aware of that.

5  Q.      Mr. Johnson, I'm going to ask you to directly

6  answer my question.  I understand that your lawsuit is

7  about your complaints related to your care and

8  treatment, but it's a mental health and dental care, is

9  that correct?

10  A.      Yes, it is.  But you asked if there were a

11  wide range of other issues.  Medical, et cetera.

12  Q.      My main goal here today is to understand your

13  specific claims against my client.  So I'm going to ask

14  you questions specific to each of them, if that's okay.

15  A.      That's fine.

16  Q.      First I'm going to start with mental health.

17  Why are you suing Dr. Ciemone Easter-Rose?

18  A.      As I just stated, she, as well as the other

19  staff, refused to allow me to receive any mental health

20  care, because I would not sign a form, which they

21  labeled a consent form, that required me to consent to

22  allowing mental health staff to discuss my mental

23  health issues and my conversations with them, with

24  nonmental health staff, at their discretion.

25          They refused me mental health care.  And I've

1    been very clear that my refusing to waive my right to

2    have my mental health issues protected as a privilege

3    has nothing to do with my desire to receive mental

4    health care.  And I specifically wanted to have mental

5    health care.  They refused to give me mental health

6    care.  Specifically Easter-Rose, Martin Perdue,

7    Patricia Northcutt and others.  And Wexford.  That

8    created that so called procedure and policy.

9    Q.        What was your understanding of Dr. Ciemone

10   Easter-Rose's role at Pendleton?

11   A.        I understood that she was the supervisory

12   mental health staff person or psychologist.  She was

13   the highest person to consult as a regular staff member

14   for mental health issues, mental health records, mental

15   health concerns, mental health care.

16   Q.        And you understood that she's a psychologist,

17   correct?

18   A.        Yes, I did.

19   Q.        And you did not want to discuss your mental

20   health issues with a psychologist?

21   A.        I just explained to you, I wanted mental

22   health care.  I wanted to discuss my mental health

23   issues with mental health staff.  Easter-Rose included.

24   I specifically spoke to Easter-Rose, on several

25   occasions, telling her that I wanted to talk to mental

1   health staff, her included, to receive mental health

2   care.  And she responded I was not allowed mental

3   health care assessment, discussions, on anything else,

4   because I refused to sign that so called consent form

5   that I was just speaking about.

6   Q.        Why did you refuse to sign the consent form?

7   A.        Because the consent form specifically stated

8   that I was waiving my right to privileged privacy in my

9   discussions and in my issues related to mental health

10  care with staff.  That they -- it's their discretion to

11  discuss what I discussed with them and my mental health

12  concerns with nonmental health staff.  And I refused to

13  waive my right to mental health privilege of

14  confidentiality.

15  Q.        Why were you seeking mental health care?

16  A.        Because I have been previously diagnosed and

17  treated with depression.  I've also had a diagnosis

18  that I potentially suffer from post traumatic stress

19  disorder.

20  Q.        Could you state that last -- could you please

21  repeat your answer.  There was some feedback.

22  A.        Because I have been previously diagnosed and

23  treated, and actually participated in a mental health

24  program for depression.  I also have been assessed and

25  potentially suffered from post traumatic stress

1    disorder, from mental health staff in other States.

2    Q.        Have you signed consent for treatment in

3    other facilities?

4    A.        There was no requirement to sign such

5    treatment.  That form that we're speaking of at

6    Pendleton was not a consent or denial of consent to

7    treatment.  It was consent to allow them to discuss my

8    issues and my conversations with nonmental health

9    staff.

10           So once again, I did not decline mental

11   health care.  And I was not given an opportunity to

12   receive mental health care.  I was told I could not

13   receive mental health care, because I would not agree

14   to allow them to discuss my mental health issues with

15   nonmental health staff.  And, again, there are forms

16   that you all are aware that were signed by Defendant

17   Northcutt to that effect, because you sent me copies of

18   it.

19           She signed a form where I specifically stated

20   I wanted mental health care and I was not going to

21   signed a form that consented for them to discuss my

22   mental health issues with nonmental health staff.  And

23   she sign a form stating that I would not receive mental

24   health care until I signed that form.

25   Q.        Is that accurate?

1  A.        Yes, it is.  I believe -- I believe so.  And

2  I believe you sent me copies of that document with your

3  initial discovery disclosure.

4  Q.        Yes.  And so I'm just trying to understand

5  and get it clear for the record, you would not agree to

6  receive mental health treatment because you would not

7  sign the form?

8  A.        That is not what I said.  I asked for mental

9  health treatment.  I refused to sign that form saying

10 that I would allow them to discuss my mental health

11 issues with nonmental health staff.  And I specifically

12 repeatedly told them that my not signing that form had

13 nothing to do with my desire or my need to receive

14 mental health care.  And that I specifically wanted

15 mental health care.  And it had nothing to do with

16 signing that form.

17 Q.        Did Dr. Rose have a conversation with you

18 letting you know that if you did not sign a consent

19 form then treatment could not be provided, except in

20 crisis, critical, or emergent situations for mental

21 health?

22 A.        What are you referring to as a consent form?

23 Q.        The Mental Health Consent Form.

24 A.        The document that I was just talking about

25 that allows them to discuss mental health issues with

Exhibit A

1    nonmental health staff?  Is that the document you're

2    referring to?

3    Q.        Yes.

4    A.        Yes.  I did have a conversation with her that

5    if I did not sign and agree to them discussing my

6    mental health issues with nonmental health staff, I

7    would not receive mental health care.  Yes, she

8    definitely did have that conversation.

9    Q.        Is it your understanding that this form was

10   facility policy?

11   A.        No.  That form was Wexford policy.  Because

12   prior to Wexford taking over the contract with Indiana

13   DOC, that was not a requirement for people who were

14   incarcerated in the IDOC, and they received mental

15   health care.  Those who were already confined at IDOC

16   before Wexford came on.  Once Wexford came on they

17   continued to receive mental health care and they didn't

18   have to sign that form.

19             That form was only required to be signed by

20   people who got into IDOC after Wexford took on that

21   contract.  So that was very selectively applied and it

22   was not a policy of IDOC.  That was Wexford's policy.

23   Q.        What do you mean it was not selectively

24   applied?

25   A.        I just explained.  It was not applied to

Exhibit A

1    people who were already incarcerated in the IDOC before

2    Wexford assumed the contract as medical, dental and

3    mental health provider for the IDOC.  It only was

4    applied, and people were only required to sign it, who

5    came into IDOC custody after, I believe it was 2016,

6    when Wexford took on that contract as the mental,

7    medical and dental health care provider for the IDOC.

8            Before that, there was no requirement that

9    those incarcerated at IDOC sign any such form.  And it

10   wasn't enforced against anybody except those who came

11   into IDOC custody after Wexford took that contract.  So

12   it was selectively applied.

13   Q.        What did you want Dr. Ciemone Easter-Rose to

14   do differently?

15   A.        I wanted mental health care.  I wanted to be

16   able to address my mental health concerns, my stress

17   concerns, my depression concerns, my post traumatic

18   stress disorder concerns with her and other mental

19   health staff.  To be assessed.  To be diagnosed.  And

20   needed to be treated.

21   Q.        Did you receive mental health care treatment

22   at other Indiana Department of Correction facilities?

23   A.        No, I did not.

24   Q.        Why was that?

25   A.        Apparently because of that policy.  They said

1    I would not receive mental health care in the IDOC if I

2    didn't sign that form.  And it was enforced.

3    Q.        How were you harmed by this form?  And how

4    were you harmed by Dr. Rose specifically?

5    A.        Obviously I suffered what I recognize to be

6    because of prior clinical diagnosis, because of my

7    familiarity with the symptoms, and prior experience

8    with it, I suffered continued bouts with depression and

9    the intended(sic) stresses, the intended discomfort.

10   The intended fluctuation of sleep cycles, et cetera,

11   that were and are caused by depression, the

12   frustration, the panic attacks, et cetera, that tend to

13   happen with post traumatic stress disorder.

14            I suffered without any care.  Without being

15   able to talk to anybody.  To have any outlet with any

16   assistance with what I believed and had been diagnosed

17   in the past as symptoms of mental health problems.

18   Specifically depression and also post traumatic stress

19   disorder.

20   Q.        When you would see Dr. Rose, where would you

21   see her?  Was that in your cell or --

22   A.        She made rounds.  There was a guy in the cell

23   next to me named -- I would have to go back and look at

24   any documents.  Martin.  I think his name was Martin

25   Smith, something to that effect.  They came to see him.

1  Q.       We'll get to Martin -- we'll get to Martin in

2  a minute.  I'd like to stay on Dr. Rose.

3  A.       Okay.

4  Q.       So would Dr. Rose --

5  A.       No, I didn't say the defendant Martin.  I

6  said it was an incarcerated person next door to me.  I

7  believe his name was Martin.  Who she would come to

8  visit.  And at those times I would stop her and try and

9  talk to her.  Her and Northcutt, defendant Martin, et

10 cetera.  And those were the only times that I would get

11 to actually see them, except when they made the general

12 visual check.

13          That's how I was able to talk to Easter-Rose,

14 when she was at other cells.  When she came by my cell

15 going to his cell, I would stop her and try to talk to

16 her.  And that's when we would have these discussions

17 and she would tell me I could not receive mental health

18 care.  They could not discuss mental health issues with

19 me until I signed that form.

20 Q.       Okay.  So she -- she would come around to

21 your -- to your cell when she would see other inmates

22 on her rounds?

23 A.       No, she wouldn't come to my cell.  She would

24 go to other cells and I would stop her when she walked

25 by my cell en route to someone else's and try to talk

Exhibit A

1   to her.  And she would refuse me care or conversation,

2   on the grounds that I just explained.  Because I

3   wouldn't sign that form.

4   Q.        Did you ever have any inappropriate

5   interactions with Dr. Rose?

6   A.        Not that I know of.  What do you mean by

7   inappropriate?

8   Q.        Any -- any sexual interactions?

9   A.        That's -- is that slander or criminal

10  behavior?  What do you mean?

11  Q.        Did you ever make sexual comments to Dr.

12  Rose?

13  A.        No.  If I would she would have written a

14  disciplinary report if she was doing her job.  But, no,

15  I didn't.

16  Q.        Did you ever reveal yourself to Dr. Rose?

17  A.        No.  And I would object to that on the

18  grounds of it sounds like harassment, stigma, insult

19  and deliberately prejudicial.  And it implies the

20  conviction of criminal acts for which I have not been

21  convicted, which is, per se, slander of defamation.

22  Crimes of --

23  Q.        Mr. Johnson, you can answer my question,

24  please.  So I'm going to move on -- I'm going to move

25  on to Patricia Northcutt.  Why are you suing Ms.

Exhibit A

1    Northcutt?

2    A.       For the same basic reasons as what I

3    explained for Dr. Easter-Rose.

4    Q.       Did she specifically refuse you treatment?

5    A.       Yes, she did.  And she put it in writing.

6    That you sent me a copy of.

7    Q.       Tell me about your experience with her.

8    A.       There was no experience.  She would not give

9    me mental health care.  I tried to talk to her.

10   Explain to her several times when I needed mental

11   health care.  She would make -- the extent of mental

12   health contact with me would consist of only when they

13   made rounds, they would look in to see if I was alive.

14   That's it.  Sometimes she would walk by.  She would be

15   the one that would make the rounds, I think, during

16   some of the period when she was working in segregation.

17            She would -- I think that happened like once

18   a month in my case.  Because I was classified as having

19   no mental health classification.  So I would just be

20   given a visual check once a month.  I would try to talk

21   to her about my mental health issues at those times.

22   And, again, she would refuse me mental health care.

23   Refuse mental health discussions.  Tell me if I didn't

24   sign that form, that under that Wexford policy that I

25   cannot receive mental health care.  Nor have mental

1   health discussions.

2   Q.       What did you want her to do differently?

3   A.       I wanted to receive mental health care. But

4   she refused. And I informed her, on several occasions,

5   that I would litigate the issue. And I told her that

6   she would be party to that litigation. And when I made

7   the allegation to her the last few times, I didn't see

8   her anymore after that. She was one of the few who put

9   that in writing, and signed it as a witness that I

10   would not receive mental health care if I did not sign

11   that form.

12        And, again, you all actually sent me copies

13   on initial exposure of two of those so called

14   notifications where I was told in writing, and I wrote

15   out a statement, that I wanted to receive mental health

16   care. Why I was not signing that form. It was a

17   violation of my right to privacy. And I still wanted

18   to receive mental health care. And I was not refusing

19   care by not signing that form.

20   Q.       How -- how is it a violation of your privacy

21   when this is your mental health care team?

22   A.       Because mental health, discussing mental

23   health issues with nonmental health staff is a

24   violation of my constitutional rights to privacy in my

25   mental health medical care. Discussing my mental

Exhibit A

1  health issues with people who are not licensed mental

2  health staff, are not on my team.  They are not part of

3  the mental health team.  That's the whole point.  That

4  form -- that form consented to.  And that's the whole

5  basis of it.

6         Saying I agree to allow these mental health

7  staff to discuss my mental health issues with nonmental

8  health staff, and I would not agree to that.  Because

9  they are not part of any mental health team.  They were

10 nonmental health staff.  They had nothing to do with

11 mental health.

12 Q.       So how did Patricia Northcutt harm you?

13 A.       By refusing me mental health care.  Same way

14 Dr. Easter-Rose did.  And I was caused the same

15 experiences that I just explained on account of being

16 denied mental health care when I needed it.  And I

17 asked for it.  I repeatedly sought it.

18 Q.       What was your understanding of Patricia

19 Northcutt's job title?

20 A.       She was like a mental health counselor.  She

21 wasn't a doctor, that I understood.  But she dealt with

22 the therapeutic aspect of giving mental health care.

23 Talking to people who are incarcerated in segregation

24 who had mental health legal concerns.  She could convey

25 more serious concerns to the higher ups, or people with

Exhibit A

1  qualifications like Dr. Easter-Rose.

2          But she assessed and kept record -- track of

3  those who had mental health diagnoses and mental health

4  problems to determine, you know, what care they needed.

5  Increases in care.  Et cetera.  She gave therapeutic --

6  Q.        Are you saying that you would only talk to

7  the doctor for your mental health condition?

8  A.        That's not what I said.  No.  I would talk to

9  anybody qualified to talk to me about mental health.

10 And I sought mental health care of each one of the

11 defendants.  That's why they're being sued.  Because

12 they refused to give me mental health care.

13 Q.        Who is qualified to give you mental health

14 care at Pendleton?

15 A.        I don't know.  Whoever's licensed to do so.

16 They make that determination.  I don't make that

17 determination.  They all refused me mental health care.

18 Q.        Did you have any inappropriate interactions

19 with Patricia Northcutt?

20 A.        I don't know what you mean by inappropriate

21 mental health interactions.

22 Q.        Did you make any sexual comments or gestures

23 toward her?

24 A.        No, I did not.  And, again, I would object on

25 the grounds that that is stigmatizing, slander,

Exhibit A

1   harassing, and it imputes the behavior that is

2   criminal, form of moral turpitude and is, per se,

3   slander of defamation.

4   Q.        Did you ever reveal yourself to Patricia

5   Northcutt?

6   A.        No, I did not.  And I have the same

7   objection.  I did see a document that you included in

8   your initial disclosure that made an allegation which

9   was, I guess, for some strange reason, not followed up

10  on.  No disciplinary action was actually pursued on

11  that.  But I saw that allegation and it seemed to

12  coincide with the time that I told her I was going to

13  sue her for not giving me mental health care.

14          So I think it's also a liability issue.

15  That's slander.  So if you all are cool with raising

16  that issue, I would add it as a claim in this case for

17  slander of defamation.

18  Q.        Mr. Johnson, your case is about your medical

19  care, and I represent the medical defendants.  Your

20  case impacts their -- all of their licenses and

21  financial impact.  So I'm going to ask you questions

22  about your care and interaction with my client.  What

23  were your diagnoses -- your mental health diagnoses

24  while you were at Pendleton?

25  A.        Objection.  These questions are redundant.

Exhibit A

1  I've already explained I was denied all mental health

2  care assessment. You asked me the same questions over

3  and over again. I was refused mental health care. I

4  was given no mental health assessment or diagnosis.

5  Q.        Would you agree that you had a diagnosis of

6  schizophrenia at the time?

7  A.        Not that I'm aware of. Where would that

8  diagnosis have been made?

9  Q.        It was made in your restrictive housing

10  documentation on September 3rd, 2020. And it is

11  located at MR, page 88. The diagnosis says, "The

12  patient has a current active psychotic disorder

13  diagnosis of schizophrenia, delusional disorder,

14  schizophrenia disorder, schizoeffective disorder, brief

15  psychotic disorder, substance abuse psychotic disorder,

16  excluding (inaudible) and withdrawal."

17  A.        May I ask who made that diagnosis?

18  Q.        It's located in your documents at page MR88.

19  A.        Let me write this down. MR88.

20  Q.        It has a list -- a very long list of

21  diagnoses.

22  A.        And who made this diagnosis, may I ask?

23  Q.        The mental health care team. When you were

24  put in restrictive housing. That's the document.

25  A.        I never saw a mental health team. And you

1    have the documentation to that effect, that I was not

2    allowed.  And I have a document to that effect.  Are

3    you sure you are not inventing evidence?

4    Q.        Mr. Johnson, I'm looking at page MR88.  There

5    is nothing made up about this.

6    A.        Yeah, okay.

7    Q.        If you don't have it you can take a look at

8    your documents that we sent you in initial disclosures.

9    A.        Okay.  I mean, I'm not saying you're

10   inventing what you're telling me.  I'm saying are you

11   sure this is not invented after the fact of them

12   knowing litigation was forthcoming or had been

13   initiated.  Because I never saw anybody.  I never

14   received --

15   Q.        This was -- this was entered on September

16   3rd, 2020 at 3:17 p.m.  I'm going to move on to Martin

17   Perdue.  Why are you suing Martin Perdue?

18   A.        Same reason as Patricia Northcutt and Dr.

19   Easter-Rose.  He refused to provide me any mental

20   health care or assessment.  And it was put in writing,

21   by defendant Northcutt, that I was not allowed to

22   receive any mental health care, any mental health

23   assessments, as long as I refused to sign that form.

24   He put that in writing.

25   Q.        Did he specifically refuse you mental health

Exhibit A

1    treatment?

2    A.          Yes, he did.  He was the first one to do so.

3    Q.          And when did he do that?

4    A.          When I first got to Pendleton I was called

5    into his office for an initial, I guess, screening.

6    And he presented me with that form to sign.

7    Q.          About what -- about when was that?

8    A.          That was when I first got to Pendleton in

9    November of 2018.

10   Q.          And when did Dr. Rose refuse you treatment?

11   A.          That was on numerous occasions.  I would have

12   to look at my calendar to give you specific dates that

13   I had contact with her.

14   Q.          What about Patricia Northcutt?

15   A.          Same thing.  Numerous occasions.  And she put

16   it in writing.  Twice.  And admitted it in my

17   grievance.  In response to the grievance that I filed

18   about being denied mental health care because I

19   wouldn't sign that form.  They admitted I was not

20   entitled to and would not receive mental health care

21   until I signed that form.

22          So, again, somebody apparently is fabricating

23   assessments.  And counsel understands the

24   responsibility of not producing all evidence.  He put

25   in writing that I would not receive and never had

Exhibit A

Kevin Johnson
February 07, 2022

1. received mental health care.

2. Q.        What did you want Mr. Perdue to do

3. differently?

4. A.        Provide me mental health care, assessment,

5. discussion, assistance.

6. Q.        And how did that harm you?

7. A.        Again, I was forced, as I explained

8. previously, to suffer the effects of depression, PTSD,

9. lack of mental health care.

10. Q.        What was your understanding of Mr. Perdue's

11. job title?

12. A.        Similar to Northcutt, I think.  I don't know.

13. I know it was similar to Northcutt.  But he was the --

14. prior to Northcutt, I think he was the assigned mental

15. health supervisor of the segregation unit at Pendleton.

16. And he performed the job that she did prior to her

17. being assigned back there as the mental health

18. treatment staff person.

19. Q.        I'm looking at MR, page 84.  This is the

20. Mental Health Services Consent For Treatment And Limits

21. Of Confidentiality Form.  It says that "Mental health

22. services staff provide counseling and psychological

23. evaluation for offenders in the facility.  The mental

24. health staff wants you to feel comfortable in

25. discussing your personal concerns with them, but you

1    need to be aware of special situations in which

2    confidentiality will be lifted.

3              "Security and safety are very important in

4    the jails and prisons.  And to ensure safety of

5    everyone, mental health staff must report situations

6    that could be harmful to yourself, others, or

7    operations of the facility, including escape planning,

8    planned violence towards others.  Risk of suicide,

9    hunger strikes, drug fails, or trafficking,

10   inappropriate relationships with staff, child abuse or

11   neglect, or behavior that endangers another person."

12   Are you familiar with this form?

13   A.         Yes, I am.  It says more than that too,

14   doesn't it?

15   Q.         What in this form concerns you?

16   A.         Did you read the entire form?

17   Q.         Yes.

18   A.         Okay.  After you gave that specific list,

19   what does it say after that?

20   Q.         "For many problems and concerns, group

21   settings are the best mode of treatment or

22   intervention.  All verbal and mental health staff

23   encourage all group members to follow the instruction

24   to keep anything said during group sessions to

25   themselves.  They cannot guarantee that the information

Exhibit A

1  discussed or in group counseling will not be shared by

2  group members with others.  You need to be aware that

3  confidentiality leaks can happen.  Offenders found to

4  be sharing information from a group may be removed from

5  the group."

6  A.        That form specifically deals with

7  confidentiality and a recognition that those

8  incarcerated and those who are subject to Wexford staff

9  mental health access and care, et cetera, is subject to

10 confidential protection.  And it states, after giving

11 the specific list of instances in which they will

12 revoke confidentiality, that it's in their

13 interpretation, things that may present a risk of harm,

14 or security threat, or what have you, they exercise the

15 discretion to share those things with nonmedical health

16 staff.

17        That broad discretion is what I have a

18 problem with.  If they have a security concern or a

19 safety concern, and in my experience, in over 30 years

20 of incarceration, officials, mental, medical staff, et

21 cetera, enjoy twisting, distorting and inventing things

22 that they claim to be security concerns to justify all

23 types of abuse.

24        So given their discretion to interpret what

25 they want, they have a threat to security or safety, et

1    cetera, is a problem to me.  Because that means they

2    can discuss anything that I discuss with them with

3    nonmental health staff.  And I'm not willing to allow

4    them that broad discretion.  That broad phased

5    unspecified discretion.

6    Q.       And so that was your main -- main problem

7    with this form?

8    A.       Yes, that they gave them broad discretion to

9    interpret what they want as a so called security or

10   safety concern.  And they can, therefore, discuss

11   basically anything you talk to them about in a mental

12   health setting with nonmental health staff.  And that

13   violated my right to mental health confidentiality.

14   Q.       And that's why you wouldn't sign the form?

15   A.       Exactly.

16   Q.       Okay.  Thank you.  I'm seeing, on MR84, that

17   you refused to sign this form and you -- it was

18   generated by Sara Clark, mental health professional, on

19   September 3rd, 2020.  Does that sound right?

20   A.       I don't -- I don't have a copy of that

21   document with me right now, so I can't say.  But I

22   never signed that form.  And I explained why.

23   Q.       Okay.  Correct.  That's what I'm saying.  All

24   right.  Why did you sue Wexford of Indiana?

25   A.       Because Wexford created that rule.  And it

Exhibit A

1  was enforced according to the grievance that I filed.

2  According to the statement of the defendants that you

3  have questioned me about specifically, that that was

4  Wexford's policy that if I didn't sign that form, I

5  forfeit the right to receive mental health care.

6          And I explained to them by refusing to sign

7  that form had nothing to do with my desire to receive

8  mental health care.  And they had no right to condition

9  my right to mental health care and whether I signed or

10  didn't sign the form.  They had a constitutional

11  obligation to provide me care.  Regardless of what I

12  signed or didn't sign.

13  Q.        How did this policy harm you?

14  A.        We discussed that repeatedly.  I was denied

15  mental health care when I had a prior mental health

16  diagnosis and I needed mental health care and was

17  refused.

18  Q.        So what did you want Wexford to do

19  differently here?

20  A.        To not have their staff and not enforce a

21  policy that denied me mental health care because I

22  wouldn't sign an arbitrary form created by Wexford.

23  Q.        So, Mr. Johnson, if you saw a mental health

24  care professional and didn't sign this form, and you

25  had any suicidal ideations, you wouldn't want that

Exhibit A

1    reported?

2    A.        That's not what I objected to.  And I think I

3    just made that clear to you.  I said the vague

4    interpretation that they were allowed to make

5    discretion -- with broad discretion to choose what they

6    desire to claim was a security or safety threat and

7    repeat or report it to nonmental health staff.

8    Q.        So you wouldn't want your mental health staff

9    acting to ensure your safety and security in the

10   Department of Corrections?

11   A.        I just explained what my concern was.  Them

12   discussing my mental health discussions and issues on a

13   vague broad discretionary basis with nonmental health

14   staff.

15   Q.        Who were they going to tell?  Mr. Johnson,

16   help me understand the impact of this.  Who would they

17   tell and how would that impact you?

18   A.        According to their form, anybody they wanted

19   to that's not in mental health.  That's the whole basis

20   of their form.  They're saying that they would discuss

21   or share this information with nonmental health staff.

22   That could be anybody.  Counselor, security, the

23   warden, a groundskeeper.  I don't know.  That's the

24   whole point.  They gave them broad discretion to

25   discuss my mental health issues with anybody who is

Exhibit A

1    nonmental health staff.  And I would not consent to

2    that.

3            And ultimately it doesn't matter.  They have

4    a constitutional obligation to provide mental health

5    care when a person has a serious mental health need.

6    Period.  The constitutional requirement is not

7    conditioned on whether I sign a form or not.  It's like

8    a constitutional requirement to provide me medical care

9    when I have a serious medical need and it's brought to

10   the attention of medical staff is not conditioned on

11   whether I consent or sign a form saying, oh, you can

12   tell nonmedical staff about my medical issues.

13           I don't have to sign a form or not sign a

14   form to receive medical care under constitutional

15   requirement.  That was a --

16   Q.      Mr. Johnson --

17   A.      Yes, ma'am.

18   Q.      -- you had access to mental health

19   professionals like Dr. Rose, Patricia Northcutt, Martin

20   Perdue, correct?

21   A.      I did not.  Again, according to the document

22   that Patricia Northcutt herself signed, I was not

23   allowed to have mental health contact, support,

24   assistance, assessment from mental health staff.  I

25   would stop them and try to talk to them and they would

Exhibit A

1    run off telling me if I didn't sign that form they

2    could not assist me.

3    Q.        But you were instructed in the role of the

4    mental health care team and how to get a hold of the

5    mental health team as needed, correct?

6    A.        And I was told if I got a hold of them they

7    would not do anything to help me, because I didn't sign

8    the form.  So, yeah, I could formally send them a

9    request form and tell them I'm having a mental health

10   crisis right now, and they would respond saying you

11   could not receive help.  We cannot assist you because

12   you won't sign this form.

13   Q.        When were you having -- when were you having

14   a mental health crisis?

15   A.        That was ongoing.  I told you I would -- I

16   frequently suffered conditions of depression.  Symptoms

17   of depression.

18   Q.        All right.  I'm looking on the medical

19   record, page 95, says you were assessed for restricted

20   housing. Initial placement.  The limits to

21   confidentiality were reviewed and not signed.  You were

22   instructed on the role of mental health and how to get

23   a hold of mental health.  You understood.  You

24   indicated that you had no current mental health issues

25   at the time.  Is that correct?

1    A.        Did I sign that form?

2    Q.        No, you did not.  But you indicated that you

3    did not have a current -- any current mental health

4    issues.  In September of 2020.

5    A.        Can I -- can I ask you a question?  What --

6    Q.        Yes.

7    A.        -- even if that were the case, which I don't

8    agree to, that has nothing to do with the period of

9    2018 through early 2020.  Which was the period during

10   which I was -- excuse me, latter 2020, during the

11   period I was confined to Pendleton.  So what relevance

12   does that question have to the claims in this case?

13   Q.        When -- when did you leave Pendleton, Mr.

14   Johnson?

15   A.        I left Pendleton in September of 2020.

16   Q.        September 2020.  And so that's when you

17   onboarded at Wabash Valley, correct?

18   A.        Yes, ma'am.

19   Q.        In September.  And where did you -- where

20   were you housed in Wabash Valley?

21   A.        I was housed in the shoe.  Segregation unit.

22   Q.        Did you receive any mental health care

23   treatment in the shoe?

24   A.        No, I didn't.  On the same basis, that I

25   never signed that form.

Exhibit A

Kevin Johnson
February 07, 2022

1   Q.        What are your mental health care claims

2   worth?  What would you ask a jury to award you?

3   A.        What would I ask them to award me?

4   Q.        Yes.

5   A.        I would ask me to award me damages.

6   Compensatory, nominal, punitive --

7   Q.        How much?

8   A.        How much?

9   Q.        Yes.

10  A.        I believe it's in their discretion.  I don't

11  think I can quantify the value of what I experienced

12  and suffered as a consequence of being denied care of

13  the conditions I suffered.  Isolated.  Being denied any

14  sort of interventional assistance.  I -- I wouldn't

15  know.  I mean, if you asked me that question for -- are

16  you asking me that question in general, or a question

17  on potential settlement?  What is the basis of the

18  question?

19  Q.        I'm asking you what -- if this case went to

20  trial, what would you ask a jury to give you?

21  A.        What I asked in the addendum clause of my

22  lawsuit, any sum in excess of $20 that a jury finds

23  fair and just.

24  Q.        Did someone help you write this lawsuit?

25  A.        No, they did not.

1  Q.          Is there anything else that you would like to

2  add about your mental health care claim?

3  A.          Nope.

4  Q.          All right.  Let's talk about your dental

5  issues now.  Tell me, why are you suing Dr. Noll?

6  A.          Alongside defendant Ingalls, I was given --

7  knowingly given inadequate dental care.  I was left

8  suffering a repairable dental condition for weeks on

9  end in considerable pain, when they were aware I had a

10 repairable dental condition.  On numerous occasions.

11 They deliberately used dental machinery that they knew

12 was faulty.  That they admitted was faulty.  And was

13 even admitted in response to my grievances was faulty.

14          That I knew was faulty based on them

15 confessing themselves to me that the dental equipment

16 that they were using was faulty and would not

17 adequately bond the -- what they was filling my teeth

18 with.  And my filling was falling out and would fall

19 out because they were not given the dental equipment

20 that they needed.  And they refused to refer me to an

21 outside dental care specialist, or to another

22 institution where adequate machinery was available and

23 adequate equipment -- and tools were available.

24          So that's why I sued them.  There was several

25 occasions where I was subjected to deliberately,

Exhibit A

1  knowingly, inadequate dental care that caused me

2  considerable pain and suffering.  I'm still having

3  dental problems because of the work that was performed

4  on me with that faulty equipment.

5  Q.        What did you want Dr. Noll to do differently?

6  A.        Supervise my dental care with equipment,

7  tools that were adequate to the care that he was

8  supposed to be providing.  Instead of deliberately

9  using faulty equipment on me.  That he admitted caused

10 my fillings to fall out.

11 Q.        When did you first see Dr. Noll?

12 A.        I first saw him in -- I think it was December

13 2019.

14 Q.        Did you see him in June 2019?

15 A.        I may have.  I'm not sure.  Why?  Is there a

16 documentation that I saw him June 2019?

17 Q.        Yes.  I'm looking at medical record page 413.

18 This is a summary of your dental visits with Dr. Gregg

19 Noll while at Pendleton.

20 A.        And what does that say specifically?  Refresh

21 my memory.

22 Q.        On June 18th, 2019 you had a visit with Dr.

23 Gregg Noll, DDS.  He indicated "Lingual caries

24 excavated and a crown recemented with zinc phosphate

25 cement.  Patient has worn through the incisal edge of

1  the crown by" --

2  A.        Yeah, that was June 18th.  That's when he

3  replaced my gold crown that fell out a month before

4  that.  Yeah.  But he left me suffering in pain for a

5  whole month.  Yeah.

6  Q.        Okay.  So that's accurate.  So he put you

7  under local anesthetic?

8  A.        Yes.

9  Q.        And then they did an x-ray and they gave you

10 -- they recemented your crown and your bridge.

11 A.        Yes.

12 Q.        Does that sound right?

13 A.        Yes.  After they left me suffering with it an

14 entire month before, when it fell out, yeah.

15 Q.        Did you -- when did you arrive at Pendleton?

16 A.        Again, November.  Approximately November the

17 16th, 2018.  Objection.  That's a redundant question.

18 Q.        And in that visit they restored tooth number

19 9 with resin.  Does that sound right?

20 A.        I don't know the number of the teeth.  I

21 don't know.

22 Q.        And in December of 2019, December 23rd, you

23 saw Dr. Gregg Noll again.  You were triaged because of

24 complaints of cold sensitivity since losing small resin

25 from tooth number 27.  At that time tooth 27 was

Exhibit A

1    restored with resin at that appointment.  Is that

2    correct?

3    A.        Yes.  Approximately three weeks after that

4    filling came out and I was suffering -- I was suffering

5    in pain for approximately three weeks after that was

6    brought to their attention, that my filling had fallen

7    out.  I was seen -- the filling came out on the 8th.  I

8    immediately filed a health care request form.  They

9    didn't see me until, yes, the 23rd.

10            And Dr. Noll did not fill it.  Ingalls, the

11   dental assistant, filled it, using the air drying

12   machine that has -- was blowing out water instead of

13   dry air.  Which they admitted was a faulty -- faulty

14   machinery.

15            It was not supposed to be blowing out water.

16   And she, in fact, showed me, during my next filling,

17   which was February, latter February, that same filling

18   came right back out after she put it in.  It fell out

19   like a month later.  And she explained to me the reason

20   it fell out, and he admitted as well, during that visit

21   in February, that the filling fell right back out again

22   because they were -- they couldn't dry the epoxy that

23   they used to bond -- it wouldn't bind with my tooth,

24   because the air machine that they was using did not

25   blow dry air.  It blew water out.

1    And she went and got a paper towel and put it

2  in her hand and used a little air blowing device on the

3  machine that was supposed to blow out dry air into your

4  mouth to dry the resin, and blew it on a paper towel

5  and showed me how it was spraying water.  She said they

6  refused to fix this.  They are making us still, as you

7  all see, and use this broken air machine to dry the

8  filling and that's why your filling fell right back

9  out.

10    She admitted it and he admitted it.  And I

11  wrote a grievance about it.  And they admitted it.

12  That's how I knew about the air -- the air machine

13  blowing water.  I wrote a grievance about it and they

14  admitted, yes, the machine is faulty.  It doesn't work

15  right.  It should not be blowing water, but it does.

16  And that's why your filling came back out.  But they

17  repaired it again.

18  Q.    Mr. Johnson, I'm going to stop you there.

19  I'm talking about Dr. Noll.  We haven't gotten to

20  Ingalls yet.  We will get there.  So I want to stay on

21  track here, because you have several dental visits and

22  I want to keep on pace.

23  A.    Okay.  But you're talking about the filling

24  that he didn't do.  But he -- he supervised what

25  Ingalls did.  Both of them participated.  So I'm

1   explaining what happened and why.

2   Q.        So on February 20 of 2020, Dr. Gregg Noll

3   wrote a procedure and responded to health care request

4   2191906.  You were triaged at no charge.  Patient lost

5   filling from tooth 27 again.  A new facial resin was

6   placed by dental assistant Ingalls, taking care to try

7   to keep the preparation as dry as possible, given the

8   moist air lines within the clinic.  No anesthetic

9   necessary to complete the restoration.  Is that what

10  you were talking about with the air line?

11  A.        Yes, it is.  And he admitted the mechanical

12  flaw that should not have been taking place with that

13  machinery.  And is why the filling kept falling out.

14  It would not dry in the tooth.  And it fell out again

15  because of that very reason.

16  Q.        So tooth 27 was restored with resin at that

17  visit on March 16th.

18  A.        It fell out again on March 3rd.

19  Q.        Okay.  So on March 16 Dr. Gregg Noll noted

20  that you were triaged at no charge for health care

21  request 312991.  He replaced facial resin, tooth 27,

22  attempting to keep the prep dry despite moisture in the

23  facility's air line.  Does that sound right?

24  A.        Yeah.

25  Q.        Okay.

1   A.          Yes, it does.

2   Q.          And so what would you want Dr. Noll to do

3   differently?

4   A.          Do differently?  What he admitted should have

5   been done.  He acknowledged himself, and dental

6   assistant Ingalls acknowledged at each visit, they

7   should have had equipment that blew dry air and that

8   did not blow water out of the air hose.  Because the

9   air hose blew water when they used it to dry the

10  filling, it didn't dry the filling.

11          So the filling didn't bond with my tooth.

12  And each time they filled my tooth, the filling fell

13  right back out.  So the inside of my tooth was open.   I

14  suffered extreme pain from a toothache.  Having the

15  inner tooth exposed to the elements.  Cold, heat, food,

16  et cetera.  While I was made to suffer because they

17  knowingly kept filling my tooth using machinery that

18  they admitted was faulty.

19          I would have desired that they used the

20  machinery that did not have the flaws that they

21  admitted it had, which was blowing water instead of dry

22  air.  And then they left me each time for weeks without

23  dental care when the filling fell out.  Suffering a

24  toothache and the pain of my internal tooth being

25  exposed to food, cold, the elements, et cetera.  And

1    heat for weeks at a time after the filling fell out,

2    because of them using faulty equipment.  Knowingly

3    they're using faulty equipment.

4    Q.        I see that you filed several grievances

5    around this time.  And you were informed that you were

6    on the list to be seen.  Is that your understanding?

7    A.        Yes.  In some cases.  Other cases they

8    refused to give me dental care at all until people in

9    the outside filed complaints with the ombudsman's

10   office.  And I was taken over to be seen.  But they

11   admit they were trying to refuse me dental care at all.

12   They were mad because I was writing grievances.  Dr.

13   Noll specifically.

14            He told me if I wrote another grievance he

15   would make me sit with my tooth open and the dentist --

16   the filling had to have fallen out for six months,

17   which he's saying is the maximum time period that they

18   can make a person wait before they're seen.  And I was

19   only seen because of some of my correspondence on the

20   outside, supportive friends, et cetera, began filing

21   complaints with the ombudsman.

22            And the ombudsman admitted that they

23   needlessly delayed giving me the ability to receive

24   care.  And it was because of her intervention that they

25   got me over there a couple times to get my tooth

Exhibit A

1    refilled.  They were uncooperative when I did need

2    dental care and they knew about it.  He didn't want me

3    to go up to get care, because he was mad because I

4    wrote grievances about him.  I have a response from the

5    ombudsman where she acknowledged that she had the

6    inability to give me to do.

7    Q.       So after March of 2020 did you have any

8    interaction with Dr. Noll?

9    A.       Yes, I did.  That would be, again, objection

10   on the redundance.  That would be when he restored my

11   gold crown in June of 2020.  You're already aware that

12   after March I saw him again.

13   Q.       About how long were you having these dental

14   issues, Mr. Johnson?  What was the time frame of when

15   they first happened?

16   A.       I'm not clear what you mean.  What do you

17   mean how long did I have mental issues?

18   Q.       Your dental issues, when did you first start

19   having issues with your teeth at Pendleton?

20   A.       My filling in my front tooth, which I guess

21   you identify as tooth number 9, first came out in early

22   December of 2019.  It wasn't until late December,

23   around the 23rd, that I finally got the dental, as I

24   explained they didn't want me to be seen.  Got the

25   dental almost three weeks later.  And it was filled by

1  Ingalls.  It came out again.

2      After it came out again January -- about

3  latter January of 2020, a month later I was seen by

4  Ingalls, who filled it again.  That's when she showed

5  me the little paper towel thing where she said the

6  reason the filling came out again was because of the

7  water in the air line from the air machine and that

8  they had -- they had complained and asked that the

9  machine be repaired, or that they be provided with

10 machinery that didn't have water in the line, because

11 it impaired their ability to properly fill people's

12 teeth.

13     She said they had brought this to the

14 attention of Wexford, IDOC, the warden at Pendleton.

15 They said they refused to repair the equipment.  So

16 they would use the equipment knowingly that they knew

17 was not adequate to repair people's teeth with.  My

18 filling came out again on March 3rd.  That's when I

19 went back again.  Almost three weeks later, on the

20 16th, that's when Dr. Noll, he experimented, as you

21 said.

22     He used some experimental method, which he

23 told me, to try to fill it in a way that the filling

24 would stay in and it wouldn't fall out again.  Because

25 still he was still using this air machine that blew

1    water.  And as I explained, I'm still having problems

2    with the same tooth because of the faulty filling.

3    Q.       And why are you suing Wexford for your dental

4    issues?

5    A.       Because Wexford was responsible, according to

6    them, for them using that machine and refusing to

7    repair it or to refer me somewhere where I could have

8    access to adequate dental care without being subjected

9    to faulty equipment, et cetera.  Hold on.  This

10   counselor is coming into the office.  Okay.  You can go

11   ahead.  He left back out.

12   Q.       And so we were talking about the equipment,

13   correct?  Is there -- are there any other reasons why

14   you're suing Wexford?

15   A.       Also because the bond that was used to repair

16   my gold crown, Dr. Noll admitted that it was -- it was

17   a water based bond and therefore my gold crown would

18   likely come back out again in the next three or four

19   years, he said, because Wexford refuses to provide the

20   right epoxy that they could use to bond those types of

21   caps in people's teeth at Pendleton.

22           So he said it was because he didn't have the

23   right filling equipment and the right dental equipment

24   from Wexford that my -- my gold -- my gold tooth would

25   likely not stay in.  He admittedly did not use the

Exhibit A

1    right type of epoxy to bond that tooth back in.

2    Q.        When did he tell you this?

3    A.        He told me that on June 18th, when he put my

4    gold tooth back in.  Told me he was using a water based

5    cement that would likely result in my gold tooth

6    falling back out, because Wexford would not allow or

7    provide them with the epoxy that was needed to make

8    those type of bonds or crown that he asked them to

9    provide him, but they would not give it to him.

10   Q.        Have you ever seen a Wexford policy or

11   document to the equipment or epoxy concerns?

12   A.        Nope.

13   Q.        As to your dental claims against Dr. Noll --

14   actually, we haven't talked about Dr. Ingalls.  Dawn

15   Ingalls specifically.  We talked about her a little

16   bit.

17   A.        Can you hold on one second.  Hold on one

18   second.  Go ahead.  I'm sorry.

19   Q.        What did Dawn Ingalls do wrong?

20   A.        She was the one that filled my tooth three

21   times.  And it fell out.  No, she filled it twice.  She

22   was the one that filled my tooth the first time the

23   filling came out.  The second time it came out.  And

24   she was the one that explained to me in detail, no one

25   agreed with her, but she was the one that detailed to

Exhibit A

1  me the water in the air hole machine and showed me the

2  air hole machine blowing water on the paper towel.

3          She was the one explaining to me that they

4  knew they were using faulty equipment, but were using

5  it anyway to fill my tooth.  And it was causing my

6  filling to fall right back out and me to suffer pain of

7  my filling coming out.  And me being without -- with a

8  hole in my tooth.  And she just kept giving me the same

9  filling, using that machine that she do without

10  repairing my tooth.

11  Q.        And was Dr. Noll in the room with Ms.

12  Ingalls?

13  A.        Yes, he was.  He was supervising her when

14  she did both of my fillings.  He was right there

15  supervising her.  And confirmed what she was saying.

16  But they both were having the conversation with me.

17  She was the one explaining and demonstrating in detail

18  the air coming out of the air hose.  I mean the water

19  coming out of the air hose.

20  Q.        What did you want her to do differently?

21  A.        That if she was going to fill my tooth, fill

22  my tooth with machinery that worked appropriately.  And

23  that wasn't damaged, as she admitted it was.  Blowing

24  water instead of air onto my tooth, when they were

25  supposed to be bonding the epoxy, or whatever it was

1  that they were using to fill my tooth.

2  Q.        What was your understanding of Ms. Ingalls'

3  job title?

4  A.        She was a dental assistant.

5  Q.        And as to your claims, your dental claims

6  against Wexford, Dr. Noll and Dr. Ingalls, what would

7  you ask from a jury?

8  A.        I would ask what's in the addendum clause of

9  my lawsuit.

10  Q.        And in terms of money, how much do you think

11  they would award you?

12  A.        How much do I think they would award me?

13  Q.        Yeah.  How much would you ask -- if we went

14  to trial today, how much would you ask the jury for

15  regarding your dental claim?

16  A.        I don't know.  That was a lot of suffering.

17  That was a lot of ongoing suffering.  The fear of my

18  filling falling out and going through that pain again.

19  Of my crown falling out.  The pain I went through when

20  they were out and I was denied the filling for weeks.

21  It falling out because of faulty care.  What would I

22  ask?  That was a lot of pain.  Dental pain is probably

23  the worst pain you can suffer.

24  Q.        Place a number on it.

25  A.        I'm thinking.  That's hard to quantify.  I

Exhibit A

1   don't know, 250,000.  I don't know.  I would have to

2   look -- I would have to look at precedent to see in

3   similar situations what some damage awards -- what were

4   considered reasonable damage awards for those types of

5   injuries, or that type of suffering.  I wouldn't just

6   throw something out there being random and be

7   ridiculous.  Either in excess or minimalizing what

8   could be awarded.  I would have to research, you know,

9   other precedent to see what was awarded in a similar

10  case.  But I don't think 250,000 would be unreasonable.

11  Q.        Mr. Johnson, what is the state of your tooth

12  now?

13  A.        It has -- it has several -- I believe it has

14  cavities in it.  Because whatever method Dr. Noll used,

15  there were openings all around the filling that he put

16  in.  It wasn't sealed to my tooth.  So there were

17  cracks all around the filling that he put in.  And you

18  can see brown holes.  I have little brown spots that

19  developed around the cracks, which I think are

20  cavities.  Because the filling wasn't fitted to my

21  tooth and dried and sealed and smoothed, there were

22  cracks in it, and I figured it caused other cavities to

23  develop in the area where he filled it.

24  Q.        So it still hasn't been fixed?

25  A.        No.  You -- when you asked me earlier what

Exhibit A

1  dental care I was receiving here and I told you I was

2  waiting.  That's one of the issues that I'm waiting to

3  be seen for.

4  Q.       Is there anything else you want me to know

5  about your claims against any of the defendants that I

6  represent that we haven't covered this morning?

7  A.       Not that I can think of at this point.  I

8  mean, I may think of something later on that wasn't

9  addressed.  But at this moment I can't think of

10  anything, no.

11  Q.       Thank you, Mr. Johnson.

12          MS. STEUERWALD:  I have no further

13          questions at this time.  Andrew.

14          MR. KIRTLEY:  Yes.  Erika, I might take

15          a three minute break.  Do you need longer?

16          MS. STEUERWALD:  That's fine.

17                  *    *    *

18          (Whereupon, a short break was taken.)

19                  *    *    *

20                  EXAMINATION

21                  *    *    *

22  BY MR. KIRTLEY:

23  Q.       Mr. Johnson, my name is Andrew Kirtley.  I

24  represent Robert Carter, Jr., and Dushan Zatecky.  Do

25  you understand that?

Exhibit A

1    A.        Yes, I do.

2    Q.        What did you do to prepare for this

3    deposition today?

4    A.        Nothing.

5    Q.        Do you have any documents which have not been

6    produced to us in this case?

7    A.        Not that I'm aware of.

8    Q.        And I'm going to go through very quickly,

9    you're currently receiving a life sentence for murder,

10   correct?

11   A.        It's been imputed against the Kevin Johnson.

12   Those are the charges imputed against him.  I think

13   I've addressed that in the motion that I filed.

14   Q.        Okay.  Is the murder conviction your first

15   time being incarcerated?

16   A.        I have not conceded to any murder conviction.

17   Q.        Have you been incarcerated before this?

18   A.        Before my current incarceration as an adult,

19   no, I have not.

20   Q.        Do you have any past convictions for perjury,

21   making a false statement, criminal fraud, embezzlement

22   or tax invasion?

23   A.        None at all.  No convictions involving crime

24   or moral turpitude, no, sir.

25   Q.        I believe you previously testified you were

Exhibit A

Kevin Johnson
February 07, 2022

1   at Pendleton Correctional Facility in Indiana from

2   November 2018 to September 2020, is that correct?

3   A.        Yes, sir.

4   Q.        And after September you were transferred to

5   the Wabash Valley Correctional Facility?

6   A.        Yes.

7   Q.        And, Kevin, you're an interstate compact

8   offender, correct?

9   A.        I was transferred under cover.  Apparently

10  they say compact.  I wouldn't say that it was a lawful

11  transfer.  But apparently that's the guise under which

12  I was transferred.

13  Q.        Before Indiana what States were you

14  incarcerated in?

15  A.        I've been held in Oregon, Texas, Florida, and

16  then Indiana.  Before all of that, Virginia.

17  Q.        When you filed lawsuits in those States, is

18  it typically in Federal Court?

19  A.        Did I file lawsuits in those States?

20  Q.        Did you file Federal Court lawsuits in those

21  States?

22  A.        No.  Not all of them, no.

23  Q.        At least Texas and Virginia, correct?

24  A.        Yes.

25  Q.        So related specifically to Indiana, how many

Kevin Johnson
February 07, 2022

1    Federal lawsuits did you file?

2    A.         Two, where you were representing defendants

3    in both of those.   I think you're familiar with those.

4    Q.         So it would just be the Feber case.   This

5    case, which is 201 and the other one, which is 602, is

6    that correct?

7    A.         Yes.

8    Q.         Have you ever submitted any grievances

9    against Robert Carter, Jr.?

10   A.         Yes, I have.

11   Q.         What was the -- strike that.   I'm going to go

12   through each one.   So what were those regarding?

13   A.         They were a lot of them.   I think you sent me

14   a list of grievances from your summary judgment motion

15   from the other summary case.   You know, there are a

16   large number of grievances I filed.   I can't -- I filed

17   just as many that follow me at Wabash, so I really

18   can't give you an account of all of the grievances I've

19   filed, the subject, specifically who was named and each

20   one.   So I'm not really in a place right now where I

21   can specify what each one was that related to him.

22   Q.         I think there were about 1100 pages of

23   grievance documents.   Does that sound about right?

24   A.         That may be accurate.   So you know it's not

25   unreasonable that I can't tell you each grievance I

1   filed against him.

2   Q.          And I -- I asked you about Robert Carter,

3   because I -- I don't recall seeing any filed against

4   him.  But it's your recollection that you think you

5   filed some against him personally?

6   A.          Yes.

7   Q.          And you don't recall what specifically the

8   grievances that those were involving?

9   A.          I know some of them.  I don't know all of

10  them.

11  Q.          What were some of them?

12  A.          Housing transfer.  IDOC custody, I believe.

13  The conditions.  But a number of disputes I filed would

14  either disappear or be destroyed, which I think you now

15  have, or you already had, which you didn't disclose.  A

16  lot of grievances that I tried to file would disappear

17  on block.  In violation of policy.  So a number of

18  these I did submit weren't processed.  But the

19  conditions in -- the conditions of Pendleton and

20  Wabash.  Denial of mental health care.  Denial of

21  medical care.  Number of things.  Number of issues.

22          His refusal to exercise, oversight, or

23  enforce policy rules, regulations, constitutional

24  requirements against his staff subordinates and

25  contractors, et cetera.

Exhibit A

1  Q.        Have you ever submitted any grievances

2  against Warden Zatecky?

3  A.        Yes.  My response would be the same as mine

4  about Robert Carter.

5  Q.        Okay.

6  A.        I don't think you can deny that I made very,

7  very extensive efforts to make sure I exhausted

8  administrative remedy.  Even though I'm blocked.  But I

9  tried to make sure I exhausted administrative remedies

10 in those types of games that are played that say I

11 didn't aren't successfully played.  I go out of my way

12 to exhaust administrative remedy on issues that I

13 anticipate may lead to litigation.

14 Q.        Kevin, did you -- and I believe this is your

15 testimony, correct me if I'm wrong, you did not review

16 any documents to prepare for the deposition today, is

17 that correct?

18 A.        No.  I don't believe I did.

19 Q.        Did you discuss the deposition with anyone?

20 A.        I did with the counselor.  Like I said, I

21 asked him Friday how this would be conducted.  Who

22 would be present, et cetera.  That was the conversation

23 we had earlier.  He's about the only one.

24 Q.        So you did not discuss it with anyone else?

25 A.        No.  I told people that I had a deposition

Exhibit A

1   today.  But as far as discussing this deposition

2   itself, no.

3   Q.        Can you tell me who Robert Carter, Jr. is?

4   A.        He's the commissioner or the director of the

5   Indiana Department of Corrections.

6   Q.        What knowledge does he have about the

7   allegations in your Complaint related to him?

8   A.        Numerous complaints I have sent in reference

9   to him.  Numerous complaints that have been made by

10  people on the outside about the conditions I was

11  subjected to.  Which can run into the thousands.

12  Q.        Kevin, I'm sorry, let me -- I may have asked

13  you a bad question.  What knowledge does he have about

14  the allegations related to broken dental equipment?

15  A.        According to the medical co-defendant, he, as

16  I stated, they specifically said they had complained to

17  the director's office, the warden, and Wexford about

18  that faulty air machine.  And they refused to repair

19  it, and refused to provide them with proper equipment.

20  And they explained that in an attempt, I guess, to try

21  to rationalize repeatedly using what they admitted was

22  faulty machinery on me that caused me suffering.  And

23  failed to repair my dental problem.

24          They admitted that they themselves had made

25  complaints and they were trying to get the machinery

1  repaired.  And they refused to repair it.  And so they

2  were using equipment that they knew was faulty on

3  people with dental care.

4  Q.          How do you know that?

5  A.          As I explained and told you that they

6  explained everything to me about the machine being

7  faulty.  Dr. Noll and defendant Ingalls specifically

8  stated this to me.  Just --

9  Q.          Have you -- I apologize.  Did you have

10  anything else?

11  A.          Oh, no, I was going to say, just like they

12  explained to me the machine being faulty.  They were

13  how I knew the machine was blowing water, which was

14  admitted when I filed my grievance, stating that they

15  had told me this.  I knew everything about the

16  machinery not being properly operating.  I wouldn't

17  have even known.  I didn't know why my filling kept

18  falling out.  They explained it to me.

19          And by way of explanation of why they were

20  still using it, told me we have made complaints to the

21  director's office, to the warden, and to Wexford, and

22  they refused to replace the machinery.  That's why

23  we're still using it.

24  Q.          Have you communicated with Robert Carter, Jr.

25  about the allegations in your Complaint?

Exhibit A

1   A.        I sent complaints, grievances, letters.  I've

2   had a multitude of people on the outside e-mail

3   complain, through phone calls, et cetera.  So, yeah, I

4   directed a multitude of complaints about most of the

5   major issues that I have filed grievances about.  I'm

6   pretty sure you probably received a lot of

7   documentations that they have a number of outside

8   complaints and protests about my treatment and

9   condition.  Reports from people on the outside.

10  Q.        Describe how Robert Carter, Jr. was

11  deliberately indifferent to your dental health care.

12  A.        I just explained.  Knowingly refusing to

13  provide dental staff with equipment, machinery, et

14  cetera, that they complained of needing to provide

15  proper care.

16  Q.        And I believe you testified that you know

17  that based on a conversation with dental staff, is that

18  correct?

19  A.        Yes.  As well as complaints made by people on

20  the outside as well.  After these problems started

21  arising.

22  Q.        Were there any other ways?

23  A.        I mean, I directly complained to them as

24  well.

25  Q.        Any other way?

1    A.         Wrote grievances, letters.  Outside people

2    complaining through e-mails and phone calls.  I

3    directed complaints -- again, most every major issue

4    that I filed grievances on, they received complaints

5    from a wide range of sources and messages about these

6    issues and they refused to correct them.  In fact, I

7    believe that's probably why they got rid of me in

8    Indiana, because of the viable complaints they were

9    getting about my condition.

10   Q.         Did you ever personally speak with Robert

11   Carter?

12   A.         No, I have not.

13   Q.         Robert Carter did not participate in your

14   treatment or make any decisions regarding your

15   treatment, correct?

16   A.         As a direct participant, a hands on

17   participant, no.

18   Q.         Robert Carter is not a medical professional,

19   correct?

20   A.         No.  But he's the person that contracts

21   medical professionals.  And I believe by law is

22   required to ensure that they provide or they're

23   provided with necessary equipment and that they are

24   properly supervising how they treat people in his

25   charge.

Exhibit A

1  Q.        Robert Carter cannot prescribe any medication

2  or treatment, correct?

3  A.        I don't know.  I don't know if he has any

4  medical qualifications or not.

5  Q.        What did you expect Robert Carter to do

6  differently?

7  A.        To ensure, when it was brought to his

8  attention, that those lead contracts who provide care

9  to people in his custody, and those who he supervises,

10  when it's brought to his attention, provide care to

11  those in his custody that is required by constitutional

12  law, by statutory law, by common law, and so on.  This

13  is what he is charged with.

14          Refusing to provide appropriate supervision

15  and care under circumstances where he was made aware of

16  illegal conduct and treatment by staff, by people he

17  contracted with to provide care to those in his

18  custody.  And as a result I suffered injury of pain, et

19  cetera.

20  Q.        Can you tell me who Dushan Zatecky is?

21  A.        He was the warden at Pendleton Correctional

22  Facility.

23  Q.        What knowledge does he have about the

24  allegations in your complaint related specifically to

25  the faulty dental equipment?

1    A.         Much the same as Robert Carter.  My response

2    is much the same as my response to your question about

3    Robert Carter.  He's informed the same way.  His

4    responsibilities were much the same.  And he failed to

5    do those responsibility in much the same way.

6    Q.         Have you communicated with him about the

7    allegations related to faulty dental equipment?

8    A.         Yes.  As I said, complaints were made to him

9    numerous ways by me.  Including my grievance that he

10   responded to.  About the faulty dental equipment.  Hold

11   on.  Did he -- I don't want to be quoted on that.  I

12   don't know that he was the one that responded.  I know

13   it went across his desk and he was specifically

14   informed by me in complaints, as well as by others on

15   the outside, through e-mails and grievances and phone

16   call complaints.

17   Q.         When you say by others on the outside, do you

18   have any record of those communications?

19   A.         I know by you by discovery.  Particularly the

20   e-mails, that sort of thing.

21   Q.         Please describe how Warden Zatecky was

22   deliberately indifferent to the issues of which you

23   complained.  Related specifically to faulty -- alleged

24   faulty dental equipment.

25   A.         Again, my answer is much the same on that

Exhibit A

1  question as it was for the question about Robert

2  Carter.  He failed to provide appropriate supervision

3  and he failed to provide proper response and care

4  related to his -- his subordinates and those who were

5  contracted with Pendleton and Indiana Department of

6  Corrections to provide dental and mental health care.

7           And he failed to properly supervise in

8  providing mental health care when it was brought to his

9  attention that faulty equipment, machinery, tools were

10 being used and they did nothing to resolve those

11 issues.  And as a consequence I suffered pain.  I

12 suffered injury.  And I continue to suffer still.  And

13 possibly still ongoing dental problems as a result.

14 Q.       Warden Zatecky did not participate in your

15 treatment or make any decisions regarding your

16 treatment, correct?

17 A.       He didn't have hands on -- no, he wasn't

18 hands on involved in the treatment.  But it was brought

19 to his attention, the situation and the problem, and it

20 wasn't resolved.

21 Q.       Warden Zatecky is not a doctor, correct?

22 A.       I don't know.

23 Q.       Warden Zatecky cannot prescribe any

24 medication or treatment, correct?

25 A.       I don't know.

Exhibit A

Kevin Johnson
February 07, 2022

1    Q.        What did you expect Warden Zatecky to do

2    differently?

3    A.        Same that I expected Robert E. Carter to do.

4    Provide proper supervision, training, intervention,

5    supervision of his subordinates, contracted medical and

6    mental health, dental et cetera, staff in their

7    treatment of people in his custody.  Which he failed to

8    do.  And as a result, again, I suffered pain, injury

9    and ongoing stress of psychological pain, et cetera.

10   Q.        What damages are you seeking from Warden

11   Zatecky and Commissioner Carter?

12   A.        What I stated in the addendum clause of my

13   suit.  From an excess of $20 that a jury finds fair and

14   just.  That would be compensatory, punitive and nominal

15   damage.

16   Q.        Please describe your injuries, your physical

17   injuries that you allege that have occurred from your

18   filling and crown falling out.

19   A.        From my filling falling out, the filling

20   falling out leaves an open wound in my tooth.  Painful

21   open hole in my tooth.  Multiple times.  Because of my

22   -- my gold crown falling out I suffered with several

23   cavities that developed because the tooth had been

24   filed down to where the pulp in the back of my tooth

25   was exposed.  There was a big hole where they filed the

1  tooth down so that the crown now actually becomes the

2  enamel.  Then they cement it in.

3         So a large part of the inside of my tooth was

4  exposed to everything.  So I ended up with cavities at

5  the bottom of my tooth, the side of my tooth, the back

6  of my tooth.  I suffered extreme pain by having a large

7  part of the inside of my tooth exposed to the elements.

8  Cold, hot, et cetera.  Because almost the entire back

9  of my tooth, the enamel has been filed away.  Yeah.  I

10 suffered the pain of having my tooth drilled in order

11 to repair and replace the filling, which was done

12 several times without any anesthesia.

13        Although no -- he said it could be done so

14 fast that I probably could forgo any anesthesia.  But I

15 certainly don't allow anesthesia a lot of times with a

16 lot of my treatment, because it causes swelling and a

17 lot of other stuff that I don't like.  But, yeah, the

18 pain.  The cavities.  Et cetera.

19 Q.        Did your injuries cause any physical

20 limitations?

21 A.        Yeah.  It injured my ability to eat.  It

22 injured my ability to sleep.  Caused a lot of -- yeah.

23 Cavities cause --

24 Q.        I apologize for speaking over you.  What were

25 you saying about your physical limitations?

1    A.        Open holes in your teeth.  Cavities are some

2    of the most painful things you can suffer.  They cause

3    many -- a lot of intended suffering.  Impaired sleep.

4    Impaired ability to eat.  Impaired ability to consume

5    what you may consume ordinarily food and liquid wise.

6    A lot of painful shocks.  Yeah.  Caused a lot of

7    intended pain and suffering.

8    Q.        Did it cause you to miss work?

9    A.        I didn't have a job.  I was in the hole.  I

10    was in segregation.

11    Q.        You did not have to pay for any dental care

12    provided by the facility, correct?

13    A.        I paid in pain and suffering.  I don't think

14    you can quantify that.

15    Q.        So no money, correct?

16    A.        No, I didn't -- I didn't lose money that I

17    know of.  Except having to pay these filing fees, et

18    cetera.

19    Q.        If this case were to go to trial, who do you

20    expect to call as witnesses in this case?

21    A.        I would have to look over people who were in

22    my vicinity who was specifically relevant to what

23    happened to me with respect to these claims.  I haven't

24    made that determination yet.

25    Q.        Kevin, do you keep a diary, journal, notebook

1    or other contemporary record of your life?

2    A.        No, I don't.

3    Q.        Have you spoken with anyone else about this

4    lawsuit since you filed it?

5    A.        In what way?  What do you mean?  I talk to a

6    lot of people about my lawsuits.  I've written about

7    it.  I've published articles about it a lot.

8    Q.        You say you wrote an article about that?

9    A.        Yeah.  They're published articles.

10   Q.        Where would that be located?

11   A.        I have to go -- I'd have to consult with

12   folks to get the links.  Some of them are online.  Some

13   of them were publicly published in journals and

14   newspapers.  I would have to specifically ask some of

15   the -- the editors and publishers that I worked with,

16   you know, where they can be referenced.  Or found.

17   Q.        When you say in a journal, what -- where is

18   that typically located?  Is there a specific one you

19   publish with?

20   A.        My stuff is published in a wide range of

21   publications.  Journals -- specific journals that I've

22   written for, like, focus on entomagraphy.  Journals.

23   Well, mostly political -- political journals.  Like I

24   published one in Canada called Kype Journals.

25   Q.        Okay.  So, Kevin, I think that's all I have

1    for you at this time.

2               MR. KIRTLEY:  Erika, do you have any

3          followup?

4               MS. STEUERWALD:  I do have a couple

5          questions.

6                         *    *    *

7                         EXAMINATION

8                         *    *    *

9    BY MS. STEUERWALD:

10   Q.        Mr. Johnson, where were you living in

11   December of 2019 at Pendleton?  What unit?

12   A.        I was in the segregation unit.

13   Q.        Is that G cell house?

14   A.        Yeah.  G cell house was the population unit I

15   was in.

16   Q.        Tell me about the process of getting from G

17   cell house to the dental appointments.

18   A.        The process?

19   Q.        Yes.  How that works?

20   A.        Submit -- you submit a request.  Let me --

21   let me ask something else.  I'm sorry.  To both of you

22   all.  Just brought something -- well, brought

23   something to my attention that it may provide an answer

24   to the questions ya'll asked on liability.  From

25   reading the documentation that you sent me, it would

1   imply that the warden has failed to provide a system

2   whereby those incarcerated in Pendleton could be

3   escorted in a timely manner to medical, dental, et

4   cetera appointments.

5           I'm not conceded that that's true.  But from

6   responses that were written by Ingalls and others, they

7   intended to imply that they would make requests to

8   security, and security, being under the warden's

9   supervision and direction, did not have a system in

10  place whereby they could timely get people escorted

11  from G cell house to dental appointments and that sort

12  of thing.

13          As I said, I was specifically told by Noll

14  that he was deliberately going to delay my being

15  brought to dental because of me filing a grievance.

16  But that may be another factor in answering how Zatecky

17  was liable.  Because he failed to ensure that there was

18  a system in place whereby people could be escorted from

19  G cell house in a timely matter to dental visits if

20  they had painful dental conditions, or serious medical

21  conditions, that sort of thing.  But outside of that --

22  Q.      Mr. Johnson, I'm going to stop you right

23  there.  I want you to clarify something.  You said Dr.

24  Noll told you about a delay.  Can you repeat that

25  sentence?

Exhibit A

1  A.          Yeah.  I explained that earlier.  I said he

2  told me, because I filed a grievance, he said he -- he

3  said if you file another grievance about your dental

4  issues, I'll make sure you stay in that cell for six

5  months before you get over here.  He said that's the

6  maximum amount of time I have to see you when you got a

7  dental problem.  He said don't be writing no

8  grievances.

9          He was angry because I wrote a grievance

10 about not being brought to dental and I'm suffering

11 from pain in my mouth.  And he told me he would make me

12 wait the maximum time period with pain with dental

13 problems the next time I had another dental issue if I

14 wrote another grievance about me having dental issues.

15 Q.          When -- when did Dr. Noll say that?

16 A.          I think he said that either the second or the

17 third time that I came to dental.  To have my tooth

18 filled.

19 Q.          Mr. Johnson, I want to go back to my

20 question.  So how did you get from G cell house to

21 dental?  Tell me that process.

22 A.          Guards had to escort me.  They would escort

23 me.  They would bring me -- they would chain me up, put

24 me in handcuffs, shackles, that sort of thing, and

25 escort me from G cell house to dental, which they had

1    -- they were supposed to have escort staff available at

2    all times just specifically for that function.  To

3    transport or move people incarcerated in the

4    institution to different places.  Medical, dental,

5    mental health.  Outside cell mental health visits, that

6    sort of thing.

7    Q.        How many guards would typically escort you to

8    dental from G cell house?

9    A.        One.

10   Q.        One?

11   A.        Yes.

12   Q.        Were there two sometimes?

13   A.        Sometimes two.  Most -- most every time was

14   one.

15   Q.        Were there times there weren't enough guards

16   to take you to your dental appointment?

17   A.        I don't know.  As I said, that's one of the

18   issues with regard to the conditions of confinement.

19   When you asked did I get rec and I told you they were

20   always claiming they were short of staff for

21   everything.  Everything suffered at that institution

22   because of claimed staff shortages.  Food access.

23   Access to cleanliness in the housing unit.  Access to

24   going outside to exercise in rec.

25              And as you're implying, shortage of staff was

1    the go to explanation or excuse or pretext for why we

2    didn't get almost anything that we were legally

3    entitled to.  They always claimed it was a shortage of

4    staff.

5    Q.          Mr. Johnson, I'm looking at an incident

6    report from September 26th, 2019 regarding

7    inappropriate conduct.  "While conducting a mental

8    health round on 2C range under Kevin Johnson's

9    behavioral health stature itself.  Of speaking with the

10   offender he began to act strangely.  She then noticed

11   that offender appeared to be stroking and rubbing

12   himself inappropriately while speaking with behavioral

13   health staff.  Immediately ended the conversation and

14   walked down the range to leave."  Do you recall that

15   incident?

16   A.          There was no such incident.  Again, I object

17   on the basis, as I said before, that's slander, that's

18   insulting.  That is stigmatizing.  Harassing.

19   Degrading.  And a multitude of other things.  It never

20   happened.  And I would charge that that was invented as

21   a response to me notifying Northcutt that I was going

22   to sue them for refusing me mental health care.

23          And the very fact that it was bogus is

24   indicated by the fact that that report was never filed.

25   That report was never heard.  There was never a

Exhibit A

1    conviction that came from that report.  That report was

2    written and never processed.  So there's a whole lot of

3    questions connected to a report that's written and

4    nothing happens with it and suddenly it finds its way

5    into this legal record.  And it was never even heard,

6    processed.  Where did it come from?

7    Q.        Were they addressed -- was it addressed when

8    you -- didn't you -- did you leave for Wabash Valley

9    shortly after this incident?

10   A.        I left Wabash Valley, and I have the letter

11   -- you said after that incident?  No.

12   Q.        This incident happened in September 27th,

13   2019.  When did you arrive at Wabash Valley?

14   A.        I arrived at Wabash in 2020.  September.

15   That's a whole year later.  So, no.

16   Q.        A year later.  Okay.

17   A.        Yeah.  And that was -- I have the letter.  I

18   was transferred after an alleged assault on another

19   prisoner and a guard.  There was a letter written by

20   the internal affairs investigator at Pendleton calling

21   for the transfer.

22   Q.        And so, going back to the dental equipment,

23   how do you know that the dental equipment was faulty?

24   A.        I just told you.  They stated it to me.  They

25   admitted it in the grievance.  And I think it was just

1    read on the record that there was water in the air line

2    that should not have been, when the fillings were

3    placed in my teeth.  And as a result, the fillings did

4    not dry.  And fell right back out.

5    Q.        When you say they, I'm trying to understand

6    who -- who were they?  I want to understand everybody

7    that told you that.

8    A.        Again, Ingalls gave me the specifics.  She

9    went and got a paper towel, held it in her hand.  Used

10   the air hose on the air machine and blew onto the paper

11   towel showing me that water was coming out of the air

12   hose.  Saturated with water.  She explained to me the

13   reason why my filling came out the first time, and

14   would likely keep coming out, was because they were

15   using an air hose to dry -- supposedly dry the filling

16   that was not drying the filling, because it was blowing

17   water out.

18             So the filling did not properly dry when they

19   would put in the tooth.  And therefore did not set

20   correctly.  And as a result they kept falling back out.

21   She told me and she demonstrated to me the water coming

22   out of the air hole.  Dr. Noll was there and he

23   confirmed everything she was saying.  He was yesing and

24   agreeing with everything she was telling me.

25             And they both were telling me how they had

Exhibit A

1  complained to Wexford, to the director's office, and to

2  the warden about the air machine and it needed to be

3  replaced.  And how they refused to replace it.  In

4  response to my grievances, it was admitted that the air

5  hose machine blew air -- I mean blew water, and was the

6  cause of my fillings coming out again.

7        And I guess in some sort of mitigation they

8  said, well, he didn't charge you for the repair that

9  you received this time when your filling fell out again

10 because of this.  So they acknowledged, in response to

11 my grievance in writing, and you read earlier, the

12 acknowledgement that air -- I mean water was coming out

13 of the air hose.  There was water in the system.

14        MS. STEUERWALD:  I have no further

15        questions.

16        MR. KIRTLEY:  I have no follow up to

17        that.  So, Mr. Johnson -- or, Erika, I'll let

18        you kind of run through if he wants to make a

19        statement.

20        MS. STEUERWALD:  You can go ahead,

21        Andrew.  That's fine.

22        MR. KIRTLEY:  Mr. Johnson, since Erika

23        and I are both done today and you don't have

24        an attorney to represent you, we'd like to

25        give you the opportunity to make a statement,

1    as if you had an attorney here to make

2    questions.  Is there any statement you would

3    like to make?

4         THE WITNESS:  Is there a statement I

5    should make?

6         MR. KIRTLEY:  I'm not your attorney, but

7    for me it's usually about 50/50.  Sometimes

8    people do make statements.  Sometimes they

9    don't.  I just wanted to afford you the

10    opportunity today.

11         THE WITNESS:  Well, I would like to

12    state for the record that I wish to review

13    the transcript of the deposition before it is

14    submitted or used, in case there are

15    objections as to the accuracy of it or what

16    have you.

17         MR. KIRTLEY:  Anything else?

18         THE WITNESS:  I would state again, I

19    would reassert my concern regarding

20    privilege.  That I was compelled to discuss a

21    lot that was related to medical, dental and

22    mental health that are private in the

23    presence of people who are not medical,

24    mental or dental health professionals, and

25    not as part of any public record or anything

Exhibit A

1    that has already been submitted in the public

2    domain, but as a general question and answer

3    session that was part of a deposition that

4    has, as yet, not yet been made public, and

5    may not be made public, based upon objections

6    as to the confidentiality of things that have

7    been discussed.

8         So I think I've been compelled to go

9    against my privileges.

10        MR. KIRTLEY:  Mr. Johnson, I think

11   you're getting into kind of what Magistrate

12   Garcia got into today.  But anything --

13        THE WITNESS:  I wanted it on the record

14   what my continued objection, what I've been

15   made to do and why it violated my rights.

16        MR. KIRTLEY:  Okay.

17        THE WITNESS:  And that's to be

18   challenged to the District Judge and the

19   District Judge to the Court of Appeals.  So I

20   want to get on record what my objections are.

21        MR. KIRTLEY:  Anything else?

22        THE WITNESS:  No.  That's about it.

23        MR. KIRTLEY:  Well, thank you for coming

24   to your deposition today.  And it sounds like

25   you would like to review for signature, is

1    that correct?

2         THE WITNESS:  Review for signature?

3         MR. KIRTLEY:  I think you said you

4    wanted to review the transcript and sign it.

5         THE WITNESS:  Yes, I do.

6         MR. KIRTLEY:  Okay.  Erika, I will let

7    you go through the -- I don't know if the

8    liaison is the appropriate person at that

9    facility, or how they do it.

10        MS. STEUERWALD:  That's a good question,

11   Andrew.  So typically, Mr. Johnson, what you

12   are asking for is an Errata Sheet of the

13   deposition.  The court reporter will send you

14   a copy of this deposition.  This is not a

15   time to change substantive details of the

16   deposition.  However, it is an opportunity to

17   correct spelling of names or if a name has

18   been misplaced.  For example, if we're

19   talking about Northcutt and the name is

20   listed incorrectly.

21        And so this is not an opportunity for

22   you to go in and change your testimony.  But

23   you will be sent that and you can return a

24   copy to the court reporter.

25        THE WITNESS:  Okay.  Can I just request

1    for -- in terms of it being delivered, that

2    it be sent legal mail, because anything

3    outside of legal mail may be withheld for

4    weeks or months arriving at the institution.

5    So it needs to be provided as legal mail so

6    it's delivered directly to me.  As opposed to

7    just being held up for months at a time.  As

8    they tend to do with general -- bulky general

9    mail.

10            MS. STEUERWALD:  And, Lisa, I can talk

11   to you offline if it would be easier for you

12   to send the Errata Sheet to us and I can have

13   my paralegal Kelly send legal mail to Mr.

14   Johnson.

15            THE COURT REPORTER:  Okay.

16            MR. KIRTLEY:  And this is Andrew Kirtley

17   from the State.  We're going to take a

18   condensed pdf, please.

19            MS. STEUERWALD:  And we would like a

20   condensed pdf as well.  And is it possible to

21   send a rough copy?

22            THE COURT REPORTER:  Okay.

23                    *    *    *

24            (Witness excused.)

25                    *    *    *

Exhibit A

Kevin Johnson
February 07, 2022

1          (Whereupon, the telephonic deposition

2      was concluded at 12:02 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit A

C E R T I F I C A T I O N

I, Lisa M. Cooper, a Court Reporter and Notary Public, do hereby certify the foregoing to be a true and accurate transcript of my original stenographic notes taken at the time and place hereinbefore set forth.

Witness my hand and official seal this 10th day of February A.D. 2022.

_____
Lisa M. Cooper
Court Reporter and Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any names, unless under the direct control and/or supervision of the certifying reporter.)

Exhibit A 117

Kevin Johnson
February 07, 2022

```
 1              INSTRUCTIONS TO WITNESS

 2                Read your deposition over carefully.  It

 3    is your right to read your deposition and make changes

 4    in form of substance.  You should assign a reason in

 5    the appropriate column on the errata sheet for any

 6    change made.

 7                After making any change in form or

 8    substance, and which have been noted on the following

 9    errata sheet, along with the reason for any change,

10    sign your name on the errata sheet and date it.

11                Then sign your deposition at the end of

12    your testimony in the space provided.  You are signing

13    it subject to the changes you have made in the errata

14    sheet, which will be attached to the deposition before

15    filing.  You must sign it in front of a witness.  Have

16    the witness sign in the space provided.  The witness

17    need not be a notary public.  Any competent adult may

18    witness your signature.

19                Return the original errata sheet to the

20    court reporter promptly!  Court rules require filing

21    within 30 days after you receive the deposition.

22

23

24

25
```

Kevin Johnson
February 07, 2022

1   ERRATA SHEET

2   PAGE        LINE NO.        CHANGE        REASON THEREFOR

3   ------------------------------------------------------------

4   ------------------------------------------------------------

5   ------------------------------------------------------------

6   ------------------------------------------------------------

7   ------------------------------------------------------------

8   ------------------------------------------------------------

9   ------------------------------------------------------------

10  ------------------------------------------------------------

11  ------------------------------------------------------------

12  ------------------------------------------------------------

13  ------------------------------------------------------------

14  ------------------------------------------------------------

15  ------------------------------------------------------------

16  ------------------------------------------------------------

17  ------------------------------------------------------------

18  ------------------------------------------------------------

19  ------------------------------------------------------------

20  ------------------------------------------------------------

21  ------------------------------------------------------------

22  ------------------------------------------------------------

23  ------------------------------------------------------------

24  ------------------------------------------------------------

25  ------------------------------------------------------------

1       SIGNATURE PAGE

2           OF

3       KEVIN JOHNSON

4

5          I hereby acknowledge that I have read

6   the aforegoing deposition, dated February 7th, 2022,

7   and that the same is a true and correct transcription

8   of the answers given by me to the questions propounded,

9   except for the changes, if any, noted on the attached

10  errata sheet.

11

12

13  SIGNATURE:        ---------------------------------------

14

15  WITNESSED BY:     ---------------------------------------

16  DATE:             ---------------------------------------

17

18

19

20

21

22

23

24

25

108:6 109:13

**2020**
  38:3 59:10
  60:16 65:19
  70:4,9,10,
  15,16 77:2
  80:7,11 81:3
  89:2 109:14
**2191906**
  77:4
**23rd**
  74:22 75:9
  80:23
**250,000**
  86:1,10
**26**
  17:12
**264847**
  30:1
**26D1E**
  5:10 6:5
  9:19 10:14
  15:18
**26th**
  108:6
**27**
  74:25 77:5,
  16,21
**27th**
  109:12
**2C**
  108:8

---

### $

**$20**
  71:22 100:13

---

### -

**--certainly**
  7:21

---

### 1

**1100**
  90:22
**15**
  35:20
**16**
  77:19
**16th**
  38:2 74:17
  77:17 81:20
**18th**
  73:22 74:2
  83:3
**1971**
  29:24
**1990**
  35:22 36:13

---

### 2

**20**
  77:2
**201**
  90:5
**2016**
  50:5
**2018**
  37:7 38:2
  61:9 70:9
  74:17 89:2
**2019**
  73:13,14,16,
  22 74:22
  80:22 104:11

---

### 3

**30**
  25:15,19
  64:19
**312991**
  77:21
**3:17**
  60:16
**3rd**
  29:24 59:10
  60:16 65:19
  77:18 81:18

---

### 4

**413**
  73:17

---

### 5

**50**
  33:7
**50/50**
  112:7

---

### 6

**6**
  28:14
**602**
  90:5

---

### 8

**84**
  62:19
**88**
  59:11
**8th**
  75:7

---

### 9

**9**
  40:6 74:19
  80:21
**95**
  69:19

---

### A

**ability**
  34:17 79:23
  81:11
  101:21,22
  102:4
**able**
  14:25 20:10

  22:3 50:16
  51:15 52:13
**above**
  11:7
**absolutely**
  8:2
**abuse**
  35:7 59:15
  63:10 64:23
**access**
  21:3 26:12
  34:11 40:3
  64:9 68:18
  82:8 107:22,
  23
**accessible**
  42:9
**accommodating**
  41:5
**accommodation**
  19:9 21:5
  27:6
**account**
  56:15 90:18
**accuracy**
  112:15
**accurate**
  47:25 74:6
  90:24
**acknowledged**
  78:5,6 80:5
  111:10
**acknowledgement**
  111:12
**across**
  98:13
**act**
  26:20 108:10
**acting**
  67:9
**action**
  58:10
**active**
  59:12
**activity**
  39:20

Exhibit A

acts
  53:20
add
  15:9 58:16
  72:2
addendum
  71:21 85:8
  100:12
address
  5:19 8:18
  50:16
addressed
  16:11 39:21
  40:5 42:4
  87:9 88:13
  109:7
addresses
  40:7
adequate
  72:22,23
  73:7 81:17
  82:8
adequately
  72:17
administered
  32:21 33:3
administrative
  92:8,9,12
admit
  79:11
admitted
  61:16,19
  72:12,13
  73:9 75:13,
  20 76:10,11,
  14 77:11
  78:4,18,21
  79:22 82:16
  84:23 93:21,
  24 94:14
  109:25 111:4
admittedly
  82:25
adolescence
  35:18

adult
  88:18
advise
  32:2
afar
  22:1
affairs
  109:20
affiliation
  39:20
afford
  112:7
afield
  22:1
agree
  21:23 22:17
  47:13 48:5
  49:5 56:6,8
  59:5 70:8
agreed
  83:25
agreeing
  110:24
ahead
  10:25 12:23
  23:6 24:21
  82:11 83:18
  111:20
air
  75:11,13,24,
  25 76:2,3,7,
  12 77:8,10,
  23 78:7,8,9,
  22 81:7,25
  84:1,2,18,
  19,24 93:18
  110:1,10,11,
  15,22 111:2,
  4,5,12,13
alcohol
  35:5,12
alive
  54:13
allegation
  55:7 58:8,11
allegations
  38:4 93:7,14

94:25 97:24
  98:7
allege
  100:17
alleged
  98:23 109:18
allegedly
  36:1 39:18
alleging
  27:1
allow
  6:3 7:4 17:8
  43:24 44:19
  47:7,14
  48:10 56:6
  65:3 83:6
  101:15
allowed
  17:11 22:2
  23:10 25:13
  46:2 60:2,21
  67:4 68:23
allowing
  44:22
allows
  48:25
Alongside
  72:6
amount
  106:6
Andrew
  7:11 10:2
  13:1 14:11
  15:8 28:11
  87:13,23
  111:21
  114:11
  115:16
anesthesia
  101:12,14,15
anesthetic
  74:7 77:8
angry
  106:9
answer
  10:19 12:4,
  15 17:17

19:14 28:25
  29:7 32:4,
  10,15,21
  33:2 40:18
  44:6 46:21
  53:23 98:25
  104:23 113:2
answered
  16:19
answering
  32:17 105:16
answers
  16:23 18:22
  31:20
anticipate
  16:10 25:14
  92:13
anybody
  50:10 51:15
  57:9 60:13
  67:18,22,25
anymore
  34:12 55:8
anyone
  6:23 92:19,
  24 103:3
apologize
  33:5 94:9
  101:24
apparently
  50:25 61:22
  89:9,11
appealing
  23:25
Appeals
  113:19
appeared
  108:11
applied
  49:21,24,25
  50:4,12
appointment
  75:1 107:16
appointments
  104:17
  105:4,11

Exhibit A

appreciate
  27:14
appreciated
  19:10
appropriate
  97:14 99:2
  114:8
appropriately
  84:22
approximately
  74:16 75:3,5
arbitrary
  66:22
area
  86:23
areas
  20:12
arisen
  18:10
arises
  27:22
arising
  95:21
around
  35:20 38:2
  52:20 79:5
  80:23 86:15,
  17,19
arrange
  6:1
arranged
  11:2,14
arrive
  74:15 109:13
arrived
  109:14
arriving
  115:4
article
  103:8
articles
  103:7,9
asked
  16:2 17:7
  28:21 44:10
  48:8 56:17
  59:2 71:15,

21 81:8 83:8
86:25 91:2
92:21 93:12
104:24
107:19
asking
  6:24 10:4
  12:3,15
  15:25 18:11
  22:5 23:20
  71:16,19
  114:12
aspect
  56:22
assault
  109:18
assert
  6:24
asserted
  29:2
assessed
  46:24 50:19
  57:2 69:19
assessment
  46:3 59:2,4
  60:20 62:4
  68:24
assessments
  60:23 61:23
assigned
  62:14,17
assist
  69:2,11
assistance
  51:16 62:5
  68:24 71:14
assistant
  33:13 75:11
  77:6 78:6
  85:4
assume
  32:10
assumed
  50:2
attach
  22:11

attacks
  51:12
attempt
  93:20
attempting
  77:22
attention
  68:10 75:6
  81:14 97:8,
  10 99:9,19
  104:23
attorney
  6:17 14:10
  21:14,21
  29:13 111:24
  112:1,6
attorneys
  18:17
available
  15:1 40:9,
  16,21 41:2
  42:17 72:22,
  23 107:1
awaiting
  42:25
award
  71:2,3,5
  85:11,12
awarded
  86:8,9
awards
  86:3,4
aware
  23:2 38:18
  41:1,22 44:4
  47:16 59:7
  63:1 64:2
  72:9 80:11
  88:7 97:15

---

**B**

B-R-E-N-E
  29:21
back
  19:22 51:23
  62:17 75:18,

21 76:8,16
78:13 81:19
82:11,18
83:1,4,6
84:6 100:24
101:5,8
106:19
109:22
110:4,20
background
  33:4
bad
  93:13
balance
  20:17 22:23
based
  8:12 72:14
  82:17 83:4
  95:17 113:5
basic
  15:23 54:2
basically
  65:11
basis
  5:14 17:14
  40:5 42:16
  56:5 67:13,
  19 70:24
  71:17 108:17
bathroom
  41:21
began
  38:7 79:20
  108:10
begin
  32:17
behalf
  6:22,23 7:3
behavior
  53:10 58:1
  63:11
behavioral
  108:9,12
believe
  14:3 15:5
  22:12 27:5
  48:1,2 50:5

52:7 71:10
86:13 88:25
91:12 92:14,
18 95:16
96:7,21
**believed**
51:16
**best**
32:14 63:21
**big**
100:25
**bind**
75:23
**birth**
29:23,24
**bit**
83:16
**blew**
75:25 76:4
78:7,9 81:25
110:10 111:5
**block**
91:17
**blocked**
92:8
**blood**
34:14
**blow**
75:25 76:3
78:8
**blowing**
75:12,15
76:2,13,15
78:21 84:2,
23 94:13
110:16
**bogus**
108:23
**boils**
12:5
**bond**
72:17 75:23
78:11 82:15,
17,20 83:1
**bonding**
84:25

**bonds**
83:8
**book**
34:24
**bottom**
41:20 101:5
**bought**
41:6
**bouts**
51:8
**break**
13:9 87:15,
18
**Brene**
29:21
**bridge**
74:10
**brief**
10:5 59:14
**bring**
106:23
**broad**
64:17 65:4,8
67:5,13,24
**broken**
76:7 93:14
**brought**
27:1 68:9
75:6 81:13
97:7,10
99:8,18
104:22
105:15
106:10
**brown**
86:18
**bulky**
115:8
**bunk**
41:20
**buy**
40:13,19,23,
25

---

### C

**calendar**
61:12
**call**
7:5,6 10:8
11:16 12:24
20:12 98:16
102:20
**called**
45:8 46:4
55:13 61:4
65:9 103:24
**calling**
13:1 109:20
**calls**
6:14 16:7
17:11 20:13,
20 95:3 96:2
**Canada**
103:24
**canceled**
40:8
**caps**
82:21
**care**
9:6 19:3
38:5,17,19,
20 39:2,5,8
41:25 42:2,
7,8,23,25
43:1,2,17,
19,23 44:2,
7,8,20,25
45:4,5,6,15,
22 46:2,3,
10,15 47:11,
12,13,20,24
48:14,15
49:7,15,17
50:7,15,21
51:1,14
52:18 53:1
54:9,11,22,
25 55:3,10,
16,18,19,21,

25 56:13,16,
22 57:4,5,
10,12,14,17
58:13,19,22
59:2,3,23
60:20,22
61:18,20
62:1,4,9
64:9 66:5,8,
9,11,15,16,
21,24 68:5,
8,14 69:4
70:22 71:1,
12 72:2,7,21
73:1,6,7
75:8 77:3,6,
20 78:23
79:8,11,24
80:2,3 82:8
85:21 87:1
91:20,21
94:3 95:11,
15 97:8,10,
15,17 99:3,
6,8 102:11
108:22
**caries**
73:23
**carpenter's**
33:13
**Carter**
13:14 87:24
90:9 91:2
92:4 93:3
94:24 95:10
96:11,13,18
97:1,5 98:1,
3 99:2
100:3,11
**case**
7:23 16:25
20:19 21:1
26:16 33:6
34:24 43:5
54:18 58:16,
18,20 70:7,
12 71:19
86:10 88:6

90:4,5,15
102:19,20
112:14
cases
33:25 79:7
catch
28:13
caused
51:11 56:14
73:1,9 86:22
93:22 101:22
102:6
causing
84:5
cavities
86:14,20,22
100:23
101:4,18,23
102:1
cell
51:21,22
52:14,15,21,
23,25
104:13,14,17
105:11,19
106:4,20,25
107:5,8
cells
52:14,24
cement
73:25 83:5
101:2
Center
36:19,22,25
certain
22:3,7 41:5
certainly
24:3 101:15
cetera
44:11 51:10,
12 52:10
57:5 64:9,21
65:1 78:16,
25 79:20
82:9 91:25
92:22 95:3,
14 97:19

100:6,9
101:8,18
102:18 105:4
chain
106:23
challenged
113:18
chance
24:7
change
114:15,22
charge
77:4,20
96:25 108:20
111:8
charged
97:13
charges
36:4,5 88:12
check
52:12 54:20
child
63:10
cholesterol
34:15 38:14
43:15
choose
67:5
chronic
31:10 37:14,
19 38:14,15
42:22 43:17,
19
Ciemone
44:17 45:9
50:13
circumstances
20:11 97:15
City
36:5
Civic
15:18
civil
5:9 6:5 9:18
10:14 33:19
34:25

claim
39:20 40:6,8
42:12 58:16
64:22 67:6
72:2 85:15
claim's
39:21
claimed
107:22 108:3
claiming
107:20
claims
27:2 38:18
40:5 44:13
70:12 71:1
83:13 85:5
87:5 102:23
clarify
105:23
Clark
65:18
classificatio
n
54:19
classified
25:5 54:18
clause
71:21 85:8
100:12
cleanliness
107:23
clear
16:5 20:9
26:2 31:12
41:18 45:1
48:5 67:3
80:16
clearly
20:6 31:5,7,
13
client
21:14,21
44:13 58:22
clients
9:5
clinic
77:8

clinical
51:6
clubs
39:23
co-defendant
93:15
coincide
58:12
cold
74:24 78:15,
25 101:8
come
7:19 37:5
52:7,20,23
82:18 109:6
comfortable
62:24
commences
11:10
comments
53:11 57:22
commissary
40:3,4,13,
16,21,25
41:2
commissioner
93:4 100:11
commitments
35:14,17
common
6:9 36:4
97:12
communicated
20:10 94:24
98:6
communication
21:22
communication
s
20:24 98:18
compact
89:7,10
compel
11:22
compelled
5:10 112:20
113:8

compensatory
  71:6 100:14
complain
  95:3
complained
  81:8 93:16
  95:14,23
  98:23 111:1
complaining
  96:2
complaint
  29:4 93:7
  94:25 97:24
complaints
  29:9 44:7
  74:24 79:9,
  21 93:8,9,25
  94:20 95:1,
  4,8,19 96:3,
  4,8 98:8,14,
  16
complete
  20:13 77:9
completely
  6:21
compromised
  31:13
computer
  36:6
conceded
  88:16 105:5
concern
  5:7 6:24
  8:1,12,24
  9:24 11:4,5,
  24 15:15,16
  17:5,15,18
  20:15 22:18
  24:15,17
  64:18,19
  65:10 67:11
  112:19
concerned
  25:6
concerns
  5:19,25 6:22
  8:17 23:24

25:3 45:15
46:12 50:16,
17,18 56:24,
25 62:25
63:15,20
64:22 83:11
condensed
  115:18,20
condition
  37:9,11,13,
  14 42:19
  57:7 66:8
  72:8,10 95:9
  96:9
conditioned
  68:7,10
conditions
  37:19 38:8,
  11,13 69:16
  71:13 91:13,
  19 93:10
  105:20,21
  107:18
conduct
  12:8 20:13
  23:1 40:10
  97:16 108:7
conducted
  6:6,13 7:6
  16:1,7 17:8
  92:21
conducting
  108:7
conference
  13:13
conferencing
  15:1
confessing
  72:15
confidential
  7:6 22:6,20
  26:22 28:9
  64:10
confidentiali
ty
  17:1 21:17
  46:14 62:21

63:2 64:3,7,
12 65:13
69:21 113:6
confined
  42:16 49:15
  70:11
confinement
  107:18
confirm
  29:23 36:7
confirmed
  84:15 110:23
conflict
  5:24 8:9,23
connected
  109:3
consent
  43:24 44:21
  46:4,6,7
  47:2,6,7
  48:18,22,23
  62:20 68:1,
  11
consented
  47:21 56:4
consequence
  71:12 99:11
considerable
  72:9 73:2
considered
  86:4
consist
  54:12
constitutiona
l
  26:19 55:24
  66:10 68:4,
  6,8,14 91:23
  97:11
consult
  12:7 45:13
  103:11
consume
  102:4,5
contact
  54:12 61:13
  68:23

contemporary
  103:1
contents
  24:6
continue
  37:1 99:12
continued
  49:17 51:8
  113:14
continuity
  38:7
contract
  49:12,21
  50:2,6,11
contracted
  97:17 99:5
  100:5
contractors
  91:25
contracts
  96:20 97:8
contradiction
  26:5
contradicts
  24:14
contrary
  22:13
conversation
  19:12,23
  48:17 49:4,8
  53:1 84:16
  92:22 95:17
  108:13
conversations
  44:23 47:8
convey
  56:24
convicted
  53:21
conviction
  53:20 88:14,
  16 109:1
convictions
  88:20,23
cool
  58:15

Exhibit A

cooperate
  8:4  9:23
  10:8  11:18
copies
  44:3  47:17
  48:2  55:12
copy
  31:15  54:6
  65:20
  114:14,24
  115:21
correct
  37:22  43:17
  44:9  45:17
  65:23  68:20
  69:5,25
  70:17  75:2
  82:13  88:10
  89:2,8,23
  90:6  92:15,
  17  95:18
  96:6,15,19
  97:2  99:16,
  21,24
  102:12,15
  114:1,17
Correction
  50:22
correctional
  6:10  7:15
  9:4  13:21
  14:23  15:4,
  7,23  24:23
  25:2  36:18,
  20,23,24
  37:5,22  38:6
  89:1,5  97:21
Corrections
  16:7  67:10
  93:5  99:6
correctly
  9:12  110:20
correspondenc
  e
  79:19
cough
  31:11

counsel
  5:11,23  14:3
  15:16  20:22
  21:21  25:9
  27:5  61:23
counseling
  62:22  64:1
counselor
  9:15  15:23
  17:22,25
  18:3,4  56:20
  67:22  82:10
  92:20
couple
  79:25  104:4
course
  16:18,20
  21:3  22:9
  24:13  25:24
court
  5:18  6:25
  7:7,22  11:21
  12:20  16:14
  19:7  21:10
  26:25  30:4,
  5,19  31:2,21
  32:13,21
  34:10  89:18,
  20  113:19
  114:13,24
  115:15,22
cover
  89:9
covered
  87:6
covering
  16:16
cracked
  43:6
cracks
  86:17,19,22
created
  45:8  65:25
  66:22
creates
  25:12

crime
  88:23
Crimes
  53:22
criminal
  53:9,20  58:2
  88:21
crisis
  48:20  69:10,
  14
critical
  48:20
crown
  73:24  74:1,
  3,10  80:11
  82:16,17
  83:8  85:19
  100:18,22
  101:1
current
  42:24  59:12
  69:24  70:3
  88:18
custody
  50:5,11
  91:12  97:9,
  11,18  100:7
cycles
  51:10

―――――――――

D

damage
  86:3,4
  100:15
damaged
  84:23
damages
  27:2  34:6
  71:5  100:10
date
  29:23,24
dates
  61:12
Dawn
  30:8  83:14,
  19

day
  41:10,11
days
  25:15,19
  40:12
DDS
  73:23
deadline
  24:12
dealing
  16:14  17:1
  24:19  26:21
deals
  17:12  64:6
dealt
  56:21
December
  73:12  74:22
  80:22  104:11
decide
  12:20
decision
  23:10,11
decisions
  96:14  99:15
decline
  47:10
defamation
  53:21  58:3,
  17
defendant
  47:16  52:5,9
  60:21  72:6
  94:7
defendants
  6:18  9:1
  14:3,6,12,
  14,15  18:18
  22:10  24:5
  25:17  27:2
  29:14  30:10,
  12  57:11
  58:19  66:2
  87:5  90:2
definitely
  49:8

**Degrading**
108:19
**delay**
105:14,24
**delayed**
79:23
**deliberately**
53:19 72:11,
25 73:8
95:11 98:22
105:14
**delivered**
115:1,6
**delusional**
59:13
**demonstrated**
110:21
**demonstrating**
84:17
**denial**
47:6 91:20
**denied**
38:17 56:16
59:1 61:18
66:14,21
71:12,13
85:20
**dental**
9:6 16:12
17:2,4 21:17
26:10,17,18,
23 38:19,20
39:5,8
42:23,25
43:1,2,7,8
44:8 50:2,7
72:4,7,8,10,
11,15,19,21
73:1,3,6,18
75:11 76:21
77:6 78:5,23
79:8,11
80:2,13,18,
23,25 82:3,
8,23 83:13
85:4,5,15,22
87:1 93:14,
23 94:3

95:11,13,17
97:25 98:7,
10,24 99:6,
13 100:6
102:11
104:17
105:3,11,15,
19,20 106:3,
7,10,12,13,
14,17,21,25
107:4,8,16
109:22,23
112:21,24
**dentist**
79:15
**deny**
92:6
**denying**
10:20
**Department**
16:6 50:22
67:10 93:5
99:5
**depends**
18:21 41:12
**deponent**
28:20
**deposed**
30:15,24
**deposition**
5:11,20 6:6,
11 7:5 8:3
9:7,16,22,
24,25 10:16
11:3,6,10,
19,20,22,24
12:9,22
13:25 14:22,
25 15:7,20
16:1,19,24
17:8,14,17
18:12 21:2,
20,24 22:8
23:1,7 24:6,
19 25:18,22,
24 26:8 27:7
28:10 29:12
31:15,23

32:2 34:20
88:3 92:16,
19,25 93:1
112:13
113:3,24
114:13,14,16
**depositions**
24:25
**depression**
46:17,24
50:17 51:8,
11,18 62:8
69:16,17
**deputy**
14:9
**describe**
95:10 98:21
100:16
**desire**
45:3 48:13
66:7 67:6
**desired**
78:19
**desk**
98:13
**destroyed**
91:14
**detail**
83:24 84:17
**detailed**
83:25
**details**
114:15
**detainer**
39:19
**determination**
57:16,17
102:24
**determine**
6:25 10:15
57:4
**detract**
8:17
**develop**
86:23
**developed**
86:19 100:23

**device**
76:2
**diagnosed**
37:9 42:18
46:16,22
50:19 51:16
**diagnoses**
57:3 58:23
59:21
**diagnosis**
46:17 51:6
59:4,5,8,11,
13,17,22
66:16
**diary**
102:25
**different**
41:11,14
107:4
**differently**
50:14 55:2
62:3 66:19
73:5 78:3,4
84:20 97:6
100:2
**difficult**
14:21
**direct**
96:16
**directed**
95:4 96:3
**direction**
105:9
**directly**
44:5 95:23
115:6
**director**
93:4
**director's**
93:17 94:21
111:1
**disappear**
91:14,16
**disciplinary**
53:14 58:10
**disclose**
24:6 91:15

Exhibit A

disclosing
  25:17
disclosure
  22:14 48:3
  58:8
disclosures
  44:4 60:8
discomfort
  51:9
discoverable
  28:16
discovery
  9:11 10:8,23
  11:20 13:12
  14:17 18:9
  25:25 26:3
  48:3 98:19
discretion
  44:24 46:10
  64:15,17,24
  65:4,5,8
  67:5,24
  71:10
discretionary
  67:13
discuss
  43:25 44:22
  45:19,22
  46:11 47:7,
  14,21 48:10,
  25 52:18
  56:7 65:2,10
  67:20,25
  92:19,24
  112:20
discussed
  19:25 20:15
  46:11 64:1
  66:14 113:7
discussing
  29:10 49:5
  55:22,25
  62:25 67:12
  93:1
discussion
  26:9 62:5

discussions
  46:3,9 52:16
  54:23 55:1
  67:12
dismiss
  10:7
dismissed
  34:4,5
disorder
  46:19 47:1
  50:18 51:13,
  19 59:12,13,
  14,15
disposed
  34:8
dispositive
  34:5
dispute
  14:17 18:9
disputes
  91:13
distorting
  64:21
District
  113:18,19
divulge
  17:3
DOC
  29:25 49:13
doctor
  56:21 57:7
  99:21
document
  48:2,24 49:1
  58:7 59:24
  60:2 65:21
  68:21 83:11
documentation
  44:2 59:10
  60:1 73:16
  104:25
documentation
s
  95:7
documents
  34:19,22
  51:24 59:18

60:8 88:5
  90:23 92:16
doing
  18:3,6 25:14
  53:14
domain
  29:3,4,12
  113:2
door
  20:8 52:6
dried
  86:21
drilled
  101:10
drug
  35:3 63:9
dry
  75:13,22,25
  76:3,4,7
  77:7,14,22
  78:7,9,10,21
  110:4,15,18
drying
  75:11 110:16
due
  25:2
duly
  5:3
Dushan
  87:24 97:20

―――――――――
          E
―――――――――

e-mail
  95:2
e-mails
  96:2 98:15,
  20
earlier
  43:16 86:25
  92:23 106:1
  111:11
early
  70:9 80:21
easier
  115:11

easily
  42:9
Easter-rose
  30:7 44:17
  45:6,23,24
  50:13 52:13
  54:3 56:14
  57:1 60:19
Easter-rose's
  45:10
eat
  101:21 102:4
edge
  73:25
editors
  103:15
education
  33:14 39:23
effect
  47:17 51:25
  60:1,2
effects
  62:8
efficiency
  19:6
efforts
  92:7
either
  7:23 86:7
  91:14 106:16
elements
  78:15,25
  101:7
else's
  52:25
embezzlement
  88:21
emergent
  48:20
employments
  33:12
en
  52:25
enamel
  101:2,9
encourage
  63:23

Exhibit A

end
  32:1 40:12
  72:9
endangers
  63:11
ended
  101:4 108:13
enforce
  66:20 91:23
enforced
  50:10 51:2
  66:1
enjoy
  64:21
enrolled
  43:17
ensure
  63:4 67:9
  96:22 97:7
  105:17
enter
  35:16
entered
  60:15
entire
  63:16 74:14
  101:8
entitled
  27:3 61:20
  108:3
entomagraphy
  103:22
epoxy
  75:22 82:20
  83:1,7,11
  84:25
equipment
  72:15,19,23
  73:4,6,9
  78:7 79:2,3
  81:15,16
  82:9,12,23
  83:11 84:4
  93:14,19
  94:2 95:13
  96:23 97:25
  98:7,10,24

  99:9 109:22,
  23
Erika
  9:1 12:2,23
  14:5 29:13
  87:14 104:2
  111:17,22
  114:6
Erika's
  7:13
Errata
  114:12
  115:12
escape
  63:7
escort
  106:22,25
  107:1,7
escorted
  105:3,10,18
essential
  8:6,8
et
  44:11 51:10,
  12 52:9 57:5
  64:9,20,25
  78:16,25
  79:20 82:9
  91:25 92:22
  95:3,13
  97:18 100:6,
  9 101:8,18
  102:17 105:3
evaluation
  62:23
everybody
  19:6 110:6
everyone
  63:5
evidence
  60:3 61:24
Exactly
  65:15
EXAMINATION
  27:25 87:20
  104:7

examined
  5:4
excavated
  73:24
excess
  71:22 86:7
  100:13
excluding
  59:16
excuse
  70:10 108:1
excused
  115:24
exercise
  64:14 91:22
  107:24
exhaust
  92:12
exhausted
  92:7,9
exist
  24:18 39:19
expect
  18:19 97:5
  100:1 102:20
expectation
  20:18
expected
  20:22 100:3
experience
  6:12 7:17
  51:7 54:7,8
  64:19
experienced
  71:11
experiences
  56:15
experimental
  81:22
experimented
  81:20
explain
  19:25 54:10
explained
  6:14 8:19
  16:4 34:9
  45:21 49:25

  53:2 54:3
  56:15 59:1
  62:7 65:22
  66:6 67:11
  75:19 80:24
  82:1 83:24
  93:20 94:5,
  6,12,18
  95:12 106:1
  110:12
explaining
  77:1 84:3,17
explanation
  94:19 108:1
explore
  27:3
exposed
  22:19 26:17
  78:15,25
  100:25
  101:4,7
exposure
  55:13
expressed
  5:12 15:16
extend
  38:8
extensive
  92:7
extent
  54:11
extreme
  78:14 101:6
extremely
  31:10

_____

F
_____

fabricating
  61:22
facial
  77:5,21
facilities
  36:14,16
  37:2 47:3
  50:22

facility
  7:15 9:4
  13:22 14:23
  15:2,4 23:1,
  4 25:8 26:12
  36:20,23,24
  37:6,22 38:6
  39:25 42:24
  49:10 62:23
  63:7 89:1,5
  97:22 102:12
  114:9
facility's
  77:23
fact
  8:16 20:23
  23:2 40:7
  60:11 75:16
  96:6 108:23,
  24
factor
  105:16
failed
  93:23 98:4
  99:2,3,7
  100:7 105:1,
  17
fails
  63:9
failure
  10:7 11:18
fair
  21:5 32:18
  71:23 100:13
fall
  72:18 73:10
  81:24 84:6
fallen
  75:6 79:16
falling
  72:18 77:13
  83:6 85:18,
  19,21 94:18
  100:18,19,
  20,22 110:20
false
  88:21

familiar
  63:12 90:3
familiarity
  51:7
far
  28:19 34:13
  38:14 93:1
fast
  33:13 101:14
faulty
  72:12,13,14,
  16 73:4,9
  75:13 76:14
  78:18 79:2,3
  82:2,9 84:4
  85:21 93:18,
  22 94:2,7,12
  97:25 98:7,
  10,23,24
  99:9 109:23
fear
  85:17
Feber
  90:4
February
  75:17,21
  77:2
Federal
  5:9 6:4 9:18
  10:14 11:8
  15:18 29:14
  30:4,5,19
  33:21 34:25
  89:18,20
  90:1
feedback
  46:21
feel
  15:9 28:8
  62:24
fees
  102:17
fell
  74:3,14
  75:18,20,21
  76:8 77:14,
  18 78:12,23

79:1 83:21
  110:4 111:9
figured
  86:22
file
  6:3 9:17
  10:7,13,21
  11:9 12:17
  15:16 17:11
  21:12 22:11
  23:11,22,24
  24:7,11
  25:15,19
  34:24 89:19,
  20 90:1
  91:16 106:3
filed
  11:1,13
  24:11 29:15
  30:3,5,17,19
  61:17 66:1
  75:8 79:4,9
  88:13 89:17
  90:16,19
  91:1,3,5,13
  94:14 95:5
  96:4 100:24,
  25 101:9
  103:4 106:2
  108:24
filing
  42:6 79:20
  102:17
  105:15
fill
  75:10 81:11,
  23 84:5,21
  85:1
filled
  75:11 78:12
  80:25 81:4
  83:20,21,22
  86:23 106:18
filling
  43:3,9
  72:17,18
  75:4,6,7,16,
  17,21 76:8,

16,23 77:5,
  13 78:10,11,
  12,17,23
  79:1,16
  80:20 81:6,
  18,23 82:2,
  23 83:23
  84:6,7,9
  85:18,20
  86:15,17,20
  94:17
  100:18,19
  101:11
  110:13,15,
  16,18 111:9
fillings
  73:10 84:14
  110:2,3
  111:6
finally
  80:23
financial
  58:21
find
  24:20
finds
  71:22 100:13
  109:4
fine
  10:4,10 20:3
  24:2 44:15
  87:16 111:21
finish
  32:14,16
first
  5:3 29:20
  35:21 37:6
  44:16 61:2,
  4,8 73:11,12
  80:15,18,21
  83:22 88:14
  110:13
fitted
  86:20
five
  41:10
fix

76:6
**fixed**
86:24
**flaw**
77:12
**flaws**
78:20
**flexible**
19:2
**Florida**
89:15
**fluctuation**
51:10
**focus**
103:22
**folks**
27:20 103:12
**follow**
9:21 23:21
43:3 63:23
90:17 111:16
**followed**
58:9
**follows**
5:4
**followup**
104:3
**food**
33:13 40:19
78:15,25
102:5 107:22
**foods**
40:14,15,20
**forced**
62:7
**forfeit**
66:5
**forgo**
101:14
**form**
43:24 44:20,
21 46:4,6,7
47:5,19,21,
23,24 48:7,
9,12,16,19,
22,23 49:9,
11,18,19

50:9 51:2,3
52:19 53:3
54:24 55:11,
16,19 56:4
58:2 60:23
61:6,19,21
62:21 63:12,
15,16 64:6
65:7,14,17,
22 66:4,7,
10,22,24
67:18,20
68:7,11,13,
14 69:1,8,9,
12 70:1,25
75:8
**formal**
5:8 23:25
**formally**
69:8
**forms**
42:3,7,8,12,
14,15 47:15
**forthcoming**
60:12
**forward**
8:2 10:18
15:6 16:23
19:7 20:20
23:6 25:21,
23 27:7 28:3
29:5,8
**found**
10:23 64:3
103:16
**four**
82:18
**frame**
80:14
**fraud**
88:21
**free**
15:9
**frequent**
40:8
**frequently**
40:7 69:16

**Friday**
5:16 8:20
10:24 15:25
92:21
**friends**
79:20
**front**
33:1 80:20
**frustration**
51:12
**fully**
17:16
**function**
107:2
**future**
19:8 24:16

---

**G**

**games**
92:10
**Garcia**
11:17 13:11,
12,17,21,24
14:2,8,13
15:12 17:20,
25 18:4,8,
16,24 19:5,
15 20:3,16
21:18 22:9,
22 23:13,19
24:2,13,20
25:6 26:11,
24 27:11,16,
20 113:12
**gave**
8:7 57:5
63:18 65:8
67:24 74:9
110:8
**GED**
33:15
**general**
14:10 39:16
52:11 71:16
113:2 115:8

**generated**
65:18
**gestures**
57:22
**get almost**
108:2
**getting**
10:5 96:9
104:16
113:11
**give**
19:13 21:10
23:2 25:19
45:5 54:8
57:12,13
61:12 71:20
79:8 80:6
83:9 90:18
111:25
**given**
17:6 39:2
47:11 54:20
59:4 64:24
72:6,7,19
77:7
**giving**
25:14 56:22
58:13 64:10
79:23 84:8
**goal**
44:12
**going**
10:24 11:12,
16 12:4,13,
14,17 15:13
18:13 19:6,
24 20:1
21:6,25
22:24 23:22
26:9 27:6
28:15,17,20
29:8 31:1,9
33:4 44:5,
13,16 47:20
52:15 53:24
58:12,21
60:16 67:15
76:18 84:21

Exhibit A

85:18 88:8
90:11 94:11
105:14,22
107:24
108:21
109:22
115:17

**gold**
74:3 80:11
82:16,17,24
83:4,5
100:22

**good**
13:17 14:8
18:4 114:10

**grant**
24:3

**Gregg**
73:18,23
74:23 77:2,
19

**grievance**
42:14 61:17
66:1 76:11,
13 79:14
90:23,25
94:14 98:9
105:15
106:2,3,9,14
109:25
111:11

**grievances**
72:13 79:4,
12 80:4
90:8,14,16,
18 91:8,16
92:1 95:1,5
96:1,4 98:15
106:8 111:4

**ground**
11:9 16:16
31:2

**grounds**
16:21 53:2,
18 57:25

**groundskeeper**
67:23

**group**
35:15,16
39:23 63:20,
23,24 64:1,
2,4,5

**guarantee**
63:25

**guard**
109:19

**guards**
106:22
107:7,15

**guess**
12:4 58:9
61:5 80:20
93:20 111:7

**guise**
89:11

**guy**
51:22

---

**H**

**half**
39:19

**hand**
20:1 22:16
76:2 110:9

**handcuffs**
106:24

**handle**
10:9

**hands**
96:16 99:17,
18

**happen**
40:11 51:13
64:3

**happened**
54:17 77:1
80:15 102:23
108:20
109:12

**harassing**
58:1 108:18

**harassment**
53:18

**hard**
85:25

**harm**
56:12 62:6
64:13 66:13

**harmed**
51:3,4

**harmful**
63:6

**head**
32:6

**health**
9:6 15:5,21,
22 16:12
17:2,4 21:16
26:10,13,16,
18,23 29:2
35:8 38:16,
17 39:1,2
40:16,23
42:8 43:21,
22,23,25
44:1,2,8,16,
19,22,23,24,
25 45:2,4,5,
12,14,15,20,
22,23 46:1,
3,9,11,12,
13,15,23
47:1,8,11,
12,13,14,15,
20,22,24
48:6,9,10,
11,14,15,21,
23,25 49:1,
6,7,15,17
50:3,7,15,
16,19,21
51:1,17
52:17,18
54:9,11,12,
19,21,22,23,
25 55:1,3,
10,15,18,21,
22,23,25
56:1,2,3,6,
7,8,9,10,11,
13,16,20,22,

24 57:3,7,9,
10,12,13,17,
21 58:13,23
59:1,3,4,23,
25 60:20,22,
25 61:18,20
62:1,4,9,15,
17,20,21,24
63:5,22
64:9,15
65:3,12,13,
18 66:5,8,9,
15,16,21,23
67:7,8,12,
13,19,21,25
68:1,4,5,18,
23,24 69:4,
5,9,14,22,
23,24 70:3,
22 71:1 72:2
75:8 77:3,20
91:20 95:11
99:6,8 100:6
107:5 108:8,
9,13,22
112:22,24

**healthy**
40:22

**hear**
17:24 18:17
20:6,7,10,14
31:18

**heard**
108:25 109:5

**heat**
78:15 79:1

**held**
29:21 89:15
110:9 115:7

**help**
27:8 67:16
69:7,11
71:24

**Hey**
18:8

**higher**
56:25

highest
33:14 45:13
HIPAA
26:20
history
21:4 26:13
35:2
hoarse
31:10
hold
23:13 69:4,
6,23 82:9
83:17 98:10
hole
84:1,2,8
100:21,25
102:9 110:22
holes
86:18 102:1
home
35:16
homes
35:15
honestly
33:2
honor
24:9 27:18
hope
34:18
hopping
27:14
hose
78:8,9
84:18,19
110:10,12,15
111:5,13
hot
101:8
hours
18:21,25
41:8,9,10,14
house
104:13,14,17
105:11,19
106:20,25
107:8

housed
9:3 14:22
37:25 38:1
39:12,13,15,
16,17 70:20,
21
housing
59:9,24
69:20 91:12
107:23
hundred
22:17
hunger
63:9
hygienic
40:23
hypertension
34:14 38:14
42:22 43:14

_____

I

_____

ibuprofen
41:3
ideations
66:25
identified
35:24
identify
80:21
IDOC
49:14,15,20,
22 50:1,3,5,
7,9,11 51:1
81:14 91:12
illegal
97:16
imagine
28:16
immediately
75:8 108:13
impact
34:16 58:21
67:16,17
impacts
58:20

impaired
81:11 102:3,
4
implies
53:19
imply
105:1,7
implying
107:25
important
63:3
imputed
30:2 36:8
88:11,12
imputes
58:1
inability
80:6
inadequate
72:7 73:1
inappropriate
53:4,7
57:18,20
63:10 108:7
inappropriately
108:12
inaudible
59:16
incarcerated
29:17 33:10
35:21 36:6,
12 37:8,18
49:14 50:1,9
52:6 56:23
64:8 88:15,
17 89:14
105:2 107:3
incarceration
37:10 64:20
88:18
incident
108:5,15,16
109:9,11,12
incisal
73:25

included
45:23 46:1
58:7
including
63:7 98:9
incorrectly
114:20
Increases
57:5
Indiana
7:12,13,17
8:15,16 9:3,
14 14:7,24
29:25 30:8
36:23,25
37:1,3,5
49:12 50:22
65:24 89:1,
13,16,25
93:5 96:8
99:5
indicated
69:24 70:2
73:23 108:24
indifferent
95:11 98:22
individual
11:25 12:9
24:19
individuals
8:10
information
22:20 25:18
26:14 28:16
63:25 64:4
67:21
informed
55:4 79:5
98:3,14
Ingalls
30:8 72:6
75:10 76:20,
25 77:6 78:6
81:1,4
83:14,15,19
84:12 85:6
94:7 105:6

Exhibit A

110:8

**Ingalls'**
85:2

**initial**
48:3 55:13
58:8 60:8
61:5 69:20

**initiated**
60:13

**injured**
101:21,22

**injuries**
86:5 100:16,
17 101:19

**injury**
97:18 99:12
100:8

**ink**
35:1

**inmates**
6:9 52:21

**inpatient**
35:14

**inside**
20:8 23:4
78:13 101:3,
7

**instances**
64:11

**institution**
12:8 16:6
72:22 107:4,
21 115:4

**instruct**
24:5 25:21
27:7

**instructed**
69:3,22

**instruction**
21:10 23:5
63:23

**insufficient**
40:9

**insult**
53:18

**insulting**
108:18

**intend**
33:2

**intended**
51:9,10
102:3,7
105:7

**intended(sic)**
51:9

**interaction**
58:22 80:8

**interactions**
53:5,8
57:18,21

**interest**
5:25 8:9,23

**internal**
78:24 109:20

**interpret**
64:24 65:7

**interpretatio
n**
64:13 67:4

**interstate**
89:7

**intervention**
63:22 79:24
100:4

**interventiona
l**
71:14

**invade**
28:21

**invalidate**
11:5

**invasion**
88:22

**invented**
60:11 108:20

**inventing**
60:3,10
64:21

**investigator**
109:20

**involved**
19:8 33:18
99:18

**involves**
7:12

**involving**
88:23 91:8

**Isolated**
71:13

**issue**
14:19 26:20,
21 55:5
58:14,16
96:3 106:13

**issued**
22:7

**issues**
9:5 16:9,10,
12,13,18
17:2 25:7
26:10,15,23
28:22 29:2
43:25 44:11,
23 45:2,14,
20,23 46:9
47:8,14,22
48:11,25
49:6 52:18
54:21 55:23
56:1,7
67:12,25
68:12 69:24
70:4 72:5
80:14,17,18,
19 82:4 87:2
91:21 92:12
95:5 96:6
98:22 99:11
106:4,14
107:18

**items**
40:19,23

---
**J**
---

**J-O-H-N-S-O-N**
29:22

**jails**
63:4

**January**
81:2,3

**job**
53:14 56:19
62:11,16
85:3 102:9

**jobs**
41:23

**Johnson**
5:2 6:8 7:10
8:25 10:11,
17 11:15
12:2 13:13,
15 14:22
15:3,6,12
18:12 19:13,
23 20:17
21:18 25:4,
12,15 27:9
28:3,24
29:22 31:16,
18 35:25
36:1,4,6,10
44:5 53:23
58:18 60:4
66:23 67:15
68:16 70:14
76:18 80:14
86:11 87:11,
23 88:11
104:10
105:22
106:19 108:5
111:17,22
113:10
114:11
115:14

**Johnson's**
108:8

**journal**
102:25
103:17

**journals**
103:13,21,
22,23,24

**Jr**
87:24 90:9
93:3 94:24

Exhibit A

95:10

**Judge**
11:17 13:11,
17,21,24
14:2,8,13,20
15:12 17:20,
25 18:4,8,
16,24 19:5,
15 20:3,16
21:18 22:9,
22 23:13,19
24:2,13,20,
22 25:6
26:11,24
27:11,13,16,
20 28:25
29:1 33:1
113:18,19

**judgment**
22:10 90:14

**jump**
31:19

**June**
73:14,16,22
74:2 80:11
83:3

**jury**
33:1 71:2,
20,22 85:7,
14 100:13

**justify**
64:22

**juvenile**
35:11

___

**K**

___

**K-E-V-I-N**
29:22

**keep**
63:24 76:22
77:7,22
102:25
110:14

**Kelly**
115:13

**kept**
22:6 57:2
77:13 78:17
84:8 94:17
110:20

**Kevin**
5:2 13:13
29:22 35:25
36:1,4,6,10
88:11 89:7
92:14 93:12
102:25
103:25 108:8

**kind**
24:14 26:5
35:13 43:2
111:18
113:11

**Kirtley**
6:18 7:10,11
9:2,12 10:4
11:16 12:2,
10,23 13:4
14:11,13
15:10 24:9
27:18 28:11,
13 30:11
87:14,22,23
104:2
111:16,22
112:6,17
113:10,16,
21,23 114:3,
6 115:16

**knew**
72:11,14
76:12 80:2
81:16 84:4
94:2,13,15

**know**
7:17,21,22
8:17 9:8
11:19 18:14,
16 20:20,21
21:9 22:6
23:5 26:25
27:21 30:22
31:11 33:17

43:6,7 48:18
53:6 57:4,
15,20 62:12,
13 67:23
71:15 74:20,
21 85:16
86:1,8 87:4
90:15,24
91:9 94:4,17
95:16 97:3
98:12,19
99:22,25
102:17
103:16
107:17
109:23 114:7

**knowing**
60:12

**knowingly**
72:7 73:1
78:17 79:2
81:16 95:12

**knowledge**
93:6,13
97:23

**known**
10:25 94:17

**Kype**
103:24

___

**L**

___

**L-E-E**
29:21

**labeled**
44:21

**lack**
62:9

**large**
36:3,5,15
90:16 101:3,
6

**late**
80:22

**law**
20:23 26:21
96:21 97:12

**lawful**
89:10

**lawsuit**
9:3 27:1
29:3,15
30:3,17,19
38:5,18
39:18,21
40:6 44:6
71:22,24
85:9 103:4

**lawsuits**
30:5 33:19
89:17,19,20
90:1 103:6

**lead**
92:13 97:8

**leaks**
64:3

**leave**
13:1 24:3
70:13 108:14
109:8

**leaves**
100:20

**Lee**
29:20

**left**
28:4 70:15
72:7 74:4,13
78:22 82:11
109:10

**legal**
6:13 7:5
16:7 17:10
20:12,13,20
29:17 56:24
109:5 115:2,
3,5,13

**legally**
108:2

**legible**
31:12

**letter**
109:10,17,19

**letters**
95:1 96:1

letting
48:18
level
33:14
liability
58:14 104:24
liable
105:17
liaison
114:8
license
15:22
licensed
56:1 57:15
licenses
58:20
life
88:9 103:1
lifted
63:2
light
23:23
limitation
23:3
limitations
101:20,25
limits
62:20 69:20
line
13:7,15
14:10 20:9
29:1 31:3
77:10,23
81:7,10
110:1
lines
77:8
Lingual
73:23
links
103:12
liquid
102:5
Lisa
13:7 31:17
32:13 115:10

list
44:3 59:20
63:18 64:11
79:6 90:14
listed
114:20
litigate
55:5
litigation
7:12 8:11,12
43:5 55:6
60:12 92:13
little
76:2 81:5
83:15 86:18
living
33:11 104:10
local
74:7
located
8:15,16
59:11,18
103:10,18
long
18:14,18
36:12 37:25
59:20 60:23
80:13,17
longer
14:24 18:23
87:15
look
23:14 51:23
54:13 60:7
61:12 86:2
102:21
looking
35:25 60:4
62:19 69:18
73:17 108:5
lose
102:16
losing
74:24
lost
77:4

lot
19:6 34:8
40:14,20
41:8 42:13
85:16,17,22
90:13 91:16
95:6 101:15,
16,17,22
102:3,6
103:6,7
109:2 112:21
Lucasville
36:20

___

**M**

MA
24:22
Macdonald
17:23 18:1,
2,3,5,6,13,
25 19:1,11,
18,22 21:5
25:9 27:5
machine
75:12,24
76:3,7,12,14
81:7,9,25
82:6 84:1,2,
9 93:18
94:6,12,13
110:10
111:2,5
machinery
72:11,22
75:14 77:13
78:17,20
81:10 84:22
93:22,25
94:16,22
95:13 99:9
mad
79:12 80:3
made
5:7 26:2
42:3 51:22
52:11 54:13
55:6 58:8

59:8,9,17,22
60:5 67:3
78:16 92:6
93:9,24
94:20 95:19
97:15 98:8
102:24
113:4,5,15
Magistrate
10:9 11:17
12:24 13:2,
11 113:11
mail
115:2,3,5,9,
13
main
44:12 65:6
major
95:5 96:3
make
19:8 21:7
25:10 32:6
53:11 54:11,
15 57:16,22
67:4 79:15,
18 83:7
92:7,9 96:14
99:15 105:7
106:4,11
111:18,25
112:1,3,5,8
making
23:20 76:6
88:21
man
22:19
manner
105:3
March
77:17,18,19
80:7,12
81:18
Mario
11:17 13:12
Martin
30:6 45:6
51:24 52:1,

Exhibit A

5,7,9 60:16,
17 68:19
**material**
22:13
**matter**
13:13 16:15
68:3 105:19
**matters**
7:4 8:11,13
29:10
**maximum**
24:25 25:5
79:17 106:6,
12
**mean**
8:18 29:17
37:14 39:25
41:18 49:23
53:6,10
57:20 60:9
71:15 80:16,
17 84:18
87:8 95:23
103:5 111:5,
12
**means**
65:1
**mechanical**
77:11
**medical**
6:18 9:1
14:6 15:22
16:12 17:2
21:4,16
26:7,10,13,
16,22 29:2,
14 30:10
37:9,11,13,
14,19 38:11,
13 41:25
42:2,3,5,7,
14,18 44:11
50:2,7 55:25
58:18,19
64:20 68:8,
9,10,12,14
69:18 73:17
91:21 93:15

96:18,21
97:4 100:5
105:3,20
107:4
112:21,23
**medication**
34:13,15
37:17 38:25
39:4 40:25
42:5 43:11,
14 97:1
99:24
**medications**
34:16 38:22
41:1,5
**member**
7:9 15:5,8,
21,24 24:24
25:2 45:13
**members**
63:23 64:2
**memory**
73:21
**mental**
9:6 15:5,21,
22 16:12
17:2 21:16
26:10,13,16,
18,22 29:2
35:8 38:16,
17,25 39:2
43:21,22,23,
24,25 44:2,
8,16,19,22,
25 45:2,3,4,
5,12,14,15,
19,21,22,23,
25 46:1,2,9,
11,13,15,23
47:1,10,12,
13,14,20,22,
23 48:6,8,
10,14,15,20,
23,25 49:6,
7,14,17
50:3,6,15,
16,18,21
51:1,17

52:17,18
54:9,10,11,
19,21,22,23,
25 55:3,10,
15,18,21,22,
25 56:1,3,6,
7,9,11,13,
16,20,22,24
57:3,7,9,10,
12,13,17,21
58:13,23
59:1,3,4,23,
25 60:19,22,
25 61:18,20
62:1,4,9,14,
17,20,21,23
63:5,22
64:9,20
65:11,13,18
66:5,8,9,15,
16,21,23
67:8,12,19,
25 68:4,5,
18,23,24
69:4,5,9,14,
22,23,24
70:3,22 71:1
72:2 80:17
91:20 99:6,8
100:6 107:5
108:7,22
112:22,24
**mentioned**
29:1 43:16
**messages**
96:5
**method**
81:22 86:14
**mine**
92:3
**minimalizing**
86:7
**minute**
43:10 52:2
87:15
**minutes**
19:16

**misidentified**
36:9,10
**misplaced**
114:18
**mistakenly**
35:24
**mitigation**
111:7
**mode**
63:21
**modification**
25:10
**moist**
77:8
**moisture**
77:22
**moment**
87:9
**money**
85:10
102:15,16
**monitored**
20:25
**month**
54:18,20
74:3,5,14
75:19 81:3
**months**
43:20 79:16
106:5 115:4,
7
**moral**
58:2 88:24
**morning**
13:17 14:8
15:14 16:11
23:7 25:11
27:9 87:6
**motion**
5:8 6:3
9:18,21
10:7,13,21
11:9,14
12:17,18
15:17 16:15
17:11 21:13
22:12 23:11,

Exhibit A

20,25 24:11
25:20 34:5
88:13 90:14
**mouth**
76:4 106:11
**move**
6:2 8:2
10:18 15:6
16:23 20:19
22:10,14
23:6 25:21,
23 28:3
29:5,8 53:24
60:16 107:3
**MR84**
65:16
**MR88**
59:18,19
60:4
**Multiple**
100:21
**multitude**
95:2,4
108:19
**murder**
88:9,14,16

**N**

**name**
17:21,23
29:13,16,17,
18,20,21
36:4 51:24
52:7 87:23
114:17,19
**named**
35:24 51:23
90:19
**names**
114:17
**necessary**
7:3 8:7
22:21 24:1
77:9 96:23
**necessity**
12:19

**need**
16:4 20:19
22:13 40:22
43:7 48:13
63:1 64:2
68:5,9 80:1
87:15
**needed**
40:16 42:13
50:20 54:10
56:16 57:4
66:16 69:5
72:20 83:7
111:2
**needing**
95:14
**needlessly**
79:23
**needs**
115:5
**neglect**
63:11
**never**
7:19 30:24
35:12 39:20
41:6 59:25
60:13 61:25
65:22 70:25
108:19,24,25
109:2,5
**newspapers**
103:14
**night**
41:12
**Noll**
30:8 43:4,9
72:5 73:5,
11,19,23
74:23 75:10
76:19 77:2,
19 78:2
79:13 80:8
81:20 82:16
83:13 84:11
85:6 86:14
94:7 105:13,
24 106:15
110:22

**nominal**
71:6 100:14
**nonmedical**
17:4 24:15
26:18 64:15
68:12
**nonmental**
17:4 44:1,24
46:12 47:8,
15,22 48:11
49:1,6 55:23
56:7,10
65:3,12
67:7,13,21
68:1
**nonpublic**
29:11
**normal**
20:11
**Northcutt**
30:7 45:7
47:17 52:9
53:25 54:1
56:12 57:19
58:5 60:18,
21 61:14
62:12,13,14
68:19,22
108:21
114:19
**Northcutt's**
56:19
**note**
21:11 29:7
35:1
**notebook**
102:25
**noted**
77:19
**noticed**
108:10
**notifications**
55:14
**notified**
11:11
**notify**
31:8

**notifying**
42:3 108:21
**Nottoway**
36:18
**November**
37:7 38:1,2
61:9 74:16
89:2
**Novocain**
39:6,7
**number**
29:25 30:1
34:1 35:11,
17 36:3,5,15
74:18,20,25
80:21 85:24
90:16 91:13,
17,21 95:7
**numerous**
61:11,15
72:10 93:8,9
98:9

**O**

**O-R-L-A-N-D-O**
29:20
**oath**
32:21,24
33:3
**object**
10:1 22:3
53:17 57:24
108:16
**objected**
16:19 67:2
**objection**
5:8,12,17
7:2,20 8:4
11:7 16:22
21:12 23:9
24:10 29:7
58:7,25
74:17 80:9
113:14
**objections**
5:21 16:20

Exhibit A

28:8,19
112:15
113:5,20
**obligation**
66:11 68:4
**Obviously**
51:5
**occasions**
45:25 55:4
61:11,15
72:10,25
**occupy**
39:9
**occur**
20:21
**occurred**
100:17
**occurring**
14:17
**October**
29:24
**offender**
89:8 108:10,
11
**offenders**
62:23 64:3
**offering**
27:5
**office**
20:5,7,8
61:5 79:10
82:10 93:17
94:21 111:1
**officials**
12:7 64:20
**offline**
115:11
**Oftentimes**
42:10
**Ohio**
36:20,21,22
**okay**
11:15 12:1
13:6 14:13,
14 17:25
18:6,8 19:1,
11,14,15,18

21:11 23:8
27:11,20
28:6 32:11,
12 37:21,24
43:10 44:14
52:3,20
60:6,9 63:18
65:16,23
74:6 76:23
77:19,25
82:10 88:14
92:5 103:25
109:16
113:16
114:6,25
115:15,22
**ombudsman**
79:21,22
80:5
**ombudsman's**
79:9
**onboarded**
70:17
**once**
42:22 43:20,
23 44:1
47:10 49:16
54:17,20
**one**
7:20 17:18
23:13,14,21,
22 26:15
32:8,15
38:18 54:15
55:8 57:10
61:2 83:17,
20,22,24,25
84:3,17 87:2
90:5,12,20,
21 92:23
98:12
103:18,24
107:9,10,14,
17
**ongoing**
69:15 85:17
99:13 100:9

**online**
103:12
**open**
16:14 21:1,
19 22:1
78:13 79:15
100:20,21
102:1
**openings**
86:15
**operating**
94:16
**operations**
63:7
**opportunities**
40:11
**opportunity**
17:7 47:11
111:25
112:10
114:16,21
**opposed**
32:5 115:6
**oral**
23:11,20
**order**
5:9 6:4 7:23
9:19 10:13,
22 11:10,21
12:18,19
15:17 17:12
21:13 22:7
23:12 24:8
25:16,20
26:6 31:4
101:10
**ordinarily**
20:21 102:5
**Oregon**
89:15
**original**
40:6
**Orlando**
29:20
**outcome**
34:3

**outcomes**
33:25 34:2,7
**outlet**
51:15
**outside**
18:11 20:5,
6,8 21:6
25:11 72:21
79:9,20
93:10 95:2,
7,9,20 96:1
98:15,17
105:21
107:5,24
115:3
**oversight**
91:22

**P**

**p.m.**
60:16
**pace**
76:22
**pad**
35:1
**page**
59:11,18
60:4 62:19
69:19 73:17
**pages**
90:22
**paid**
102:13
**pain**
39:8 41:5
72:9 73:2
74:4 75:5
78:14,24
84:6 85:18,
19,22,23
97:18 99:11
100:8,9
101:6,10,18
102:7,13
106:11,12

painful
  100:20
  102:2,6
  105:20
panic
  51:12
paper
  76:1,4 81:5
  84:2 110:9,
  10
paralegal
  115:13
part
  9:7,10 21:25
  35:14 56:2,9
  101:3,7
  112:25 113:3
participant
  96:16,17
participate
  5:11 8:4
  9:23 11:2
  12:20 17:16
  26:3 96:13
  99:14
participated
  46:23 76:25
particular
  5:21 11:8
  39:12
parties
  5:18,23 6:6
  7:7 25:15,21
party
  10:12 55:6
pass
  41:20,21
passes
  41:16,18
past
  51:17 88:20
patient
  59:12 73:25
  77:4
Patricia
  30:7 45:7
  53:25 56:12,

18 57:19
58:4 60:18
61:14 68:19,
22
pause
  19:20 23:17
pay
  102:11,17
pdf
  115:18,20
pen
  35:1
pending
  8:12
Pendleton
  9:4 36:24
  37:22,24,25
  38:1,5,8,9,
  10,21,23
  39:10 41:17
  42:1 43:17
  45:10 47:6
  57:14 58:24
  61:4,8 62:15
  70:11,13,15
  73:19 74:15
  80:19 81:14
  82:21 89:1
  91:19 97:21
  99:5 104:11
  105:2 109:20
people
  9:9 29:10
  42:16 49:13,
  20 50:1,4
  56:1,23,25
  79:8 92:25
  93:10 94:3
  95:2,9,19
  96:1,24
  97:9,16
  100:7 102:21
  103:6
  105:10,18
  107:3 112:8,
  23
people's
  81:11,17

82:21
percent
  22:17
Perdue
  30:6 45:6
  60:17 62:2
  68:20
Perdue's
  62:10
perfectly
  8:3
performed
  62:16 73:3
period
  54:16 68:6
  70:8,9,11
  79:17 106:12
perjury
  88:20
permits
  41:17,19
person
  5:22 9:14,25
  12:21 15:20
  17:5 24:15
  26:7 35:24
  45:12,13
  52:6 62:18
  63:11 68:5
  79:18 96:20
  114:8
personal
  62:25
personally
  91:5 96:10
personnel
  8:19 26:19
perspective
  15:14
phased
  65:4
phone
  14:25 20:1
  24:24 95:3
  96:2 98:15
phosphate
  73:24

physical
  100:16
  101:19,25
pick
  42:5
place
  12:13 77:12
  85:24 90:20
  105:10,18
placement
  69:20
places
  7:18 107:4
plaintiff
  18:22
planned
  63:8
planning
  63:7
played
  92:10,11
please
  15:8 29:15,
  19 31:4 32:5
  46:20 53:24
  98:21 100:16
  115:18
point
  56:3 67:24
  87:7
police
  35:25
policy
  24:23 45:8
  49:10,11,22
  50:25 54:24
  66:4,13,21
  83:10 91:17,
  23
political
  103:23
population
  39:16 42:4
  104:14
portions
  22:7,11

Exhibit A

Kevin Johnson
February 07, 2022

possible
  77:7 115:20
possibly
  99:13
post
  46:18,25
  50:17 51:13,
  18
potential
  8:11 27:2
  71:17
potentially
  10:6 22:19
  24:16 46:18,
  25
practical
  18:10
practice
  6:9 24:23
precedent
  86:2,9
precludes
  12:19
prejudicial
  53:19
prep
  77:22
preparation
  34:19 77:7
prepare
  88:2 92:16
prescribe
  97:1 99:23
prescribed
  37:17 38:22,
  25 39:4
  43:11
presence
  5:15,17 6:1
  7:2 9:24
  11:4,6,25
  17:3 112:23
present
  5:12,20,24
  6:7 7:1,8
  8:5 9:22
  10:15,24

11:12 12:9,
21 15:19,20
16:2,8,9
17:13,22
24:16,24
36:18 64:13
92:22
presented
  61:6
pressure
  34:14
pretext
  108:1
pretty
  95:6
previously
  46:16,22
  62:8 88:25
prior
  33:18 35:2
  36:19,21,22,
  23,25 49:12
  51:6,7
  62:14,16
  66:15
prison
  9:13 21:3
  37:12
prisoner
  109:19
prisoners
  25:1
prisons
  63:4
privacy
  20:13,19
  26:20 46:8
  55:17,20,24
private
  17:9 26:22
  29:10 112:22
privilege
  17:19 21:14,
  16 24:17,18
  29:11 45:2
  46:13 112:20

privileged
  16:13,17,18
  20:24 21:22
  28:8,22 46:8
privileges
  17:1 21:14
  23:3 28:18
  113:9
pro
  6:21
probably
  31:8 35:20
  85:22 95:6
  96:7 101:14
problem
  17:9 28:7
  64:18 65:1,6
  93:23 99:19
  106:7
problems
  43:8,9 51:17
  57:4 63:20
  73:3 82:1
  95:20 99:13
  106:13
procedure
  5:10 9:19
  10:14 15:18
  34:25 45:8
  77:3
procedures
  25:10
proceed
  5:6 7:24
  9:16,20 10:3
  11:6 28:6
  32:25
proceeding
  6:3,5
proceedings
  19:20 22:16
  23:17
process
  9:8,11
  104:16,18
  106:21

processed
  91:18 109:2,
  6
produced
  88:6
producing
  61:24
professional
  65:18 66:24
  96:18
professionals
  68:19 96:21
  112:24
program
  39:24 46:24
proper
  93:19 95:15
  99:3 100:4
properly
  81:11 94:16
  96:24 99:7
  110:18
property
  34:11
proposal
  20:4
protected
  45:2
protection
  64:10
protective
  5:9 6:4 9:19
  10:13,21
  11:9 12:18,
  19 15:17
  17:12 21:13
  22:7 23:12
  24:8 25:16,
  20 26:6
protests
  95:8
provide
  21:7 22:24
  25:13 29:19
  60:19 62:4,
  22 66:11
  68:4,8 82:19

83:7,9 93:19
95:13,14
96:22 97:8,
10,14,17
99:2,3,6
100:4 104:23
105:1
**provided**
24:10 26:11
39:25 40:17
48:19 81:9
96:23 102:12
115:5
**provider**
50:3,7
**provides**
20:23
**providing**
21:1,8,19
73:8 99:8
**psychological**
62:22 100:9
**psychologist**
45:12,16,20
**psychotic**
59:12,15
**PTSD**
62:8
**public**
21:2,19
22:1,5,14
27:4 29:3,4,
12 112:25
113:1,4,5
**publications**
103:21
**publicly**
103:13
**publish**
103:19
**published**
103:7,9,13,
20,24
**publishers**
103:15
**pulp**
100:24

**punitive**
71:6 100:14
**purpose**
8:8 16:3
**purposes**
6:15 24:1
40:23
**pursued**
58:10
**put**
6:2 27:4
43:9 54:5
55:8 59:24
60:20,24
61:15,24
74:6 75:18
76:1 83:3
86:15,17
106:23
110:19

---

**Q**

---

**qualifications**
26:7 57:1
97:4
**qualified**
57:9,13
**quantify**
71:11 85:25
102:14
**question**
12:14 21:23
28:25 29:6
32:4,10,11,
16 37:11
44:6 53:23
70:5,12
71:15,16,18
74:17 93:13
98:2 99:1
106:20 113:2
114:10
**questioned**
66:3

**questions**
10:5,19
12:3,15
17:18 18:22
28:8,21 29:7
30:13 32:8,
15 33:5
34:10 44:14
58:21,25
59:2 87:13
104:5,24
109:3 111:15
112:2
**quick**
18:23
**quickly**
27:15 88:8
**quite**
9:9
**quoted**
98:11

---

**R**

---

**raise**
29:9
**raised**
25:8 28:19
**raising**
58:15
**ran**
42:12
**random**
86:6
**range**
16:11 34:7
40:14 41:8
42:14 44:11
96:5 103:20
108:8,14
**rationale**
8:7
**rationalize**
93:21
**reached**
14:16

**read**
31:7 39:11
63:16 110:1
111:11
**reading**
41:9 104:25
**ready**
28:3,6
**reason**
58:9 60:18
75:19 77:15
81:6 110:13
**reasonable**
11:13 20:18
22:23 27:6
86:4
**reasons**
7:8 8:6
40:17 54:2
82:13
**reassert**
112:19
**rec**
40:3,4
107:19,24
**recall**
91:3,7
108:14
**receive**
31:14 35:7
44:19 45:3
46:1 47:12,
13,23 48:6,
13 49:7,17
50:21 51:1
52:17 54:25
55:3,10,15,
18 60:22
61:20,25
66:5,7 68:14
69:11 70:22
79:23
**received**
38:20 39:7
43:4 49:14
60:14 62:1
95:6 96:4
111:9

Exhibit A

receiving
42:23 87:1
88:9
recemented
73:24 74:10
recent
36:16
Reception
36:21,22,25
recognition
64:7
recognize
51:5
recollection
91:4
record
10:18 13:1
21:25 22:2,4
23:9,25
29:5,8,16
31:14 48:5
57:2 69:19
73:17 98:18
103:1 109:5
110:1
112:12,25
113:13,20
records
26:17 30:22
33:24 34:8,
9,12 45:14
recovered
34:6
recreation
40:7,11
redundance
80:10
redundant
58:25 74:17
refer
72:20 82:7
reference
93:8
referenced
103:16
referring
48:22 49:2

refilled
80:1
Refresh
73:20
refusal
91:22
refuse
46:6 53:1
54:4,22,23
60:25 61:10
79:11
refused
39:3 43:23
44:1,19,25
45:5 46:4,12
48:9 55:4
57:12,17
59:3 60:19,
23 65:17
66:17 72:20
76:6 79:8
81:15 93:18,
19 94:1,22
96:6 111:3
refuses
82:19
refusing
9:23 11:2,23
17:17 26:3
45:1 55:18
56:13 66:6
82:6 95:12
97:14 108:22
regard
107:18
regarding
9:5,21 15:19
37:21 85:15
90:12 96:14
99:15 108:6
112:19
regular
40:4,10,21
42:15 45:13
regularly
40:17
regulations

91:23
relate
38:5
related
8:11,13,14
17:18 44:7
46:9 89:25
90:21 93:7,
14 97:24
98:7,23 99:4
112:21
relation
24:18
relationships
63:10
relevance
70:11
relevant
16:21 22:15
102:22
remain
21:24 22:2,4
remedies
92:9
remedy
92:8,12
remember
7:11
removed
6:2 64:4
repair
81:15,17
82:7,15
93:18,23
94:1 101:11
111:8
repairable
72:8,10
repaired
76:17 81:9
94:1
repairing
84:10
repeat
31:19 32:9
40:18 46:21
67:7 105:24

repeatedly
48:12 56:17
66:14 93:21
repetitive
33:5
rephrase
32:9
replace
94:22 101:11
111:3
replaced
74:3 77:21
111:3
report
53:14 63:5
67:7 108:6,
24,25 109:1,
3
reported
67:1
reporter
5:24 7:7
31:2,21
32:13,21
114:13,24
115:15,22
Reports
95:9
represent
6:17,21
30:11 58:19
87:6,24
111:24
representing
29:14 90:2
represents
6:18 30:11
request
41:25 42:2,
7,8 69:9
75:8 77:3,21
104:20
114:25
requested
42:25
requesting
31:23

Exhibit A

requests
105:7
required
16:23 44:21
49:19 50:4
96:22 97:11
requirement
47:4 49:13
50:8 68:6,8,
15
requirements
91:24
research
86:8
reserve
5:8
resin
74:19,24
75:1 76:4
77:5,16,21
resolve
99:10
resolved
99:20
respect
8:10 102:23
respond
28:20 69:10
responded
46:2 77:3
98:10,12
response
23:24 34:10
61:17 72:13
80:4 92:3
98:1,2 99:3
108:21
111:4,10
responses
105:6
responsibilit
ies
98:4
responsibilit
y
61:24 98:5

responsible
82:5
restoration
77:9
restored
74:18 75:1
77:16 80:10
restricted
69:19
restrictive
59:9,24
result
25:25 83:5
97:18 99:13
100:8 110:3,
20
return
114:23
returned
34:9
reveal
53:16 58:4
review
31:23 34:19
92:15 112:12
113:25
114:2,4
reviewed
69:21
revoke
64:12
Richmond
33:9
rid
96:7
ridiculous
86:7
right
5:18,19 9:20
10:12,21
11:7,19
13:6,19,25
14:2,8,15
15:12,15
17:24 19:4
20:1 23:19
27:20 28:4,9

29:9,12
30:14 31:1,
9,13 32:3,7,
19,23 45:1
46:8,13
55:17 65:13,
19,21,24
66:5,8,9
69:10,18
72:4 74:12,
19 75:18,21
76:8,15
77:23 78:13
82:20,23
83:1 84:6,14
90:20,23
105:22 110:4
rights
55:24 113:15
risk
63:8 64:13
Robert
13:14 87:24
90:9 91:2
92:4 93:3
94:24 95:10
96:10,13,18
97:1,5 98:1,
3 99:1 100:3
role
45:10 69:3,
22
room
6:10 7:25
9:15,16
15:3,8 18:11
21:6 25:2,11
28:5 34:22
84:11
Rose
48:17 51:4,
20 52:2,4
53:5,12,16
61:10 68:19
rough
115:21
round
108:8

rounds
42:4 51:22
52:22 54:13,
15
route
52:25
rubbing
108:11
rule
5:9 6:4 9:18
10:14 15:17
17:12 23:14
28:14 65:25
rules
11:8 15:18
31:2 34:25
91:23
ruling
26:25
run
16:11 69:1
93:11 111:18

S

safety
63:3,4
64:19,25
65:10 67:6,9
sanctions
25:25
Sara
65:18
Saturated
110:12
save
19:5
saying
7:24 10:22
48:9 56:6
57:6 60:9,10
65:23 67:20
68:11 69:10
79:17 84:15
101:25
110:23

Kevin Johnson
February 07, 2022

says
  59:11 62:21
  63:13 69:19
schedule
  14:21,25
scheduled
  40:10
schizoeffecti
ve
  59:14
schizophrenia
  59:6,13,14
screening
  61:5
seal
  22:15
sealed
  86:16,21
second
  23:13,15
  83:17,18,23
  106:16
security
  6:15 7:8,9
  8:6 15:24
  16:9 25:1,3,
  5,7 63:3
  64:14,18,22,
  25 65:9
  67:6,9,22
  105:8
see
  12:8 13:18
  43:7 51:20,
  21,25 52:11,
  21 54:13
  55:7 58:7
  73:11,14
  75:9 76:7
  79:4 86:2,9,
  18 106:6
seeing
  65:16 91:3
seeking
  46:15 100:10
segregation
  39:15,17

40:12 42:11
54:16 56:23
62:15 70:21
102:10
104:12
selectively
  49:21,23
  50:12
semi-private
  21:7 22:25
  25:12
semi-public
  22:25
send
  69:8 114:13
  115:12,13,21
sense
  32:6
sensitivity
  74:24
sentence
  88:9 105:25
September
  38:3 59:10
  60:15 65:19
  70:4,15,16,
  19 89:2,4
  108:6
  109:12,14
serious
  56:25 68:5,9
  105:20
services
  62:20,22
session
  113:3
sessions
  63:24
set
  41:15 110:19
setting
  17:9 65:12
settings
  63:21
settlement
  71:17

several
  30:5 39:13
  45:24 54:10
  55:4 72:24
  76:21 79:4
  86:13 100:22
  101:12
sexual
  53:8,11
  57:22
shackles
  106:24
shake
  32:6
share
  64:15 67:21
shared
  8:23 64:1
sharing
  64:4
Sheet
  114:12
  115:12
shocks
  102:6
shoe
  70:21,23
short
  13:9 87:18
  107:20
shortage
  107:25 108:3
shortages
  107:22
shortly
  109:9
showed
  75:16 76:5
  81:4 84:1
showing
  110:11
sick
  31:9
side
  101:5
sign
  43:24 44:20

46:4,6 47:4,
23 48:7,9,18
49:5,18
50:4,9 51:2
53:3 54:24
55:10 60:23
61:6,19
65:14,17
66:4,6,10,
12,22,24
68:7,11,13
69:1,7,12
70:1 114:4
signature
  113:25 114:2
signed
  47:2,16,19,
  21,24 49:19
  52:19 55:9
  61:21 65:22
  66:9,12
  68:22 69:21
  70:25
signing
  48:12,16
  55:16,19
similar
  62:12,13
  86:3,9
simple
  14:17
simply
  17:7
sir
  13:16,17,23
  18:2 19:18,
  24 88:24
  89:3
sister
  39:21
sit
  18:11 79:15
sitting
  13:24 17:24
  26:8
situation
  29:11 99:19

situations
  48:20 63:1,5
  86:3
skills
  33:16
slander
  53:9,21
  57:25 58:3,
  15,17 108:17
sleep
  41:7,10,11,
  14,15 51:10
  101:22 102:3
sleeping
  41:9
slowly
  31:5
small
  18:9 74:24
Smith
  51:25
smoothed
  86:21
solution
  18:10
sort
  71:14 98:20
  105:11,21
  106:24 107:6
  111:7
sorts
  35:15 40:24
sought
  56:17 57:10
sound
  32:11,18
  65:19 74:12,
  19 77:23
  90:23
sounds
  18:8 25:9
  53:18 113:24
sources
  96:5
Southern
  36:20

space
  22:25 25:12
  27:4 28:21
speak
  19:24 31:5,
  13 96:10
speaking
  21:20 46:5
  47:5 101:24
  108:9,12
special
  33:16 63:1
specialist
  72:21
specific
  8:10 16:25
  44:13,14
  61:12 63:18
  64:11
  103:18,21
specifically
  17:13 30:6
  45:4,6,24
  46:7 47:19
  48:11,14
  51:4,18 54:4
  60:25 64:6
  66:3 73:20
  79:13 83:15
  89:25 90:19
  91:7 93:16
  94:7 97:24
  98:13,23
  102:22
  103:14
  105:13 107:2
specifics
  110:8
specify
  90:21
spell
  29:16
spelling
  114:17
spend
  41:8

spoke
  15:25 45:24
spoken
  103:3
spontaneous
  26:9
spots
  86:18
spraying
  76:5
staff
  6:10 7:9
  15:5,7,21,23
  16:8 17:5
  20:8,14
  24:23 25:2
  40:9 42:3,5,
  11 44:1,19,
  22,24 45:12,
  13,23 46:1,
  10,12 47:1,
  9,15,22
  48:11 49:1,6
  50:19 55:23
  56:2,7,8,10
  62:18,22,24
  63:5,10,22
  64:8,16,20
  65:3,12
  66:20 67:7,
  8,14,21
  68:1,10,12,
  24 91:24
  95:13,17
  97:16 100:6
  107:1,20,22,
  25 108:4,13
stand
  19:15 25:11
start
  12:3,15
  44:16 80:18
started
  31:1 35:19
  95:20
state
  5:7 6:19
  14:12,14

16:22 17:14
  23:8 24:9
  26:21 27:17
  29:16 30:11
  33:21 46:20
  86:11
  112:12,18
  115:17
stated
  39:18 44:18
  46:7 47:19
  93:16 94:8
  100:12
  109:24
statement
  8:20 55:15
  66:2 88:21
  111:19,25
  112:2,4
statements
  112:8
states
  47:1 64:10
  89:13,17,19,
  21
stating
  28:7 47:23
  94:14
stature
  108:9
statutory
  97:12
stay
  13:7 52:2
  76:20 81:24
  82:25 106:4
step
  20:5 21:6
Steuerwald
  6:8,16 8:25
  9:1 10:2,11,
  17 11:15
  12:1,25 13:6
  14:4,5,9,18,
  20 18:18,20
  24:21,22
  27:12,13,23
  28:2,11,23

29:13 31:17,
25 87:12,16
104:4,9
111:14,20
114:10
115:10,19
**stigma**
53:18
**stigmatizing**
57:25 108:18
**stock**
42:13
**stomach**
41:4
**stop**
52:8,15,24
68:25 76:18
105:22
**strange**
58:9
**strangely**
108:10
**stress**
46:18,25
50:16,18
51:13,18
100:9
**stresses**
51:9
**strike**
20:17 22:15
90:11
**strikes**
63:9
**striking**
22:23
**stroking**
108:11
**stronger**
21:15
**stuff**
101:17
103:20
**subject**
43:4 64:8,9
90:19

**subjected**
72:25 82:8
93:11
**submit**
91:18 104:20
**submitted**
90:8 92:1
112:14 113:1
**submitting**
42:2
**subordinates**
91:24 99:4
100:5
**substance**
35:7 59:15
**substances**
35:12
**substantive**
114:15
**successfully**
92:11
**suddenly**
109:4
**sue**
9:8 58:13
65:24 108:22
**sued**
9:5,9 30:6
57:11 72:24
**suffer**
46:18 62:8
78:16 84:6
85:23 99:12
102:2
**suffered**
46:25 51:5,
8,14 69:16
71:12,13
78:14 97:18
99:11,12
100:8,22
101:6,10
107:21
**suffering**
72:8 73:2
74:4,13 75:4
78:23 85:16,

17 86:5
93:22 102:3,
7,13 106:10
**suicidal**
66:25
**suicide**
63:8
**suing**
44:17 53:25
60:17 72:5
82:3,14
**suit**
37:21 100:13
**suits**
33:21
**sum**
71:22
**summary**
22:10 73:18
90:14,15
**supervise**
73:6 99:7
**supervised**
76:24
**supervises**
97:9
**supervising**
84:13,15
96:24
**supervision**
97:14 99:2
100:4,5
105:9
**supervisor**
62:15
**supervisory**
45:11
**supplies**
40:24
**support**
68:23
**supportive**
79:20
**supposed**
18:15 73:8
75:15 76:3
84:25 107:1

**supposedly**
36:9 40:10
110:15
**sure**
12:25 17:20
18:24 24:2,
13 27:16
35:20 36:3,
7,11 60:3,11
73:15 92:7,9
95:6 106:4
**swelling**
101:16
**sworn**
5:3
**symptoms**
51:7,17
69:16
**system**
35:16 37:13
105:1,9,18
111:13

---

**T**

**take**
11:20,22,23
19:3,16 29:5
32:25 34:14,
15 60:7
87:14 107:16
115:17
**taken**
13:9 34:13
79:10 87:18
**taking**
49:12 77:6,
12
**talk**
37:24 45:25
51:15 52:9,
13,15,25
54:9,20
57:6,8,9
65:11 68:25
72:4 103:5
115:10

Kevin Johnson
February 07, 2022

talked
  5:15  8:19
  83:14,15
talking
  20:8  32:17
  48:24  56:23
  76:19,23
  77:10  82:12
  114:19
tax
  88:22
team
  55:21  56:2,
  3,9  59:23,25
  69:4,5
teeth
  72:17  74:20
  80:19  81:12,
  17  82:21
  102:1  110:3
tell
  7:15  9:12
  12:10,12
  15:13  31:9
  52:17  54:7,
  23  67:15,17
  68:12  69:9
  72:5  83:2
  90:25  93:3
  97:20  104:16
  106:21
telling
  45:25  60:10
  69:1  110:24,
  25
tend
  51:12  115:8
terms
  14:18  85:10
  115:1
testified
  5:4  32:25
  88:25  95:16
testify
  34:17
testimony
  21:2,8,19

25:13  92:15
114:22
Texas
  89:15,23
thank
  19:18  27:13,
  18,21,23
  31:16  35:2
  65:16  87:11
  113:23
therapeutic
  56:22  57:5
thing
  61:15  81:5
  98:20
  105:12,21
  106:24  107:6
things
  22:1,4
  35:11,15
  40:24  41:3
  42:6  64:13,
  15,21  91:21
  102:2  108:19
  113:6
think
  5:23  13:5
  16:16  19:1
  21:4,9  22:23
  26:5  28:14
  34:18  38:2
  40:6  43:6,20
  51:24  54:15,
  17  58:14
  62:12,14
  67:2  71:11
  73:12  85:10,
  12  86:10,19
  87:7,8,9
  88:12  90:3,
  13,22  91:4,
  14  92:6
  102:13
  103:25
  106:16
  109:25
  113:8,10
  114:3

thinking
  85:25
third
  106:17
thousands
  93:11
threat
  64:14,25
  67:6
three
  18:21,24
  75:3,5  80:25
  81:19  82:18
  83:20  87:15
throw
  86:6
time
  9:9  10:25
  11:13  17:10
  19:6,16
  25:19  27:14
  37:6  39:9
  41:9,13,15
  58:12  59:6
  69:25  74:25
  78:12,22
  79:1,5,17
  80:14  83:22,
  23  87:13
  88:15  104:1
  106:6,12,13,
  17  107:13
  110:13  111:9
  114:15  115:7
timely
  105:3,10,19
times
  40:14,20
  41:11  42:13
  52:8,10
  54:10,21
  55:7  79:25
  83:21  100:21
  101:12,15
  107:2,15
title
  56:19  62:11
  85:3

today
  13:25  14:18
  18:12,19
  19:4,9  31:4
  32:22  34:13,
  17  37:21
  44:12  85:14
  88:3  92:16
  93:1  111:23
  112:10
  113:12,24
told
  47:12  48:12
  55:5,14
  58:12  69:6,
  15  79:14
  81:23  83:3,4
  87:1  92:25
  94:5,15,20
  105:13,24
  106:2,11
  107:19
  109:24
  110:7,21
tools
  72:23  73:7
  99:9
tooth
  43:6  74:18,
  25  75:23
  77:5,14,16,
  21  78:11,12,
  13,15,17,24
  79:15,25
  80:20,21
  82:2,24
  83:1,4,5,20,
  22  84:5,8,
  10,21,22,24
  85:1  86:11,
  16,21
  100:20,21,
  23,24  101:1,
  3,5,6,7,9,10
  106:17
  110:19
toothache
  78:14,24

totally
  11:5
towel
  76:1,4 81:5
  84:2 110:9,
  11
track
  57:2 76:21
trade
  40:15,20,22
trades
  40:17
trafficking
  63:9
training
  33:16 100:4
transcriber
  6:7
transcript
  10:6 22:12
  31:6,15,24
  112:13 114:4
transfer
  89:11 91:12
  109:21
transferred
  89:4,9,12
  109:18
transport
  107:3
traumatic
  46:18,25
  50:17 51:13,
  18
treat
  96:24
treated
  38:10 46:17,
  23 50:20
treatment
  35:8,13 38:5
  44:8 47:2,5,
  7 48:6,9,19
  50:21 54:4
  61:1,10
  62:18,20
  63:21 70:23

95:8 96:14,
15 97:2,16
99:15,16,18,
24 100:7
101:16
triaged
  74:23 77:4,
  20
trial
  16:15 32:25
  71:20 85:14
  102:19
true
  105:5
truthfully
  32:22 34:17
try
  19:2,3 31:4
  32:5 52:8,
  15,25 54:20
  68:25 77:6
  81:23 93:20
trying
  20:17 48:4
  79:11 93:25
  110:5
turpitude
  58:2 88:24
twice
  61:16 83:21
twisting
  64:21
two
  14:11 18:20,
  24 55:13
  90:2 107:12,
  13
Tylenol
  41:3
type
  83:1,8 86:5
types
  64:23 82:20
  86:4 92:10
typically
  40:13 41:7
  42:6 89:18

103:18 107:7
114:11
typing
  31:3 32:13

---

**U**

ultimately
  68:3
uncooperative
  80:1
understand
  6:20 9:10
  14:15 20:16
  26:1 30:3
  31:18,22
  32:8,20
  37:10 44:6,
  12 48:4
  67:16 87:25
  110:5,6
understanding
  15:10 25:4
  45:9 49:9
  56:18 62:10
  79:6 85:2
understands
  31:5 61:23
understood
  32:10 45:11,
  16 56:21
  69:23
unit
  39:12,15,17
  40:12 42:11
  62:15 70:21
  104:11,12,14
  107:23
units
  39:13
unreasonable
  86:10 90:25
unspecified
  65:5
ups
  56:25

---

**V**

vague
  67:3,13
Valley
  36:23 70:17,
  20 89:5
  109:8,10,13
value
  71:11
various
  33:12 34:1,2
  35:15
vary
  41:9
vegetables
  40:15
verbal
  63:22
versus
  13:14
viable
  96:8
vicinity
  102:22
video
  15:1
viewing
  11:18
violated
  65:13 113:15
violation
  55:17,20,24
  91:17
violence
  63:8
Virginia
  7:14 9:13
  13:18 14:23
  15:4 33:9
  34:9 36:19
  89:16,23
virtual
  24:24
visit
  43:19 52:8

73:22 74:18
75:20 77:17
78:6
**visits**
43:22 73:18
76:21 105:19
107:5
**visual**
52:12 54:20
**voice**
31:9,12
**voluntarily**
34:4

---

**W**

**Wabash**
36:23 70:17,
20 89:5
90:17 91:20
109:8,10,13,
14
**wait**
79:18 106:12
**waiting**
87:2
**waive**
45:1 46:13
**waiving**
46:8
**walk**
54:14
**walked**
52:24 108:14
**want**
7:24 8:21
10:9 13:2
19:3 23:24
25:23 37:1
45:19 50:13
55:2 62:2
64:25 65:9
66:18,25
67:8 73:5
76:20,22
78:2 80:2,24
84:20 87:4

98:11 105:23
106:19 110:6
113:20
**wanted**
43:3 45:4,
21,22,25
47:20 48:14
50:15 55:3,
15,17 67:18
112:9 113:13
114:4
**warden**
67:23 81:14
92:2 93:17
94:21 97:21
98:21 99:14,
21,23 100:1,
10 105:1
111:2
**warden's**
105:8
**water**
75:12,15,25
76:5,13,15
78:8,9,21
81:7,10
82:1,17 83:4
84:1,2,18,24
94:13 110:1,
11,12,17,21
111:5,12,13
**way**
31:6 56:13
81:23 92:11
94:19 95:25
98:3,5 103:5
109:4
**ways**
95:22 98:9
**weeks**
40:12 72:8
75:3,5 78:22
79:1 80:25
81:19 85:20
115:4
**weigh**
28:12

**went**
41:15 71:19
76:1 81:19
85:13,19
98:13 110:9
**Wexford**
14:6,16 30:7
45:7 49:11,
12,16,20
50:2,6,11
54:24 64:8
65:24,25
66:18,22
81:14 82:3,
5,14,19,24
83:6,10 85:6
93:17 94:21
111:1
**Wexford's**
49:22 66:4
**wheelchair**
41:20
**Whoever's**
57:15
**wide**
16:11 44:11
96:5 103:20
**wise**
102:5
**withdrawal**
59:16
**withheld**
115:3
**withhold**
25:17
**witness**
5:6,15 6:12,
20 8:1,21,22
9:17 10:12,
20 11:23
12:6,17
13:16,20,23
14:1 15:15
16:3,5 17:23
20:4 21:11,
23 22:17
23:8,22
24:14 26:2,

15 27:10
28:18 31:22
55:9 112:4,
11,18
113:13,17,22
114:2,5,25
115:24
**witnesses**
102:20
**woke**
41:15
**word**
31:3
**work**
73:3 76:14
102:8
**worked**
33:13 84:22
103:15
**working**
54:16
**works**
104:19
**worn**
73:25
**worst**
85:23
**worth**
71:2
**wound**
100:20
**write**
39:11 59:19
71:24
**writing**
40:24 41:9
54:5 55:9,14
60:20,24
61:16,25
79:12 106:7
111:11
**written**
53:13 103:6,
22 105:6
109:2,3,19
**wrong**
83:19 92:15

**wrote**
 55:14 76:11,
 13 77:3
 79:14 80:4
 96:1 103:8
 106:9,14

---

**X**

---

**x-ray**
 74:9

---

**Y**

---

**ya'll**
 104:24
**yeah**
 19:5 32:6
 34:15 37:12
 38:15 39:7
 60:6 69:8
 74:2,4,5,14
 77:24 85:13
 95:3 101:9,
 17,21,22
 102:6 103:9
 104:14 106:1
 109:17
**year**
 109:15,16
**years**
 33:7 64:19
 82:19
**yesing**
 110:23

---

**Z**

---

**Zatecky**
 87:24 92:2
 97:20 98:21
 99:14,21,23
 100:1,11
 105:16
**zinc**
 73:24

Exhibit A  32