UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KEVIN JOHNSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  No. 1:21-cv-00201-JMS-MG |
| | ) |
| MARTIN PURDUE, et al., | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Kevin Johnson filed this lawsuit when he was confined at Wabash Valley Correctional Facility alleging that he has received inadequate mental health and dental care. The defendants have moved for summary judgment and Mr. Johnson has not responded.[1] For the reasons below, the motions are **GRANTED**.

**I.
Standard of Review**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving

---

[1] On January 19, 2023, based on Mr. Johnson's filing stating that he had not received the defendants' summary judgment motions, the Court directed the defendants to re-file and re-serve those motions. Dkt. 121. The Court further encouraged Mr. Johnson to file a motion if he needed to request the Court to take any action in this case. *Id.* The defendants did re-file their summary judgment motions, and Mr. Johnson did not respond or otherwise submit anything to the Court indicating any difficulty in receiving his mail or responding to the motions.

party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

In this case, the defendants have met that burden through their unopposed motions for summary judgment. Mr. Johnson failed to respond to the summary judgment motions. Accordingly, facts alleged in the motions are "admitted without controversy" so long as support for them exists in the record. *See* S.D. Ind. L.R. 56-1(b) (party opposing judgment must file response brief and identify disputed facts). "Even where a non-movant fails to respond to a motion

2

for summary judgment, the movant still has to show that summary judgment is proper given the undisputed facts." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (cleaned up).

## II.
## Factual Background

### A. The Parties

At all relevant times, Mr. Johnson was incarcerated by the Indiana Department of Correction ("IDOC") at Pendleton Correctional Facility ("PCF"). Dkt. 1 at 1. He was housed in a restricted housing unit based on conduct reports, among other things. Dkt. 124-4 ¶ 6.

Commissioner Carter is the Commissioner of the IDOC. Dkt. 126-1 at 93:3-5. Warden Zatecky was the Warden at PCF. *Id.* at 93:3-5. The IDOC contracts with medical providers to administer medical care to inmates within IDOC facilities, but neither Commissioner Carter nor Warden Zatecky decide the course of treatment. Dkt. 126-2 ¶¶ 5-6; dkt. 126-3 ¶¶ 5, 6, 9. At the time of Mr. Johnson's allegations, the IDOC contracted with defendant Wexford of Indiana, LLC, to provide medical and dental care.

Gregg Noll is a dentist who worked at PCF during the relevant time. Dkt. 124-1 ¶¶ 1-2. During this time, he was the only onsite dental provider for around 1800 inmates. *Id.* ¶ 7. He provided overall supervision to the dental department and preventative and restorative treatment to inmates. *Id*. But he was not responsible for scheduling appointments because he does not directly receive Health Care Request Forms. *Id.* ¶ 14. Instead, medical administrative staff received Health Care Request Forms and facilitated responses and scheduled appointment when necessary. *Id*.

Dental Assistant Denise Ingalls is a certified dental radiographer. Dkt. 124-1 ¶ 6. She works under Dr. Noll's supervision and is responsible for assisting during examination and treatment. *Id*.

Ciemone Rose worked as a psychologist at PCF during the relevant time. Dkt. 124-4 ¶ 1-2. Patricia Northcutt and Martin Perdue were mental health staff at PCF. *Id.* ¶ 7.

### B. Mr. Johnson's Dental Care

Dr. Noll saw Mr. Johnson on March 28, 2019, after he submitted a Health Care Request Form complaining of tooth pain. Dkt. 124-2 at 2. By the time of the visit, the pain had stopped. *Id.* Dr. Noll identified no cavities or periodontal problems and did not recommend treatment. *Id.*

Dr. Noll saw Mr. Johnson again about 6 weeks later after he complained that a crown had come off of tooth #9. *Id.* at 2-3. Dr. Noll noted that Mr. Johnson had worn through the crown by grinding his teeth. *Id.* Dr. Noll filled a cavity on that tooth and replaced the crown. *Id.*

On December 23, 2019, Dr. Noll saw Mr. Johnson after he submitted a Health Care Request stating that he had lost a filling in tooth #27 and was experiencing cold sensitivity. *Id.* at 3. The are many reasons why a filling may break or fall out, including seal failure, severe tooth decay, or pressure from chewing or grinding. Dkt. 124-1 ¶ 18. Dr. Noll removed decay and restored the tooth with resin. Dkt. 124-2 at 3.

Dr. Noll saw Mr. Johnson again regarding the filling in tooth #27 on February 20, 2020. Dkt. 124-2 at 4. Decay was removed and resin was restored. *Id.* Dental Assistant Ingalls placed a new filling, taking care to try to keep it as dry as possible "given the old moist airlines." *Id.*

The dental air compressor machine compresses, cleans, dries, and stores air to power handpieces to clean and treat patient's teeth. Dkt. 124-1 ¶ 27. As part of Dr. Noll's practice, he regularly uses the airlines to keep preparation of fillings dry. *Id.* ¶ 28. It is Dr. Noll's understanding that Wexford works with the IDOC to maintain dental equipment, including the air lines. *Id.* ¶ 26. Dr. Noll ensured to the best of his ability that the moisture was removed from the dental air lines in filling Mr. Johnson's cavities. *Id.* ¶ 30.

Commissioner Carter is not aware of issues with dental equipment, nor is that something he would normally be aware of. Dkt. 126-2 ¶ 10. Warden Zatecky's knowledge of allegedly

4

deficient dental equipment is limited to his response to a grievance appeal filed by Mr. Johnson. Dkt. 126-3 ¶ 10; dkt. 126-4. The response to the grievance states that medical was contacted, that medical staff monitored and treated Mr. Johnson, and that the resin did not dry properly but was replaced. Dkt. 126-4. Warden Zatecky is not a medical professional and does not have the ability to order specific treatment. Dkt. 126-3 ¶ 9.

### C. Mr. Johnson's Mental Health Care

Mr. Johnson was evaluated at Reception Diagnostic Center ("RDC") on January 15, 2019, and was found to be free of mental illness. Dkt. 124-3 at 3-4 (Medical Records). He was transferred to PCF on January 22, and Dr. Rose met with him at his cell to discuss his claims that he lied during his intake at RDC when he stated he did not have any mental health concerns because he was not able to have a private meeting with Mental Health Services. Dkt. 124-4 at ¶ 16; dkt. 124-3 at 1. Mr. Johnson reported to Dr. Rose that he has a history of mental health concerns including PTSD. Dkt. 124-3 at 1. Dr. Rose then reviewed Mr. Johnson's chart and medical records, which showed that he did refuse to cooperate with mental health intake at the RDC because of the presence of custody staff, and that no mental health concerns were noted. *Id.* His current complaint was that he was asked to sign a "Consent for Treatment and Limits of Confidentiality Form" to receive mental health services. *Id.*

Dr. Rose explained the purpose of the consent form to Mr. Johnson. Dkt. 124-4 ¶ 17. Specifically, the IDOC Health Care Services Directive ("HSCD") requires mental health providers to obtain informed consent by completing the consent form before undertaking any therapeutic intervention other than in an emergency. Dkt. 124-5 at 10. The form states:

> Mental Health Services Staff provide counseling and psychological evaluations for offenders in this facility. The mental health staff wants you to feel comfortable in discussing your personal concerns with them, but you need to be aware of special situations in which confidentiality will be limited.

5

> Security and safety are very important in jails and prisons. To ensure the safety of everyone, mental health staff must report situations which could be harmful to yourself or others, or a threat to the orderly operation of the facility.

Dkt. 124-6 (Mental Health Services Consent for Treatment). The HCSD further requires that mental health providers inform inmates, in writing, of the limits of confidentiality at the initiation of mental health treatment. Dkt. 124-5 at 3. The HSDC provides: "[W]ithin correctional settings, privacy requirements and security requirements may conflict when health care activities are being performed. It is necessary to provide respect and privacy when that can be accomplished without placing the provider or others at risk. **Security remains paramount**." Dkt. 124-7 at 1 (HCSD-Privacy of Care) (emphasis in original). In other words, the HCSD required mental health providers to use the consent form when treating IDOC inmates. Mr. Johnson responded that he did not want to waive his confidentiality rights and felt that it was a violation of his HIPAA rights to require the consent form. Dkt. 124-4 ¶ 17.

Additionally, regardless of housing assignment, the HCSD provides that inmates must have access to mental health services necessary to screen, evaluate, and treat mental illness and that mental health services must be provided in a manner which provides confidentiality and physical protection for the staff. Dkt. 124-5 at 3. During their initial meeting, Dr. Rose therefore explained to Mr. Johnson that he would continue to be monitored by mental health staff in monthly cell-side rounds and he could submit a Health Care Request and sign a consent form to receive mental health services. Dkt. 124-4 ¶ 17.

While Mr. Johnson was in restricted housing during the time at issue, he received regular cell-front visits from mental health staff, including Ms. Northcutt and Mr. Perdue. *Id.* ¶¶ 18-20. During his time at PCF, Mr. Johnson was not diagnosed with a "serious mental illness." *Id.* ¶ 23, 26.

## III.
## Discussion

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

For the purposes of this motion, the Court assumes that Mr. Johnson's dental issues and the need for mental health treatment constitute serious medical needs. To survive summary judgment then, Mr. Johnson must show that the defendants acted with deliberate indifference—that is, that he or she consciously disregarded a serious risk to his health. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Mr. Johnson "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Id*. "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted). The Seventh Circuit has "held that a jury can infer deliberate indifference when a treatment decision is 'so far afield of accepted professional standards as to

7

raise the inference that it was not actually based on a medical judgment.'" *Id.* (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). But where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently. *Id.* at 241-42.

### A. Dental Care

First, Mr. Johnson claims that defendants Dr. Noll and Ms. Ingalls failed to provide necessary care for his dental pain. He further alleges that the prison's dental equipment was not working and that defendants Carter, Zatecky, and Wexford were aware of the faulty equipment and did not solve the problem.

### 1. Dr. Noll and Dental Assistant Ingalls

Dr. Noll saw Mr. Johnson several times during his time at PCF. The first time, on March 28, 2019, Dr. Noll saw him after he had complained of pain. But the pain had since stopped and Dr. Noll did not identify any dental problems. Dkt. 124-2 at 2. Dr. Noll saw Mr. Johnson again about six weeks later, after his crown came off. *Id.* Dr. Noll filled a cavity and replaced the crown. *Id.* Dr. Noll next saw Mr. Johnson later that year after he submitted a Health Care Request stating that he had lost a filling and was experiencing cold sensitivity. Dr. Noll restored the tooth. *Id.* About two months later, Dr. Noll saw Mr. Johnson again regarding that filling. *Id.* Ms. Ingalls placed a new filling, taking care to try to keep it as dry as possible "given the old moist airlines." *Id.*

In other words, every time Dr. Noll or Ms. Ingalls saw Mr. Johnson for his dental concerns, they evaluated and treated him according to their evaluation. By failing to respond to the motion for summary judgment, Mr. Johnson has not pointed to evidence to dispute these facts. He has failed to raise an inference that either made any treatment decision that was "'so far afield of

8

accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Dean*, 14 F.4th at 241. While there is evidence that Dr. Noll restored a filling in late 2019, and that filling failed just a short time later, that is not enough to show that Dr. Noll acted well outside professional standards. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994) ("deliberate indifference entails something more than mere negligence"). In addition, while it was noted that care had to be taken to keep the tooth as dry as possible given the "old moist airlines," there is no evidence that Dr. Noll or Ms. Ingalls were responsible for those airlines, acted outside professional standards, or failed to attempt to keep the airlines dry when they restored Mr. Johnson's tooth. Dr. Noll and Ms. Ingalls are therefore entitled to summary judgment on Mr. Johnson's claim.

**2. Wexford**

Private corporations acting under color of state law—including those that contract with the state to provide essential services to prisoners—are treated as municipalities for purposes of Section 1983 and can be sued when their actions violate the Constitution. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). To succeed on a claim against a municipality, the plaintiff must identify an action taken by the municipality and allege a causal link between the municipality's action and the deprivation of federal rights. *Dean,* 18 F.4th at 235. "A municipality 'acts' through its written policies, widespread practices or customs, and the acts of a final decisionmaker." *Levy v. Marion Co. Sheriff*, 940 F.3d 1002, 1010 (7th Cir. 2019).

Liability may attach in two circumstances: First, "if an express municipal policy or affirmative municipal action is itself unconstitutional, . . . a plaintiff has a straightforward path to holding the municipality accountable . . . [and] a single instance of a constitutional violation caused by the policy suffices to establish municipal liability." *Taylor v. Hughes*, 26 F. 4th 419, 435 (7th

9

Cir. 2022) (cleaned up). Second, a plaintiff may show "gaps in express policies or . . . widespread practices that are not tethered to a particular written policy—situations in which a municipality has knowingly acquiesced in an unconstitutional result of what its express policies have left unsaid." *Id*. (cleaned up). Under this theory, a plaintiff "must typically point to evidence of a prior pattern of similar constitutional violations" to "ensure that there is a true municipal policy at issue, not a random event." *Id.* (cleaned up). In other words:

> a plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision. This requires more than a showing of one or two missteps. *Id.* [The Court looks] to see if a trier of fact could find systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system. And even if there are such deficiencies, a *Monell* claim can prevail only if a policy-making official knows about them and fails to correct them.

*Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (cleaned up).

Here, Wexford has presented evidence that it works with the IDOC to maintain dental equipment, dkt. 124-1 ¶ 26, and Mr. Johnson has failed to dispute this evidence. Further, because he did not respond to the motion for summary judgment, Mr. Johnson has pointed to no evidence of an express policy on Wexford's part of failing to repair the lines. In addition, he has presented no evidence to support a finding of a practice or custom of failing to maintain the equipment. There is no evidence that the presence of moisture in the dental clinic's airlines amounted to more than "one or two missteps" or that Wexford maintained such a "pervasive" practice of failure to maintain its equipment that would amount to a policy decision. *See Dixon*, 819 F.3d at 348. Accordingly, Wexford is entitled to summary judgment on Mr. Johnson's claims.

### 3. Commissioner Carter and Warden Zatecky

#### a. Commissioner Carter

Mr. Johnson sues Commissioner Carter based on his allegations that the dental equipment was faulty. But it is undisputed that Commissioner Carter had no knowledge or responsibility for the dental equipment. Dkt. 126-2 ¶ 10. He therefore was not personally responsible for any alleged faulty equipment and cannot be held liable under § 1983. *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). ("Individual liability under § 1983 ... requires personal involvement in the alleged constitutional deprivation."). Mr. Carter is therefore entitled to summary judgment on Mr. Johnson's claims.

#### b. Warden Zatecky

Mr. Johnson similarly alleges that Warden Zatecky was responsible for the allegedly faulty dental equipment. It is undisputed that Warden Zatecky is not a medical professional and that his only involvement with the dental equipment was to respond to one grievance on this issue. Dkt. 126-3 ¶¶ 9, 10; dkt. 126-4. That grievance response indicated that medical staff were contacted and had been treating Mr. Johnson, that the filling did not dry properly, and that it was replaced. Dkt. 126-4 at 1.

"If a prisoner is under the care of medical experts ... a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019) (quoting *Greeno v. Daley*, 414 F.3d 645 at 656 (7th Cir. 2005)). That is what the undisputed evidence here shows – Warden Zatecky was aware of only one grievance regarding the dental equipment and was further aware that medical staff were treating Mr. Johnson. Accordingly, Warden Zatecky is entitled to summary judgment on Mr. Johnson's claims.

### B. Mental Health Care

Mr. Johnson also alleges that defendants Purdue, Rose, and Northcutt denied him necessary mental health care because of his refusal to sign a Wexford-required consent form.

It is undisputed that the HCSD requires that inmates seeking mental health care complete the Consent for Treatment and Limits of Confidentiality Form. Dkt. 124-5 at 10. This form discusses the limits of patient confidentiality in the prison setting. Dkt. 124-6. While Mr. Johnson did not want to complete this form, Dr. Rose explained to him that he could later submit a Health Care Request for mental health services and sign a Consent form, and that he would continue to be monitored by mental health staff in monthly cell-side rounds. Dkt. 124-4 ¶ 17. And he did receive regular cell-front visits from Ms. Northcutt and Mr. Perdue. *Id.* at ¶¶ 18-20. Notably, Mr. Johnson was not diagnosed with a serious mental illness during his time at PCF. *Id.* ¶¶ 23, 26.

It is undisputed that even though Mr. Johnson refused to sign a consent form for mental health treatment, he was regularly offered treatment and was not found to have a serious mental illness. By failing to respond to the motion for summary judgment, Mr. Johnson has failed to dispute these facts and therefore has not shown that any of the mental health providers disregarded his serious medical needs. Further, Mr. Johnson has also failed to point to any constitutional right to receive mental health treatment before agreeing to the consent form or that, if he signed the form, his constitutional rights would have been violated. *See Anderson v. Romero*, 72 F.3d 518, 523 (7th Cir. 1995) (not finding "any appellate holding that prisoners have a constitutional right to the confidentiality of their medical records" but noting that such an "action might conceivably constitute the infliction of cruel and unusual punishment" "if prison officials disseminated humiliating but penologically irrelevant details of a prisoner's medical history"); *cf. Carpenter v. Phillips*, 419 Fed. App'x 658, 659 (7th Cir. 2011) (HIPAA does not furnish a private right of

action). He therefore has failed to show that any of the defendants disregarded his need for mental health treatment. Accordingly, defendants Perdue, Rose, and Northcutt are entitled to summary judgment.

By failing to show that the consent form itself violated his rights or that any individual mental health provider was deliberately indifferent to Mr. Johnson's needs, Mr. Johnson has also failed to demonstrate a right to relief against Wexford. *See Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014) ("Wexford cannot be held liable for damages because there is no underlying constitutional violation.").

## IV.
## Conclusion

For the reasons discussed above, the defendants' motions for summary judgment, dkt. [122], and dkt. [126], are **GRANTED**. Final judgment consistent with this Order shall now issue.

**IT IS SO ORDERED.**

Date: 6/22/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

KEVIN JOHNSON
1007485
Va DOC Central Mail Distribution Center
3521 Woods Way
State Farm, VA 23160

All Electronically Registered Counsel